**109 PAGES**

Gregory C. Nuti (CSBN 151754)
Christopher H. Hart (CSBN 184117)
Kevin W. Coleman (CSBN 168538)
NUTI HART LLP
411 30TH Street, Suite 408
Oakland, CA 94609-3311
Telephone: 510-506-7152
Email: gnuti@nutihart.com
      chart@nutihart.com
      kcoleman@nutihart.com

Attorneys for Capitol Station 65, LLC; Capitol Station
Member, LLC; Capitol Station Holdings, LLC and
Township Nine Owners, LLC, Debtors-in-Possession

NUTI HART LLP
411 30th Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

## SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>CAPITOL STATION 65, LLC,<br>A California Limited Liability Company<br><br>        Debtor. | Case No.: 17-23627-B-11<br><br>Chapter 11<br><br>**DC No. NH-5** |
| In re:<br><br>CAPITOL STATION MEMBER, LLC<br><br>        Debtor. | Case No.: 17-23629-B-11<br><br>Chapter 11 |
| In re:<br><br>CAPITOL STATION HOLDINGS, LLC<br><br>        Debtor. | Case No.: 17-23628-B-11<br><br>Chapter 11 |
| In re:<br><br>TOWNSHIP NINE OWNERS, LLC<br><br>        Debtor. | Case No.: 17-23630-B-11<br><br>Chapter 11 |
| ☐ Affects CS 65<br>☐ Affects CS Members<br>☐ Affects CS Holdings<br>☐ Affects T9 Owners<br>✕ Affects all DEBTORS | **CAPITOL STATION 65, LLC AND AFFILIATED DEBTORS SECOND AMENDED JOINT PLAN OF REORGANIZATION**<br>**(Dated October 17, 2017)**<br><br>Date:    February 7, 2018<br>Time:   9:30 a.m.<br>Place:   501 I Street, 6th Fl., Courtroom 32<br>           Sacramento, CA 95814<br>Judge:  Hon. Christopher Jaime |

# **TABLE OF CONTENTS**

| | Page |
|---|---|
| ARTICLE I - DEFINITIONS AND RULES OF INTERPRETATION | 1 |
| 1.1　Definitions | 1 |
| 1.2　Rules of Interpretation | 9 |
| ARTICLE II - DESIGNATION OF CLASSES OF CLAIMS AND INTERESTS  AND SPECIFICATION OF STATUS AS IMPAIRED | 9 |
| 2.1　Unsecured Claims (Classes 1(a), 1(b), and 2) | 9 |
| 2.1.1　(Unsecured Non-Priority Claims) | 9 |
| 2.1.2　(Unsecured Non-Priority Claims of Designated Recipients of Grant Funds) | 9 |
| 2.1.3　(Convenience Claims – Less Than $2,500.00) | 10 |
| 2.2　Secured Claims (Classes 3, 4 and 5(a)-(c)) | 10 |
| 2.2.1　(Secured Claim of Serene Investment Management, LLC) | 10 |
| 2.2.2　(Secured Claim of COPIA) | 10 |
| 2.2.3　(Secured Claim of The Growing Company, Inc.) | 10 |
| 2.2.4　(Secured Claim of Teichert Construction) | 10 |
| 2.2.5　(Secured Claim of Studebaker Brown Elec., Inc.) | 10 |
| 2.3　Interests- (Classes 6(a)-(d)) | 10 |
| 2.3.1　(Township Nine Owner, LLC) | 10 |
| 2.3.2　(Capitol Station Holdings, LLC) | 10 |
| 2.3.3　(Capitol Station Member, LLC) | 11 |
| 2.3.4　(Capitol Station 65, LLC) | 11 |
| ARTICLE III - TREATMENT OF UNCLASSIFIED CLAIMS | 11 |
| 3.1　Administrative Claims | 11 |
| 3.1.1　Non-Ordinary Course Administrative Claims | 11 |
| 3.1.2　Ordinary Course Administrative Claims | 12 |
| 3.1.3　"Cure" Obligations Under Assumed Executory Contracts | 12 |
| 3.2　Priority Tax Claims | 12 |
| 3.3　United States Trustee Fees | 13 |
| 3.4　Professional Fees | 13 |
| ARTICLE IV - TREATMENT OF IMPAIRED CLASSES OF CLAIMS AND INTERESTS | 14 |
| 4.1　Class 1(a) – Unsecured Non-Priority Claims | 14 |
| 4.2　Class 1(b) – Designated Recipients of Grant Funds | 15 |
| 4.3　Class 2 – Convenience Class (Claims Less Than $2,500.00) | 16 |
| Each holder of an Allowed Class 2 Claim shall be paid in full on the Effective Date. | 16 |
| 4.4　Class 3 - Serene Secured Claim | 16 |
| 4.4.1　Incorporation of DIP Credit Agreement. | 16 |
| 4.5　Class 4 – COPIA Secured Claim | 16 |
| 4.5.1　Determination of Amount. | 16 |

**NUTI HART LLP**
411 30ᵗʰ Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

i

| | | |
|---|---|---|
| 4.5.2 | Treatment. | 17 |
| 4.5.3 | Retention of Lien. | 18 |
| 4.5.4 | Rights Upon Default. | 19 |
| 4.6 | Classes 5(a), 5(b), and 5(c) – Mechanics Lien Claims | 19 |
| 4.6.1 | Teichert Construction. | 19 |
| 4.6.2 | The Growing Company and Studebaker Brown Electric, Inc. | 20 |
| 4.7 | Classes 6(a), 6(b), 6(c), or 6(d) – Limited Liability Company Member Interests | 21 |

ARTICLE V - MEANS FOR IMPLEMENTATION OF THE PLAN ........... 22

| | | |
|---|---|---|
| 5.1 | Re-Vesting of Assets | 22 |
| 5.2 | Approval of the Anthem Sale Agreement | 23 |
| 5.3 | Authorization to Sell Other Parcels | 23 |
| 5.4 | Cancellation of Pre-Petition Loan Documents | 23 |
| 5.5 | Disbursing Agent | 24 |
| 5.6 | Treatment of Disputed Claims | 24 |
| 5.6.1 | Deadline for Filing Claim Objections | 24 |
| 5.6.2 | Distribution on Allowed Claims. | 24 |
| 5.6.3 | Reserves for Disputed Claims. | 24 |
| 5.6.4 | Settlement of Disputed Claims. | 24 |
| 5.7 | Addresses for Transmitting Payments | 24 |
| 5.8 | Unclaimed Distributions | 25 |
| 5.9 | Corporate Organization | 25 |
| 5.10 | Continuation of Official Committee of Unsecured Creditors | 26 |
| 5.11 | Retention Agreements with Court Appointed Professionals | 27 |

ARTICLE VI - EXECUTORY CONTRACTS AND UNEXPIRED LEASES ....... 27

| | | |
|---|---|---|
| 6.1 | Executory Contracts/Leases Assumed. | 27 |
| 6.2 | Executory Contracts/Leases Rejected. | 30 |

ARTICLE VII - CONDITIONS TO CONFIRMATION AND EFFECTIVENESS ... 31

| | | |
|---|---|---|
| 7.1 | Conditions to Confirmation. | 31 |
| 7.2 | Conditions to Effectiveness. | 31 |

ARTICLE VIII - EFFECTS OF CONFIRMATION, RE-VESTING OF TITLE, RELEASES, AND RELATED PROVISIONS ........... 32

| | | |
|---|---|---|
| 8.1 | Discharge. | 32 |
| 8.2 | Vesting of Property. | 32 |
| 8.3 | Plan Creates New Obligations. | 33 |
| 8.4 | Effect of Conversion to Chapter 7. | 33 |

ARTICLE IX - RETENTION AND ENFORCEMENT OF CLAIMS ........... 33

ARTICLE X - MODIFICATION OF PLAN ........... 33

ARTICLE XI - RETENTION OF JURISDICTION ........... 34

ARTICLE XII - MISCELLANEOUS ........... 35

| | | |
|---|---|---|
| 12.1 | Cramdown. | 35 |

NUTI HART LLP
411 30ᵗʰ Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

12.2    Severability.                                      35

12.3    Binding Effect.                                    35

12.4    Captions.                                          35

12.5    Controlling Effect.                                35

12.6    Notices.                                           35

12.7    Rights in the Event of Default                     36

12.8    Exculpation                                        36

**NUTI HART LLP**
411 30th Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

Capitol Station 65, LLC, Capitol Station Member, LLC, Capitol Station Holdings, LLC, and Township Nine Owner, LLC (collectively "Debtors") propose this Second Amended Joint Plan of Reorganization (Dated October 17, 2017) (the "Plan") for the restructuring of the Debtors' outstanding claims and interests. If confirmed, the Plan will bind all creditors provided for in the Plan, whether or not they file a proof of claim or accept the Plan, and whether or not their claims are allowed. All creditors should refer to Articles 2 - 4 of the Plan for information regarding the precise treatment of their claims. The Disclosure Statement (the "Disclosure Statement") that is circulated with the Plan provides additional information about the Debtors' history, business, assets, operations, and events leading up to this restructuring. **Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one.**

## ARTICLE I -
## DEFINITIONS AND RULES OF INTERPRETATION

**1.1** *Definitions*

Unless the context requires otherwise, the following definitions apply in this Plan:

**1.1.1** "**Administrative Claim**" means a claim for any cost or expense of administration of a kind specified in Section 503(b) of the Bankruptcy Code that is entitled to priority over general unsecured claims under Section 507(a)(2) of the Bankruptcy Code, including, without limitation, (i) any actual or necessary costs and expenses of preserving the bankruptcy estate incurred on or after the Petition Date and through and including the Effective Date of the Plan, (ii) any cure amounts that must be paid in connection with the assumption of any executory contract or unexpired lease under Section 365 of the Bankruptcy Code, (iii) fees payable to the court system or the U.S. Trustee under Section 1930 of Title 28, United States Code, and (iv) allowed compensation for fees and reimbursable expenses for legal and other services under Sections 330 and 331 of the Bankruptcy Code, or otherwise allowed by the Bankruptcy Court under Section 503 of the Bankruptcy Code (defined below as "Professional Fee Claims").

**1.1.2** "**Administrative Claim Bar Date**" means the date that is sixty (60) days after the Effective Date, which shall be the deadline for all parties to file with the Court any requests for

**NUTI HART LLP**
411 30th Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

1

NUTI HART LLP
411 30ᵗʰ Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

payment or any other means of preserving and obtaining payment of an Administrative Claim to the extent such Claim (i) arose or was incurred between May 30, 2017 and the Effective Date and (ii) has not been paid, released, or otherwise settled, excluding all requests for payment of Professional Fee claims and Ordinary Course Administrative Claims that are subject to Article 3.1.2. Any request for payment of an Administrative Claim (other than a Professional Fee claim or Ordinary Course Administrative Claim) that is not timely filed either as set forth above shall be forever barred, and holders of such Administrative Claims shall not be able to assert such Claims in any manner against the Debtors, the Estate, or the Reorganized Debtors.

    **1.1.3** "**Agent**" means TDA Investment Group, agent for Township Nine Avenue, LLC (assignee of COPIA Lending, LLC).

    **1.1.4** "**Allowed Administrative Claim**" means all or any portion of an Administrative Claim that has either been (i) allowed by a Final Order or (ii) has not been objected to within the time period established by the Plan or by an order of the Bankruptcy Court.

    **1.1.5** "**Allowed Claim**" means a claim against any of the Debtors, other than an Administrative Claim, as to which:

        a.    A proof of claim was (i) timely filed not later than the Claims Bar Date, or any other applicable claim filing deadline, or (ii) deemed filed under 11 U.S.C. §1111(a), or (iii) filed late pursuant to an Order of the Bankruptcy Court after notice and an opportunity for hearing appropriate in the circumstances; and

        b.    Such claim is not a Disputed Claim, or if a Disputed Claim, such claim has been allowed in whole or in part by a Final Order, provided that any such claim shall be an Allowed Claim only to the extent stated in any such Final Order. Unless otherwise provided in the Plan or ordered by the Bankruptcy Court, no distributions shall be made under the Plan with respect to the disputed portion of any Disputed Claim until there is a Final Order specifying the allowed amount of such claim.

    Unless expressly made part of Claim Allowed under the terms of this Plan, no attorneys' fees, default interest, late penalties or any similar charges shall be part of an Allowed Claim, secured or unsecured, until the creditor seeking to recover such fees, interest, penalties or

charges from the Estate obtains a Court Order approving such penalties and charges.  Such approval must be made through a motion for recovery of such fees, interest, penalties, or charges filed within thirty (30) days of the Effective Date and on not less than twenty-eight (28) days' notice to the Reorganized Debtor and the Official Committee of Unsecured Creditors, or any such claim for penalties and charges shall be deemed barred.

No disputed portion of any claim shall be considered as an Allowed Claim if an objection to the allowance of such claim is made by the Debtors or another party in interest and such objection to claim has not been denied by a Final Order.

**1.1.6**   "**Allowed Secured Claim**" means any Allowed Claim that is secured by a lien on assets owned by any of the Debtors, subject to the limitations set forth in 11 U.S.C. § 506(a)(1).

**1.1.7**   "**Allowed Unsecured Claim**" means any Allowed Claim that is an unsecured claim not entitled to priority under 11 U.S.C. §§ 503 or 507, including an allowed Rejection Claim, but does <u>not</u> include Allowed Secured Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, or Disputed Claims.

**1.1.8**   "**Anthem**" means Anthem United Homes, Inc.

**1.1.9**   "**Anthem Sale Agreement**" means that certain Purchase and Sale Agreement and Joint Escrow Instructions between Capitol Station 65, LLC and Anthem dated for reference purposes July 25, 2017, a copy of which is appended hereto as **Appendix 1**.

**1.1.10**  "**Avoidance Actions**" means any rights, claims or causes of action (and any litigation thereon) which a trustee or Debtors in possession is authorized to assert under or based upon the provisions of Bankruptcy Code §§ 542 through 551 and 553.

**1.1.11**  "**Bankruptcy Code**" or "**Code**" means Title 11 of the United States Code, as it was in effect on the date of filing of the Plan, as amended by any amendments applicable to this Chapter 11 Case, and also includes Sections 157, 158, 1334, 1408-1412, and 1452 of Title 28 of the United States Code.

**1.1.12**  "**Bankruptcy Court**" or "**Court**" means the United States Bankruptcy Court for the Eastern District of California, Sacramento Division, having jurisdiction over the Chapter 11

NUTI HART LLP
411 30th Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

Cases, and any other courts or panels of courts having competent jurisdiction over the Chapter 11 Cases or appeals from orders entered in the Chapter 11 Case.

**1.1.13** "**Bankruptcy Rules**" means the rules of practice and procedure in cases under Title 11 of the United State Code, as promulgated under 28 U.S.C. §2075.

**1.1.14** "**Buyer**" means a purchaser of a Parcel that is not an affiliate of the Debtors or any of the Debtors' equity holders or subsidiaries in which the terms of the sale of a Parcel are negotiated at arm's length. Without limiting the generality of the foregoing, Anthem shall be deemed a Buyer.

**1.1.15** "**Cash**" means cash and cash equivalents.

**1.1.16** "**Chapter 7**" means Chapter 7 of the Bankruptcy Code.

**1.1.17** "**Chapter 11**" means Chapter 11 of the Bankruptcy Code.

**1.1.18** "**Chapter 11 Case**" means the cases pending in the Bankruptcy Court commenced by the Debtors filing voluntary petitions under Chapter 11 of the Bankruptcy Code on May 30, 2017.

**1.1.19** "**Claim**" means a Claim against the Debtors or, if the context otherwise requires, against other persons or entities, whether or not asserted, as defined in Section 101(5) of the Bankruptcy Code.

**1.1.20** "**Claimholder**" means the holder of a Claim.

**1.1.21** "**Claims Bar Date**" means October 3, 2017, the deadline for filing proofs of claims or interests, other than Administrative Claims, by non-government creditors and interest holders against the Debtors. In the case of governmental entities, Claims Bar Date means November 26, 2017.

**1.1.22** "**Confirmation**" means the entry by the Bankruptcy Court of an order (the "Confirmation Order") confirming the Plan.

**1.1.23** "**COPIA**" means Township Nine Avenue, LLC (assignee of Copia Lending, LLC) and the Agent, or any Claimholder who asserts a Claim based upon that certain Deed of Trust originally recorded by ISIS Lending, LLC on December 24, 2008, and a lien on personal property

NUTI HART LLP
411 30ᵗʰ Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

4

NUTI HART LLP
411 30ᵗʰ Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

of the Debtors filed with the Secretary of State of the State of California on December 24, 2008, or any related agreements or amendments to any of the foregoing.

**1.1.24** "**Current Entitlements**" means all discretionary approvals and permits in effect for the Township Nine Development, including but not limited to the Tentative Map, the approved plans processed by Capitol Station 65, LLC, and any other entitlements that were previously processed applicable to the Township Nine Development.

**1.1.25** "**Debtors**" means Capitol Station 65, LLC, Capitol Station Member, LLC, Capitol Station Holdings, LLC, and Township Nine Owners, LLC, the Debtors in the Chapter 11 Case.

**1.1.26** "**Disclosure Statement**" means the Disclosure Statement approved by the Bankruptcy Court in the Chapter 11 Case on or about November 1, 2017.

**1.1.27** "**DIP Credit Agreement**" means that certain Secured Super-Priority Post-Petition Credit Agreement attached as <u>Exhibit B</u> to the Motion to Approve Post-Petition Financing, Grant Priming Lien and Related Relief [DC No. NH-3, DN 59] filed in the Chapter 11 Case.

**1.1.28** "**DIP Loan**" means the funds borrowed by the Debtors from Serene pursuant to the Bankruptcy Court's interim order dated August 31, 2017 [DC. No. NH-3, DN 96], and any subsequent orders entered by the Bankruptcy Court authorizing the Debtors to borrow funds under the DIP Credit Agreement.

**1.1.29** "**Disbursing Agent**" means the Reorganized Debtor, or such other person or entity designated by the Reorganized Debtors to make distributions to holders of Allowed Claims under this Plan.

**1.1.30** "**Disputed Claim**" means any Claim, proof of which has been filed or deemed filed against the Debtors, as to which an objection or adversary proceeding has been timely filed and has not been withdrawn or disposed of by a Final Order of the Bankruptcy Court, or any claim which is designated as a Disputed Claim in this Plan or the Debtors' Schedules filed in the Bankruptcy Case. Without limiting the generality of the foregoing, Disputed Claim shall include all claims held by Township Nine Avenue, LLC.

**1.1.31** "**Effective Date**" means the business day designated as such by the Debtors which is not later than 30 days following the entry of the Confirmation Order, unless such order is stayed

by order of a court with original or appellate jurisdiction over this Chapter 11 Case, in which event such date shall be the first business day on or after the fifteenth calendar day after such stay expires.

**1.1.32** "**Estate**" means the Estate of any of the Debtors created under Section 541 of the Bankruptcy Code by the commencement of the Chapter 11 Case.

**1.1.33** "**Excess Net Sale Proceeds**" Excess Net Sale Proceeds shall mean the product of .01 multiplied by the Net Sale Proceeds received from any sale in which the Gross Sales Price for any Parcel (or the aggregate Gross Sales Price if multiple Parcels are sold in a single transaction) equals or exceeds the Minimum Parcel Sale Price set forth in **Schedule 1.1.33,** attached hereto.

**1.1.34** "**Fee Credits**" means all development building permit fee credits granted by Sacramento County, the City of Sacramento and/or any governmental entity relating to Parcels in the Township Nine Development.

**1.1.35** "**Final Order**" means "Final Order" means an order of the Bankruptcy Court (i) for which the time to appeal has expired and no appeal was filed, or (ii) if a timely appeal was filed, (A) the order has not been stayed and the appeal is subject to statutory or equitable mootness, or (B) the appeal has been dismissed or denied and the time for further appeal has expired or no right of further appeal exists.

**1.1.36** "**General Unsecured Creditors Fund**" means a segregated account out of which distributions to Allowed Class 1 Claim Holders will be made, funded as provided for in section 4.1.

**1.1.37** "**Grant Funds**" means any funds made available to the Debtors by a public entity to develop the Township Nine Development, including but not limited to the California Department of Housing and Community Development, the City or County of Sacramento, or the Sacramento Municipal Utility District.

**1.1.38** "**Gross Sales Price**" means the total consideration paid to the Debtors by a buyer to purchase a Parcel and all rights and interests of the Debtors (including Fee Credits) related to the purchased Parcel.

**1.1.39** "**Insider**" means any person or entity meeting the definition of 11 U.S.C. § 101(31) with respect to the Debtor.

**NUTI HART LLP**
411 30ᵗʰ Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

**1.1.40** "**Interest**" means the limited liability company member interests in each of the Debtors.

**1.1.41** "**Mechanics Lien Claimant Fund**" means a segregated account out of which distributions to holders of Allowed Claims in Classes 5(a), 5(b) (if applicable) and 5(c) will be made, funded by (a) deposits of all Excess Net Sale Proceeds and (b) such other amounts as provided for in section 4.6.2.

**1.1.42** "Minimum Parcel Sale Price" means the prices listed in the Minimum Sale Price (land and fee credits) column for each Parcel set forth in **Schedule 1.1.33.**

**1.1.43** "**Net Sale Proceeds**" means the Gross Sales Price minus (a) any applicable costs of sale (including any brokers or other real estate commission), and payments to Serene under the terms of the DIP Credit Agreement.

**1.1.44** "**Ordinary Course Administrative Claim**" means an Administrative Claim subject to the terms of Article 3.1.2.

**1.1.45** "**Parcel**" means a parcel of land identified on the Tentative Map (or such final map(s) as may subsequently be processed and recorded for the Township Nine Development that defines parcels in substantially the same manner as the Tentative Map), together with all rights associated with such land, including any Fee Credits.

**1.1.46** "**Parcel Release Price**" shall mean the product of .75 multiplied by the Net Sale Proceeds for a Parcel.

**1.1.47** "**Petition Date**" means May 30, 2017, the date on which the Debtors filed their voluntary petitions commencing the Chapter 11 Case.

**1.1.48** "**Plan**" means this Capitol Station 65, LLC and Affiliated Debtors First Amended Joint Chapter 11 Plan of Reorganization Dated September 12, 2017, and filed by the Debtors with the Bankruptcy Court, including any modification(s) or amendment(s) thereto.

**1.1.49** "**Priority Claim**" means any Allowed Claim entitled to priority pursuant to Section 507(a) of the Bankruptcy Code, but not including Administrative Claims.

**1.1.50** "**Priority Tax Claim**" means any Allowed Unsecured Claim entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

**NUTI HART LLP**
411 30ᵗʰ Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

**1.1.51** "**Professional Fee Claim**" means the Claim of any professional retained under Sections 327 or 1102 of the Bankruptcy Code seeking compensation and expense reimbursement from the assets of the Debtors' Estate or Reorganized Debtors under Section 330(a) of the Bankruptcy Code.

**1.1.52** "**Reorganized Debtors**" means Capitol Station 65, LLC, Capitol Station Member, LLC, Capitol Station Holdings, LLC, and Township Nine Owner, LLC on and after the Effective Date.

**1.1.53** "**Rejection Claim**" means an allowed unsecured claim arising from Debtors' rejection of an unexpired lease or executory contract pursuant to the Plan or pursuant to a prior or subsequent order of the Bankruptcy Court.

**1.1.54** "**Secured Claim**" means any Claim secured by property of the Debtors.

**1.1.55** "**Serene**" means T9 SIM Investors, LLC, assignee of Serene Investment Management, LLC.

**1.1.56** "**Tentative Map**" means the approved Tentative Map Subdivision Modification for the Township Nine Development dated March 3, 2015 attached hereto as **<u>Appendix 2</u>**.

**1.1.57** "**Township Nine Development**" means the parcels of land identified on the Tentative Map including all common area driveways and park paseos appurtenant thereto ("Land"), together with: (i) all improvements, equipment, fixtures and any and all other articles of personal property attached or affixed to the Land, (ii) all assignable intangible personal property to the extent owned by Capitol Station 65, LLC and arising directly out of or in connection with its ownership of the Land and pertaining only to the Land, (iii) all Fee Credits, (iv) any and all remaining grant money pertaining to the Land, and (v) the Current Entitlements.

**1.1.58** "**Unclaimed Property**" means any distribution that cannot be delivered to, or is not accepted by, the holder of an Allowed Claim, and shall include, without limitation, checks (and the funds represented thereby) that are returned as undeliverable without proper forwarding address, are not cashed, or are not delivered because of the absence of a proper address to which to deliver the distribution.

**NUTI HART LLP**
411 30th Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

**1.1.59** "**Unclassified Claims**" means a Claim of a kind specified in Sections 507(a)(2), 507(a)(3), or 507(a)(8) of the Bankruptcy Code.

**1.1.60** "**Unsecured Claims**" shall mean all unsecured claims against the Debtors, and where the context of a provision of this Plan requires, may include a Tax Claim, and an Administrative Expense Claim.

**1.1.61** "**U.S. Trustee**" means the Office of the United States Trustee for Region 17.

**1.2** *Rules of Interpretation*

All capitalized terms not otherwise defined herein have the meanings ascribed to them in this Article 1 of the Plan. A term used in the Plan that is not defined in the Plan shall have the meaning assigned to such term in the Bankruptcy Code, the Bankruptcy Rules, or the Uniform Commercial Code, if defined therein, unless the context of the Plan clearly requires otherwise.

In computing any period of time prescribed or allowed by the Plan, the provisions of Rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

**ARTICLE II -**
**DESIGNATION OF CLASSES OF CLAIMS AND INTERESTS**
**AND SPECIFICATION OF STATUS AS IMPAIRED**

The Claims against Debtors and the equity interests in Debtors held as of the Petition Date are designated and classified as follows in this Article 2. Only claims in a class that is designated as impaired are entitled to vote to accept or reject the Plan.

**2.1** *Unsecured Claims (Classes 1(a), 1(b), and 2)*

**2.1.1** **(Unsecured Non-Priority Claims)**

Class 1(a) consists of all Allowed Unsecured Claims not entitled to priority under a provision of section 507 of the Bankruptcy Code in which a Claimholder provided goods and/or services to the Debtors, except to the extent that the Claimholder holds a claim in Class 1(b). Class 1(a) is impaired.

**2.1.2** **(Unsecured Non-Priority Claims of Designated Recipients of Grant Funds)**

Class 1(b) consists of all Allowed Unsecured Claims not entitled to priority under a provision of section 507 of the Bankruptcy Code in which a Claimholder provided goods

NUTI HART LLP
411 30ᵗʰ Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

and/or services to the Debtors and that Claimholder is a designated recipient of Grant Funds referred to in Article 4.2.  Class 1(b) is impaired.

### 2.1.3  (Convenience Claims – Less Than $2,500.00)

Class 2 consists of Allowed Unsecured Claims which are in an amount less than $2,500.00, or any other Allowed Unsecured Claim that elects to be treated as a Class 2 Claim Holder.  Class 2 is unimpaired.

## 2.2  *Secured Claims (Classes 3, 4 and 5(a)-(c))*

### 2.2.1  (Secured Claim of Serene Investment Management, LLC)

Class 3 consists of the Secured Claim held by Serene.  Class 3 is unimpaired.

### 2.2.2  (Secured Claim of COPIA)

Class 4 consists of the Secured Claim asserted by COPIA.  Class 4 is impaired.

### 2.2.3  (Secured Claim of The Growing Company, Inc.)

Class 5(a) consists of the The Growing Company, Inc.  Class 5(a) is impaired.

### 2.2.4  (Secured Claim of Teichert Construction)

Class 5(b) consists of the Secured Claim asserted by Teichert Construction.  Class 5(b) is unimpaired.

### 2.2.5  (Secured Claim of Studebaker Brown Elec., Inc.)

Class 5(c) consists of the Secured Claim asserted by Studebaker Brown Elec., Inc.  Class 5(c) is impaired.

## 2.3  *Interests- (Classes 6(a)-(d))*

### 2.3.1  (Township Nine Owner, LLC)

Class 6(a) consists of the member interests in Township Nine Owner, LLC.  Class 6(a) is unimpaired.

### 2.3.2  (Capitol Station Holdings, LLC)

Class 6(b) consists of the member interests in Capitol Station Holdings, LLC.  Class 6(b) is unimpaired.

NUTI HART LLP
411 30th Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

### 2.3.3 **(Capitol Station Member, LLC)**

Class 6(c) consists of the member interests in Capitol Station Member, LLC. Class 6(c) is unimpaired.

### 2.3.4 **(Capitol Station 65, LLC)**

Class 6(d) consists of the member interests in Capitol Station 65, LLC. Class 6(d) is unimpaired.

## ARTICLE III -
## TREATMENT OF UNCLASSIFIED CLAIMS

### 3.1 *Administrative Claims*

Administrative Claims (including Professional Fee Claims), Priority Tax Claims, and obligations arising under 28 U.S.C. § 1930(a)(6) against the Debtors are not classified for purposes of voting on, or receiving distributions under, the Plan. Holders of such Claims are not entitled to vote on the Plan. All such Claims are instead treated separately in accordance with this Article 3 and the requirements set forth in Section 1129(a)(9) of the Bankruptcy Code.

#### 3.1.1 **Non-Ordinary Course Administrative Claims**

On or before ten (10) days after the Effective Date, the Debtors shall serve notice of the Administrative Claim Bar Date on all creditors. All requests for payment of an Administrative Claim (other than Professional Fee Claims and Ordinary Course Administrative Claims) shall be filed in the Bankruptcy Court on or prior to the Administrative Claims Bar Date. No Administrative Claim shall be deemed Allowed unless either: (a) the Bankruptcy Court has entered a Final Order allowing such claim, or (b) the Debtors has stipulated to the validity of such claim (except for Professional Fee Claims, which remain subject to Bankruptcy Court approval in all instances). Each Allowed Administrative Claim (except for Professional Fee Claims which shall be treated as set forth in Section 3.4 of the Plan) shall, unless the holder of such Claim shall have agreed to different treatment of such Claim, be paid in full in Cash by the Reorganized Debtors on the latest of: (a) the Effective Date; (b) such date as may be fixed by the Bankruptcy Court; (c) the tenth (l0th) Business Day after such Claim is Allowed; or (d) the date such Claim is otherwise due according to its terms.

NUTI HART LLP
411 30th Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

### 3.1.2   Ordinary Course Administrative Claims

Notwithstanding anything in Section 3.1.1 to the contrary, holders of Administrative Claims based on liabilities incurred in the ordinary course of the Debtors businesses following the Petition Date by (i) a current or former employee of the Debtors for wages, benefits, or expense reimbursement, (ii) a utility providing services to the Debtors, (iii) a carrier providing insurance coverage to the Debtors or for the benefit of the Debtors employees to the extent that the claim is for policy premiums, (iv) a seller of goods, raw materials, or inventory to the Debtors, and (v) a provider of services to the Debtors (but excluding any entity that holds a Professional Fee Claim) shall not be subject to the Administrative Claims Bar Date. Holders of an Ordinary Course Administrative Claim shall submit their invoice, billing statement or other evidence of indebtedness to the Debtors in the ordinary course of business.  In the event the Debtors and/or the Reorganized Debtors dispute the asserted Ordinary Course Administrative Claim, it may file an objection as if the claimant had filed an Administrative Claim with the Bankruptcy Court.

### 3.1.3   "Cure" Obligations Under Assumed Executory Contracts

All amounts that the Debtors owe to cure defaults as a condition for assumption of executory contracts held by a designated recipient of Grant Funds referred to in Article 4.2 shall be paid out of Grant Funds after approval by the public entity administering the Grant Funds.  In all other cases, the amounts that the Debtors owe to cure defaults as a condition for assumption of executory contracts in accordance with Article VI shall be paid in full on the Effective Date.

### 3.2   *Priority Tax Claims*

Allowed Priority Tax Claims not previously satisfied will be paid on the Effective Date out of proceeds of the DIP Loan.   In the event the Bankruptcy Court does not authorize draws on the DIP Loan for this purpose, then Allowed Priority Tax Claims shall receive deferred cash payments that shall satisfy such Allowed Priority Tax Claim in full on or before May 30, 2023, with interest on the unpaid portion of such Claim at the statutory rate determined under applicable non-bankruptcy law as of the calendar month in which this Plan is confirmed.  Each Allowed Priority Tax Claim shall be paid in quarterly installments with the first installment due

NUTI HART LLP
411 30th Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

on the latest of: (i) the first business day following the end of the first full calendar quarter following the Effective Date (January 2, April 1, July 1, October 1, as applicable), (ii) the first business day following the end of the first full calendar quarter following the date an order allowing such claim becomes a Final Order, and (iii) such other time or times as may be agreed with the holder of such claim. Each installment shall be in an amount sufficient to pay accrued interest (but not any additional penalty based upon the failure to pay such tax at when due in the absence of filing this Case) plus one-twentieth (1/20) of the principal amount of such Allowed Priority Tax Claim until such Claims are paid in full, provided however, that the balance due and all accrued interest shall be paid in full on or before May 20, 2023. However, the Reorganized Debtors shall be permitted to pre-pay without premium or penalty a pro rata amount of Allowed Priority Tax Claims. In addition, if the Reorganized Debtors make distributions to Allowed Class 1 holders, the Debtors shall pay an amount necessary to amortize the Allowed Priority Tax Claims at a rate not less favorable than Allowed Class 1 Claim holders.

**3.3**     *United States Trustee Fees*

The Reorganized Debtors shall file timely quarterly reports in the form prescribed by the U.S. Trustee; such reports shall be filed within 30 days following the end of each calendar quarter until the case has been converted, dismissed or closed by entry of a final decree. The Reorganized Debtors shall pay in cash in full when due any statutory fees imposed under section 1930(a)(6) of Title 28, United States Code. After the Effective Date, the Debtors shall pay a quarterly fee to the U.S. Trustee, for deposit into the U.S. Treasury, for each quarter (including any fraction thereof) until this chapter 11 case is converted, dismissed, or closed by entry of a final decree, pursuant to section 1930(a)(6) of Title 28, United States Code.

**3.4**     *Professional Fees*

Professionals employed under Bankruptcy Code section 327 shall file applications for compensation and expense reimbursement for all fees and costs incurred between the Petition Date and the Effective Date. Professionals who have had their compensation agreements approved by the Bankruptcy Court under Bankruptcy Code section 328 shall be required to file applications for compensation only to the extent that: (a) such professional seeks reimbursement

NUTI HART LLP
411 30th Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

for costs incurred between the Petition Date and the Effective Date, or (b) such professional is entitled under the terms of the retention agreements approved by the Court to payment of a fee prior to the Plan Effective Date. The Reorganized Debtors shall pay the amount awarded by the Bankruptcy Court pursuant to Section 330 of the Bankruptcy Code on account of a Professional Fee Claim promptly after the order approving such payment becomes a Final Order, unless the Reorganized Debtors and the applicable professional agree otherwise.

**ARTICLE IV -**
**TREATMENT OF IMPAIRED CLASSES OF CLAIMS AND INTERESTS**

The classified claims and interests designated in this Article of the Plan will receive the following treatment:

**4.1**     *Class 1(a) – Unsecured Non-Priority Claims*

Allowed Class 1 Claim Holders shall be entitled to pro-rata distributions of all funds deposited into the General Unsecured Claim Fund until such claims are paid in full. From and after the Effective Date, the principal amount of each Allowed Claim within Class 1(a) shall accrue simple interest at the rate of six and one-half (6.5%) percent. Distributions to Allowed Class 1(a) Claim Holders shall be applied first to accrued interest, and then principal. Distributions from the General Unsecured Claim Fund may be made at any time at the discretion of the Disbursing Agent, provided however, that the Disbursing Agent shall make a distribution to Allowed Class 1(a) Claim Holders whenever the General Unsecured Claim Fund holds sufficient funds to permit a pro-rata distribution of twenty-five (25%) percent to all Class 1(a) Claims.

Within ten (10) days after the Effective Date, the Debtors shall file a motion seeking authority to draw on the DIP Loan the amount necessary to satisfy Class 1(a) Claim Holders in full. The motion seeking authorization to use proceeds of the DIP Loan for this purpose shall be set on regular notice and shall be served upon COPIA and the Committee and shall be earnestly and timely prosecuted by the Debtors. Any funds that the Bankruptcy Court authorizes the Debtors to borrow in order to pay Allowed Class 1(a) Claim Holders shall be deposited into the General Unsecured Claim Fund and distributed in accordance with this Plan.

**NUTI HART LLP**
411 30ᵗʰ Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

In the event the motion seeking authorization to borrow is denied, the Debtors shall deposit into the General Unsecured Claim Fund: (a) five (5%) percent of Net Sales Proceeds realized upon the closing of the first sale to Anthem, and thereafter, ten (10%) percent of the Net Sales Proceeds realized from all subsequent sales of a Parcel(s) to a Buyer, and (b) any other funds it receives that are not subject to the lien and security interest asserted by COPIA (with the exception of Grant Funds paid to holders of Class 1(b) Claims pursuant to Article 4.2), until Allowed Class 1(a) Claims are paid in full, with interest.

To the extent not previously paid, all Allowed Class 1(a) Claim Holders shall be paid in full, with interest on or before the last calendar day of the thirty-sixth (36) month after the Plan Effective Date.

**4.2**    *Class 1(b) – Designated Recipients of Grant Funds*

To the extent not previously paid, promptly after the Effective Date, the Debtors shall make an application to the City of Sacramento requesting release of the Grant Funds that have been earmarked by the California Department of Housing and Community Development and City of Sacramento (as applicable) to pay the following Claimholders:

|                                      | Grant Amount (estimated) |
|--------------------------------------|--------------------------|
| Capitol Utility Specialists, Inc.    | $    2,296.75            |
| DCM Group                            | $    4,842.45            |
| Geocon Consultants                   | $    1,287.50            |
| Jacobs Engineering                   | $    4,825.00            |
| Lund Construction Co.                | $  299,556.65            |
| NV5 Inc.                             | $    2,640.00            |
| Project Management App.              | $   20,195.46            |
| State Water Resources Control        | $    1,338.00            |
| Teichert Construction                | $   80,985.22            |

The amount paid to Allowed Class 1(b) Claim holders shall be determined by the public entity approving the grant request, and such amount may differ from the amount set forth above.

After the Effective Date, the Debtors shall submit additional applications for the release of Grant Funds at the times they become eligible to do so under the terms of the grant agreements and applicable law.  To the extent that the public entity approves payment of Grant Funds to any holder of an Allowed Class 1(a) Claim that is not listed above, such holder will be deemed to hold a Class 1(b) Claim and be paid the amount approved for payment out of the Grant Funds.

From and after the Effective Date, the principal amount of each Allowed Claim within Class 1(b) shall accrue simple interest at the rate of six and one-half (6.5%) percent.  To the extent any claim identified in this Article 4.2 is not paid in full out of the Grant Funds, the balance of any remaining Claim shall be paid as provided for in this Plan.

**4.3**    *Class 2 – Convenience Class (Claims Less Than $2,500.00)*

Each holder of an Allowed Class 2 Claim shall be paid in full on the Effective Date**.**  Any creditor from another class may elect to be treated as a Class 2 Claim holder, but such electing claimant will waive any amount of their claim in excess of $2,500.00.

**4.4**    *Class 3 - Serene Secured Claim*

    **4.4.1    Incorporation of DIP Credit Agreement.**

All terms and conditions of the DIP Credit Agreement are hereby incorporated into and made a part of this Plan.  The Class 3 Claim Holder shall retain all rights and lien priority granted in the Bankruptcy Court's order approving the DIP Loan, and the Class 3 Claim Holder shall be paid in accordance with the terms of the DIP Credit Agreement.

**4.5**    *Class 4 – COPIA Secured Claim*

    **4.5.1    Determination of Amount.**

The Class 4 Claim shall be deemed fully secured.  The Debtors and the Official Committee of Unsecured Creditors shall have until sixty (60) days after the Effective Date to object to the allowable amount of the Class 4 Claim ("Objection").  The Debtors, the Official Committee of Unsecured Creditors, and COPIA shall retain all of their respective rights, claims, and defenses to the Class 4 Claim and may assert them in the Objection notwithstanding entry of the Confirmation Order.  Without limiting the generality of the foregoing, the Debtors and the

NUTI HART LLP
411 30th Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

Official Committee of Unsecured Creditors shall retain and may assert in the Objection all defenses to allowance of such claim held under non-bankruptcy law, and/or any provision of Chapter 5 of Title 11 of the United States Code.

Regardless of whether an Objection is filed, no attorneys' fees, default interest, late penalties or any similar charges shall be part of the Allowed amount of the Class 4 Claim, secured or unsecured, until COPIA obtains a Court Order approving such penalties and charges. Such approval must be made through a motion for recovery of such fees, interest, penalties, or charges filed within thirty (30) days of the Effective Date and on not less than twenty-eight (28) days' notice to the Reorganized Debtors and the Official Committee of Unsecured Creditors, or any such claim for penalties and charges shall be deemed barred.

The Allowed amount of COPIA's Class 4 Claim shall be determined by a Final Order and treated in accordance with the provisions of this Article 4.4.

### 4.5.2    Treatment.

In full satisfaction, settlement, release and discharge of, and in exchange for its Allowed Class 4 Claim, COPIA shall receive the following:

#### 4.5.2.1    Interest.

From an after the Effective Date, the Allowed Class 4 Claim shall accrue simple interest at the rate of five (5.0%) percent, or such other rate as the Court shall determine is appropriate at the Confirmation Hearing ("Post-Confirmation Interest Rate"). Interest shall begin accruing on the Allowed amount of the Class 4 Claim on the Effective Date and continue until paid in full.

#### 4.5.2.2    Class 4 Payments.

The Debtors shall pay COPIA an amount equal to the Parcel Release Price out of the Gross Sales Proceeds received from each Parcel sale. Such payments shall be applied first to accrued interest, and then to principal, until the Allowed Class 4 Claim is paid in full.

NUTI HART LLP
411 30th Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

### 4.5.2.3  Maturity Date.

Unless satisfied prior to that date, the Class 4 Claim shall be paid in full, with interest on or before the last calendar day of the thirty-sixth (36) month after the Plan Effective Date (the "Maturity Date").

### 4.5.2.4  Pre-Payment.

The Debtors shall be permitted to pre-pay the Allowed Class 4 Claim at any time without penalty or other premium.

### 4.5.2.5  Escrow of Payments Pending Allowance.

In the event an Objection is filed within the time permitted by Article 4.5.1, pending a determination of whether the Class 4 Claim should be Allowed, the Debtors shall deposit into a segregated account at Wells Fargo Bank all payments that would be due to COPIA under Article 4.5.2.2 if the Class 4 Claim were an Allowed Claim on the Effective Date, and the funds deposited into said escrow account shall not be disbursed by the Debtors except as provided in this Article 4.5.2.5.  All deposits made to the escrow account at Wells Fargo Bank shall be deemed received by COPIA such that interest will cease accruing on the amount of any principal reduction in the Class 4 Claim.

The Debtors shall provide instructions to Wells Fargo Bank not to permit any withdrawals from the escrow account except upon receipt of joint written instructions from the Class 4 Claim holder and the Debtors, or a Final Order of the Bankruptcy Court.  If a Final Order is entered Allowing the Class 4 Claim, all funds in the escrow account shall be promptly remitted to COPIA up to the Allowed Amount of the Class 4 Claim.  If the Allowed Amount of the Class 4 Claim is less than the funds on deposit in the escrow account, any excess over what is required to be paid to COPIA under this Article 4.5.2.5 may be remitted to the Debtors.

### 4.5.3  Retention of Lien.

COPIA shall retain a lien on the Debtors' assets in the same amount, and with the same priority and validity, that such lien held in the Debtors' assets on the Effective Date.  Such lien shall be governed by and COPIA shall have all of the rights of a secured party under Division 9 of the California Commercial Code, Cal. Comm. Code § 9101, *et seq.*, and the rights

NUTI HART LLP
411 30th Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

18

of a beneficiary under a deed of trust under California Civil Code § 2924, et seq. (as the case may be), except that whenever a provision of Division 9 of the California Commercial Code makes reference to or incorporates an agreement between the secured party and debtor, such agreement shall be deemed to be exclusively this Plan.

COPIA shall release its lien on a Parcel (and all assets associated with a Parcel, including Fee Credits) upon tender by the Debtors of the Parcel Release Price realized upon sale of such Parcel. COPIA shall, subject to closing and payment of the Parcel Release Price, promptly provide all documentation reasonably required by a title company for recording with the Sacramento County Recorder's Office to affect a release of such lien on a Parcel, and allow title to such Parcel to be conveyed to a Buyer free and clear of such lien at the closing of a Parcel sale. In the event COPIA fails or refuses to execute an instrument of reconveyance confirming the release of its lien on a Parcel when required to do so under this Article 4.5.3, the Bankruptcy Court may issue on order *ex-parte* authorizing the sale of said Parcel to the Buyer free and clear of the COPIA lien.

### 4.5.4   **Rights Upon Default.**

In the event of a default by the Debtors under the Plan, and in the event Debtors fail to cure such default within thirty (30) days after delivery of notice to the Debtors, the Official Committee of Unsecured Creditors, Debtors' counsel, and counsel to the Official Committee of Unsecured Creditors, COPIA shall be entitled to enforce all rights available under Division 9 of the California Commercial Code and California Civil Code sections 2924 through 2924l. Either the Reorganized Debtor or the Official Committee of Unsecured Creditors may seek relief from the Bankruptcy Court for cause to extend the thirty (30) day cure period.

### 4.6   *Classes 5(a), 5(b), and 5(c) – Mechanics Lien Claims*

### 4.6.1   **Class 5(b) - Teichert Construction.**

The Debtors shall assume the construction contract with Teichert in order to facilitate completion of the work contemplated by that contract in accordance with Article 6.1, and consequently, the holder of the Class 5(b) Claim (Teichert Construction) will be paid in full as provided for under Article 6.1. In the event that the Bankruptcy Court does not approve

assumption of the Teichert construction contract, then the Debtors and any party in interest in the

Chapter 11 Case shall have thirty (30) days to object to the secured status of the Class 5(b)

Claim.  If an objection is timely filed and the Bankruptcy Court enters a Final Order determining

that the Class 5(b) Claim is not secured, any balance owed to the Class 5(b) Claimholder (after

deducting any Grant Funds paid to it) shall be treated as a Class 1(a) Claim.  If an objection to

the secured status of the Class 5(b) Claim is not timely filed or the Bankruptcy Court enters a

Final Order determining that the Class 5(b) Claim is secured, any balance owed to the Class 5(b)

Claimholder (after deducting any Grant Funds paid to it) shall be paid on a pro rata basis along

with the Class 5(a) Claim and Class 5(c) Claim out of the Mechanics Lien Claim Fund and

otherwise receive the same treatment provided for in Article 4.6.2.

### 4.6.2    Classes 5(a) and 5(c) - The Growing Company and Studebaker Brown Electric, Inc.

To the extent Allowed, the holders of claims in Classes 5(a) (The Growing

Company), and 5(c) (Studebaker Brown Elec., Inc.) shall retain their liens in the same amount,

and with the same priority and validity held as of the Effective Date.  The holders of claims in

Classes 5(a), 5(b) (if required by Article 4.6.1), and 5(c) shall release their respective liens on a

Parcel in connection with any sale of such Parcel to a Buyer, and shall promptly provide all

documentation reasonably required by a title company for recording with the Sacramento County

Recorder's Office to affect a release of their liens on the Parcel in order to allow title to such

Parcel to be conveyed to a Buyer free and clear of such lien.  In the event the holder of a claim in

Class 5(a), 5(b), or 5(c) fails or refuses to execute an instrument of reconveyance confirming the

release of its lien on a Parcel when required to do so under this Article 4.6.2, the Bankruptcy

Court may issue on order *ex-parte* authorizing the sale of said Parcel to the Buyer free and clear

of such lien.

Following the closing of a Parcel sale, the Debtors shall deposit all Excess Net

Sale Proceeds received into the Mechanics Lien Claim Fund.  Holders of Allowed Claims in

Classes 5(a), 5(b) (if required by Article 4.6.1) and 5(c) shall be entitled to pro-rata distributions

of all funds deposited into the Mechanics Lien Claim Fund until such claims are paid in full.

NUTI HART LLP
411 30ᵗʰ Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

From and after the Effective Date, the principal amount of each Allowed Claim within Classes 5(a), 5(b) (if required by Article 4.6.1), and 5(c) shall accrue simple interest at the rate of five (5%) percent. Distributions to Allowed Claims in Classes 5(a), 5(b) (if required by Article 4.6.1), and 5(c) shall be applied first to accrued interest, and then principal. Distributions from the Mechanics Lien Claim Fund may be made at any time at the discretion of the Disbursing Agent, provided however, that the Disbursing Agent shall make a distribution to Class 5(a), 5(b) (if required by Article 4.6.1), and 5(c) Claim Holders whenever the Mechanics Lien Claim Fund holds sufficient funds to permit a pro-rata distribution of twenty-five (25%) percent to all Class 5 Claims.

The Debtors shall also be permitted to deposit into the Mechanics Lien Claim Fund: (a) any other funds it receives that are not subject to the lien and security interest asserted by COPIA; and (b) any other sums that are subject to the lien and security interest asserted by COPIA if either (x) COPIA consents, or (y) the Bankruptcy Court authorizes the Debtors to use such sums for that purpose. Any motion seeking authorization to use assets subject to COPIA's lien and security interest shall be set on regular notice and served upon COPIA.

All Allowed Class 5(a), 5(b) (if required by Article 4.6.1), and 5(c) Claim Holders shall be paid in full, with interest on or before the last calendar day of the thirty-sixth (36) month after the Plan Effective Date.

**4.7** *Classes 6(a), 6(b), 6(c), or 6(d) – Limited Liability Company Member Interests*

No provision of this Plan shall affect the rights of any Holder of a member interest in any of the Debtors, and such Holders shall retain all of their interests and all of their legal and equitable rights with respect to such interests. Provided however, no holder of an interest in Classes 6(a), 6(b), 6(c), or 6(d) shall receive any dividends or any other form of distribution on account of such interest from the Debtors until all creditors in Classes 1(a), 1(b), 2, 3, 4, 5(a), 5(b), and 5(c) have been paid in full.

NUTI HART LLP
411 30th Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

# ARTICLE V -
# MEANS FOR IMPLEMENTATION OF THE PLAN

**5.1    *Re-Vesting of Assets***

On the Effective Date, all assets of the Debtors and the Debtors' Estate shall re-vest in the Reorganized Debtors free and clear of all liens, claims, or interests, except to the extent such lien, claim, or interest is preserved through a specific provision of this Plan.  The Debtors shall be entitled to operate their business and/or dispose of its assets free of any restrictions or limitations contained in 11 U.S.C. §§ 345, 361, 363, 364, 365, and 366, and Rule 9019 of the Federal Rules of Bankruptcy Procedure, provided however, that the Debtors shall not sell a Parcel (or multiple Parcels if sold pursuant to a single sale agreement) for an amount less than the Minimum Parcel Sale Price (or in the case of a sale of multiple Parcels sold pursuant to a single sale agreement, the aggregate total of the Minimum Parcel Sale Price for each of the Parcels) without either: (a) the consent of both COPIA and the Official Committee of Unsecured Creditors (if it remains in existence as contemplated by Article 5.10 at the time of such proposed sale), or (b) the approval of the Bankruptcy Court.

Notice of any sale below the Minimum Parcel Sale Price (or aggregate total of the Minimum Parcel Sale Prices for the Parcels) shall be in writing and transmitted by facsimile, email, or overnight mail for next day delivery to counsel of record for COPIA and the Official Committee of Unsecured Creditors.  The notice shall identify the Parcel(s) to be sold, the gross sales price, projected closing date, estimated Net Sale Proceeds, and a summary of any other material contingencies to closing the sale.  COPIA and the Official Committee of Unsecured Creditors shall have until 5:00 p.m. on the seventh (7th) calendar day following the transmission of the notice to object to the proposed sale.  Any objection shall state the particular grounds and outline the terms they would propose to resolve the objection.  Objections shall be transmitted by email, facsimile, or overnight mail for next day delivery to counsel of record for the Debtors so that it is received no later than 5:00 p.m. (Pacific Time) on the seventh (7th) calendar day following the transmission of the notice to object to the proposed sale.  COPIA and the Official Committee of Unsecured Creditors shall be deemed to have consented to the proposed sale if

NUTI HART LLP
411 30ᵗʰ Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

NUTI HART LLP
411 30ᵗʰ Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

they fail to timely object.  In the event the Debtors, COPIA, and the Official Committee of Unsecured Creditors are unable to resolve a timely filed objection, the Debtors shall be permitted (subject to the Bankruptcy Court's availability) to obtain a hearing on seven (7) days' notice at which the Bankruptcy Court may authorize the proposed sale.

Entry of the Confirmation Order shall discharge the Debtors from all debts that arose prior to confirmation to the fullest extent permitted by 11 U.S.C. § 1141(d).

**5.2**     *Approval of the Anthem Sale Agreement*

As of the Effective Date the Anthem Sale Agreement shall be deemed approved and the Debtors are authorized to enter into and perform all obligations under the Anthem Sale Agreement.  All of the terms and conditions set forth in the Anthem Sale Agreement are incorporated into and deemed a part of this Plan.  Title to all Parcels sold to Anthem under the Anthem Sale Agreement shall be conveyed free and clear of any liens asserted by COPIA and/or the holders of claims in Classes 5(a), 5(b), and 5(c).

**5.3**     *Authorization to Sell Other Parcels*

Subject to the provisions of Article 5.1, after the Effective Date, the Debtors are authorized to sell any Parcel to a Buyer free and clear of any liens asserted by COPIA and/or the holders of claims in Classes 5(a), 5(b), and 5(c), subject to distribution of the proceeds of such Parcel sales in accordance with Articles 4.1, 4.2, 4.4, 4.5 and 4.6.

All transfers of Parcels under this Plan (including the Anthem Sale Agreement) shall be exempt from taxes to the extent provided in 11 U.S.C. § 1146(a).

**5.4**     *Cancellation of Pre-Petition Loan Documents*

On the Effective Date, all agreements between the Debtors and COPIA which form the basis of COPIA's Class 4 Claim, and all rights of COPIA thereunder shall be cancelled. Thereafter, such agreements shall be of no force and effect, and COPIA's rights under such agreements shall be replaced by the rights conferred upon it by this Plan.

**5.5    *Disbursing Agent***

The Reorganized Debtor, or such entity as it may designate, shall act as the Disbursing Agent from and after the Effective Date.  The Disbursing Agent shall serve without bond, and shall not be compensated for distribution services.

**5.6    *Treatment of Disputed Claims***

**5.6.1    Deadline for Filing Claim Objections**

Except with respect to COPIA's Class 4 claim, any objections to Claims must be filed within ninety (90) days after the Effective Date.

**5.6.2    Distribution on Allowed Claims.**

The Debtors will make distributions only on account of Allowed Claims.  No distributions will be made to holders of Disputed Claims.

**5.6.3    Reserves for Disputed Claims.**

The Debtors shall retain in a segregated account for the benefit of each holder of a Disputed Claim, an amount equal to the  distributions that would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in the filed proof of claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claim was estimated by the Bankruptcy Court pursuant to Section 502 of the Bankruptcy Code, which constitutes and represents the maximum amount in which such Claim may ultimately become an Allowed Claim, or (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and the Reorganized Debtor.

**5.6.4    Settlement of Disputed Claims.**

The Reorganized Debtors are authorized to settle and compromise the Allowable amount of a Disputed Claim without court approval or notice to other Claim holders.

**5.7    *Addresses for Transmitting Payments***

Except as otherwise agreed with the holder of an Allowed Claim in respect thereof or as provided in this Plan, any property to be distributed on account of an Allowed Claim shall be distributed by mail, upon compliance by the holder with the provisions of this Plan, to ( a) the latest mailing address filed for the holder of an Allowed Claim entitled to a distribution under the

NUTI HART LLP
411 30th Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

Plan, (b) the latest mailing address filed for a holder of a filed power of attorney designated by the holder of such Claim to receive distributions, (c) the latest mailing address filed for the holder's transferee as identified in a filed notice served on the Debtors pursuant to Bankruptcy Rule 3001(e), or (d) if no such mailing address has been filed, the mailing address reflected on the Schedules or in the Debtors' books and records.

**5.8    *Unclaimed Distributions***

The Reorganized Debtors shall make commercially reasonable efforts to contact by telephone or email any Creditor which has failed to negotiate any distribution within one hundred twenty (120) days from the date upon which such distribution is made to verify that such Creditor has received the distribution and determine if a replacement distribution should be made.  If the Reorganized Debtors are unable to contact such Creditor because it has moved and not provided the Reorganized Debtors with a forwarding address, the Reorganized Debtors' efforts shall be deemed commercially reasonable if Reorganized Debtors diligently search publicly available information (including internet searches), in order to locate the Creditor.  The Reorganized Debtors, however, shall not be required to incur costs to an outside vendor or investigator to ascertain current contact information for the Creditor.  If the Reorganized Debtors are unable to contact such Creditor after making commercially reasonable efforts, the Creditor shall forfeit all rights to any distribution under the Plan and the Reorganized Debtors will be authorized to cancel any distribution that is not timely claimed.  Pursuant to Section 347(b) of the Bankruptcy Code, upon forfeiture, such Cash (including interest thereon, if any) will revert to the Reorganized Debtor, free of any restrictions under the Plan, the Bankruptcy Code or the Bankruptcy Rules. Notwithstanding any federal or state escheat laws to the contrary, upon forfeiture, the claim of any Creditor with respect to such funds will be discharged and forever barred, and neither such Creditors or any other entity will have any claim whatsoever with respect to such forfeited distribution against the Debtors and the Reorganized Debtors or any holder of an Allowed Claim to whom distributions are made by the Reorganized Debtor.

**5.9    *Corporate Organization***

From and after the Effective Date, the Reorganized Debtors shall operate in accordance with the by-laws and articles of organization of Capitol Station 65, LLC, Capitol Station Member, LLC, Capitol Station Holdings, LLC, and Township Nine Owner, LLC in effect as of

**NUTI HART LLP**
411 30ᵗʰ Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

the Petition Date.  Each of the Debtors' by-laws and articles of organization shall be deemed amended to prohibit issuance of non-voting securities and providing for an appropriate distribution of voting power among the various classes of securities.

The identity and affiliations of individuals proposed to serve, after confirmation, as managing member(s) and officers of the Debtors and compensation for any insiders is as follows:

1. Capitol Station Member, LLC, a Delaware limited liability company, shall continue as Manager of Capitol Station 65, LLC;

2. Capitol Station Holdings, LLC, a California limited liability company, shall continue as Manager of Capitol Station Member, LLC;

3. Township Nine Owner, LLC, a Delaware limited liability company, shall continue as the sole Member and Manager of Capitol Station Holdings, LLC;

4. First Capital Real Estate Operating Partnership, L.P., a Delaware limited partnership, shall continue as Manager of Township Nine Owner, LLC;

5. First Capital Real Estate Trust Incorporated, a Maryland corporation, shall continue as General Partner of First Capital Real Estate Operating Partnership, L.P.

6. Suneet Singal shall continue as Chief Executive Officer, Treasurer, Secretary and Chairman of the Board of Directors of First Capital Real Estate Trust Incorporated.  All compensation payable to Mr. Singal will be paid by First Capital Real Estate Trust, Inc., and not the Debtors.

The Reorganized Debtors shall also be authorized to pay a project management and overhead fee to First Capital Real Estate Trust, Inc. initially in the amount of $77,135.00 per month.

**5.10**    ***Continuation of Official Committee of Unsecured Creditors***

Notwithstanding confirmation or effectiveness of the Plan, the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case shall continue in existence and shall retain

NUTI HART LLP
411 30ᵗʰ Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

all of the powers and duties granted it under Bankruptcy Code section 1103 until all Allowed

Class 1(a) and Class 1(b) Claims are paid in full.

**5.11    *Retention Agreements with Court Appointed Professionals***

Confirmation or the effectiveness of the Plan shall not affect any retention agreements

between the Debtors, the Official Committee of Unsecured Creditors, and any professional

retained under 11 U.S.C. §§ 327 or 328.  Except as provided in Article 3.4, all such professionals

shall not be required to seek approval from the Bankruptcy Court for any compensation or

expense reimbursement after the Effective Date.

**ARTICLE VI -**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**6.1    *Executory Contracts/Leases Assumed.***

The Debtors assume the following executory contracts and/or unexpired leases (including

any modifications and amendments thereto) effective upon the Effective Date and shall perform

all obligations thereunder, both pre-confirmation and post-confirmation.  Any amounts due to

cure defaults under the assumed contracts shall be paid on the Effective Date, unless the counter-

party to such executory contract is a holder of an Allowed Class 1(b) Claim, in which case,

payment of the cure amount shall be paid out of Grant Funds.  All other post-confirmation

obligations under an assumed executory contract will be paid as they come due.  For the

avoidance of doubt, no provision of this Plan shall relieve the Debtors from any liability arising

from the failure to complete construction of the required number of affordable housing units

under the HCD Transit Oriented Development Grants described below, and following the

Effective Date, all provisions of the HCD Transit Oriented Development Grants shall be fully

enforceable against the Debtors.

| Executory Contract | Counterparty | Cure Amount |
|---|---|---|
| Development Agreement for Township 9 by and between the City of Sacramento and Borrower, dated as of August 28, 2007, recorded in the Official Records as Book 20071128, Page 9073, as amended. | City of Sacramento | $0 |

NUTI HART LLP
411 30th Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

NUTI HART LLP
411 30th Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

| Executory Contract | Counterparty | Cure Amount |
|---|---|---|
| HCD Infill Infrastructure Grant, Round 1<br>  i. *Standard Agreement* by and between the State of California Housing and Community Development Department and the City of Sacramento dated October 20, 2009<br>  ii. *Standard Agreement Amendment No. 1* by and between the State of California Housing and Community Development Department and the City of Sacramento dated April 13, 2012<br>  iii. *Infill Infrastructure Grant Program Disbursement Agreement* by and between the State of California Housing and Community Development Department and the City of Sacramento dated March 8, 2011<br><br>  iv. *Assignment and Assumption Agreement* by and between the City of Sacramento and Capitol Station 65 LLC, dated March 17, 2010<br>  v. *Declaration of Restrictive Covenants for the Development of Market Rate Housing and Affordable Housing*, by Capitol Station 65 LLC, recorded May 14, 2010 | City of Sacramento | $0 |
| HCD Infill Infrastructure Grant, Round 2<br>  i. *Standard Agreement* by and between the State of California Housing and Community Development Department and the City of Sacramento dated March 30, 2011<br>  ii. *Standard Agreement Amendment No. 1* by and between the State of California Housing and Community Development Department and the City of Sacramento dated July 16, 2013 | City of Sacramento | $0 |

NUTI HART LLP
411 30ᵗʰ Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

| Executory Contract | Counterparty | Cure Amount |
|---|---|---|
| iii. *Infill Infrastructure Grant Program Disbursement Agreement* by and between the State of California Housing and Community Development Department and the City of Sacramento dated March 30, 2011<br>iv. *First Amendment to Assignment and Assumption Agreement* by and between the City of Sacramento and Capitol Station 65 LLC, dated September 13, 2011.<br>v. *First Amendment to Declaration of Restrictive Covenant for the Development of Market Rate Housing and Affordable Housing*, by Capitol Station 65 LLC, recorded October 3, 2011 | | |
| HCD Catalyst Grant<br>i. *Standard Agreement* by and between the State of California Housing and Community Development Department and the City of Sacramento dated April 24, 2013<br>ii. *Assignment and Assumption Agreement* by and between the City of Sacramento and Capitol Station 65 LLC, dated April 30, 2013<br>vi. | City of Sacramento | $0 |
| HCD Transit Oriented Development Grants<br>i. *Assignment and Assumption Agreement* by and between the City of Sacramento and Capitol Station 65 LLC, dated June 4, 2015. | City of Sacramento | $0[1] |

[1] As noted above, the HCD Transit Oriented Development Grants require construction of a certain number of affordable housing units. Since the time to complete construction of said affordable housing has not passed, the Debtors are presently not in default and so no monetary cure obligation is reflected. However, notwithstanding any provision of this Plan, the City of Sacramento shall retain all of its rights to seek repayment from the Debtors of any Grant Funds arising from the failure to comply with the terms of the HCD Transit Oriented Development Grants.

| Executory Contract | Counterparty | Cure Amount |
|---|---|---|
| ii.  Phase 2B - *Standard Agreement* by and between the State of California Housing and Community Development Department and the City of Sacramento, dated September 16, 2015.<br>iii.  Phase 2A - *Standard Agreement* by and between the State of California Housing and Community Development Department and the City of Sacramento, dated September 16, 2015. | | |
| Agreement for Design and Construction of Park Improvements for Township 9 Park and Park Development Impact Fee Waivers, dated May 1, 2014. | City of Sacramento | $0 |
| Construction Contract | Teichert Construction | $228,462.38 |
| Construction Contract | Lund Construction | $300,796.64 |
| Construction Management Agreement | Project Mgmt. Applications Inc. | $25,283.00 |
| Labor Compliance Monitor Agreement | DCM Group | $11,758.05 |
| Service Agreement | Capitol Utilities Specialists, Inc. | $3,782.26 |

**6.2    *Executory Contracts/Leases Rejected.***

The Debtors reject the following executory contracts and/or unexpired leases and surrenders any interest in property securing these executory contracts and/or unexpired leases. The Debtors waive the protection of the automatic stay and allows the affected creditor to obtain possession and dispose of its collateral, without further order of the court.  Upon the date of the entry of the order confirming this Plan, the Debtors will be conclusively deemed to have rejected all executory contracts and/or unexpired leases not previously assumed or listed in paragraph (a) above.

NUTI HART LLP
411 30ᵗʰ Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

| Name of Lessor/Counterparty | Property Address or Description |
|---|---|
| COPIA Lending, LLC | Environmental Indemnity Agreement dated September 1, 2016, counter-parties COPIA Lending, LLC, First Capital Real Estate Trust, Inc. and First Capital Real Estate Operating Partnership, L.P. |

Notwithstanding the preceding paragraph, on the Effective Date, each Non-Disclosure Agreement and Common Interest and Joint Defense Agreement that exists between the Debtors and any person, to the extent that it constitutes an executory contract, is assumed pursuant to the Plan. Entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions pursuant to section 365(a) of the Bankruptcy Code.

## ARTICLE VII -
## CONDITIONS TO CONFIRMATION AND EFFECTIVENESS

**7.1    *Conditions to Confirmation.***

The following are conditions precedent to confirmation of this Plan:

(a)    The Bankruptcy Court shall have entered a Final Order approving the Disclosure Statement with respect to this Plan in form and substance satisfactory to the Debtors;

(b)    The Bankruptcy Court shall have entered a Final Order approving the DIP Credit Agreement in form and substance satisfactory to the Debtors; and

(c)    The Bankruptcy Court shall have entered the Confirmation Order that *inter alia*, approves the Anthem Sale Agreement.

**7.2    *Conditions to Effectiveness.***

The following are conditions precedent to the occurrence of the Effective Date:

(a)    The Bankruptcy Court shall have conducted the hearing on Confirmation of this Plan;

(b)    Serene has the financial ability and will fund the DIP Loan; and

(c)    The Confirmation Order shall be a Final Order.

**NUTI HART LLP**
411 30th Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

**ARTICLE VIII -
EFFECTS OF CONFIRMATION, RE-VESTING
OF TITLE, RELEASES, AND RELATED PROVISIONS**

**8.1     *Discharge.***

Pursuant to Section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the rights afforded under this Plan and the Confirmation Order and the treatment of Claims and Interests thereunder shall be in exchange for, and in complete satisfaction, discharge and release of, all Claims.  Except as otherwise expressly provided in the Plan or the Confirmation Order, upon the occurrence of the Effective Date, the Debtors shall be discharged, effective immediately, from any Claim and any "debt" (as that term is defined in Section 101(12) of the Bankruptcy Code), and the Debtors' liability in respect thereof shall be extinguished completely, whether reduced to judgment or not, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, known or unknown, that arose from any agreement of the Debtors entered into or obligation of the Debtors incurred before the Effective Date, or from any conduct of the Debtors prior to the Effective Date, or that otherwise arose before the Effective Date, including, without limitation, all interest accrued and expenses incurred, if any, on any such debts, whether such interest accrued or such expenses were incurred before or after the Petition Date, and including, without limitation, any liability of a kind specified in Sections 502(g), 502(h) and 502(i) of the Bankruptcy Code, whether or not a proof of Claim was Filed or is deemed Filed under Section 501 of the Bankruptcy Code, such Claim is allowed under Section 502 of the Bankruptcy Code or the Person holding such Claim has accepted the Plan. The discharge granted under this Section shall void any judgment obtained against the Debtors or the Post-Effective-Date Debtors at any time, to the extent that such judgment relates to a discharged Claim.

**8.2     *Vesting of Property.***

On the Effective Date, all property of the estate will vest in the Reorganized Debtors pursuant to Section 1141(b) of the Bankruptcy Code free and clear of all claims and interests

NUTI HART LLP
411 30th Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

except as provided in this Plan; subject to revesting to the estate upon conversion of the Debtors'

Case to chapter 7 as provided in Article 8.4 below.

**8.3    *Plan Creates New Obligations.***

The obligations to creditors that Debtors undertakes in the confirmed Plan replace those

obligations to creditors that existed prior to the Effective Date of the Plan.  Debtors' obligations

under the confirmed Plan constitute binding contractual promises that, if not satisfied through

performance of the Plan, create a basis for an action for breach of contract under California law.

**8.4    *Effect of Conversion to Chapter 7.***

If the case is at any time converted to one under chapter 7:

(i)     All property of the Debtors as of the date of conversion, whether acquired

pre-confirmation or post-confirmation, shall vest in the chapter 7 bankruptcy estate and such

remaining property shall be administered by the chapter 7 trustee as prescribed in chapter 7 of

the Bankruptcy Code.; and

(ii)    All creditors, whether their claims arose pre-confirmation or post-

confirmation, are prohibited from taking action against the chapter 7 bankruptcy estate or

property of the estate by Section 362 of the Bankruptcy Code.

**ARTICLE IX -
RETENTION AND ENFORCEMENT OF CLAIMS**

Debtors retain, and may seek to enforce, all claims against all persons or entities,

including claims arising under non-bankruptcy law and claims arising under Chapter 5 of the

Bankruptcy Code ("Litigation Claims").  Without limiting the generality of the foregoing, the

Debtors shall retain the right to prosecute any Avoidance Actions, and any other claim for relief

against any other person or entity.

**ARTICLE X -
MODIFICATION OF PLAN**

The Debtors, as Plan proponent, may modify the Plan prior to Confirmation if the Plan,

as modified, meets the requirements of the Bankruptcy Code.  Such modification shall be

NUTI HART LLP
411 30th Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

deemed accepted or rejected by a holder of a Claim that has previously accepted or rejected the Plan.

The Reorganized Debtors shall also be permitted to modify this Plan to alter the treatment of Class 1 Claims, Class 2 Claims, Class 4 Claim, and Class 5 Claims provided that each creditor holding such Claim consents to such modification, and the modification does not violate the rights of any Allowed Claim holders that are equal to or senior in priority to such Claims.

**ARTICLE XI -**
**RETENTION OF JURISDICTION**

The Bankruptcy Court shall retain jurisdiction notwithstanding Confirmation of this Plan or the occurrence of the Effective Date, over proceedings including, without limitation:

11.1     To resolve controversies and disputes regarding interpretation of the Plan or the Confirmation Order, including whether the Debtors has defaulted in performance of any Plan obligation and whether the time for performing any Plan obligation should be extended;

11.2     To implement the provisions of the Plan and Confirmation Order, and to enter orders in aid of Confirmation, including orders designed to protect the Debtors or the Reorganized Debtor, and to facilitate sales of Parcels free and clear of liens;

11.3     To modify the Plan pursuant to section 1127 of the Bankruptcy Code.

11.4     To determine the allowability and classification of Claims upon objection to such claims;

11.5     To adjudicate any causes of action, including Avoidance Actions, brought by the Debtors or the Reorganized Debtor, or any party-in-interest designated to do so;

11.6     To determine whether a trustee should be appointed, or the case should be converted to one under chapter 7 (and proceedings following any such conversion); and

11.7     To resolve disputes with COPIA.

//

//

**NUTI HART LLP**
411 30th Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

**NUTI HART LLP**
411 30th Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

## ARTICLE XII -MISCELLANEOUS

**12.1    *Cramdown.***

Pursuant to section 1129(b) of the Bankruptcy Code, Debtors reserves the right to seek confirmation of the Plan notwithstanding the rejection of the Plan by one or more classes of creditors.

**12.2    *Severability.***

If any provision in the Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

**12.3    *Binding Effect.***

The rights and obligations of any entity named or referred to in the Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity.

**12.4    *Captions.***

The headings contained in the Plan are for reference and convenience only and do not affect the meaning or interpretation of the Plan.

**12.5    *Controlling Effect.***

Unless a rule of law or procedure is supplied by federal law (including the Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of California govern the Plan and any agreements, documents, and instruments executed in connection with the Plan, except as otherwise provided in the Plan.

**12.6    *Notices.***

Any notice to the Debtors shall be in writing and mailed, and will be deemed to have been given three days after the date sent by first class mail, postage prepaid and addressed as follows:

Attorneys for the Debtors:                        Debtors:

Greg Nuti/Kevin W. Coleman              Capitol Station 65, LLC
Nuti Hart LLP                                          c/o First Capital Real Estate Trust, Inc.
411 30th Street, Suite 408                       Attn: Suneet Singal
Oakland, CA 94609                                 410 Park Avenue, 14th Floor
(Tel.) 510 506-7153                                New York, NY  10022
Email: gnuti@nutihart.com                     (Tel.) 212-388-6800
          kcoleman@nutihart.com               Email: s@firstcapitalre.com

**12.7    *Rights in the Event of Default***

In the event the Reorganized Debtors materially defaults in the performance of its obligations under this Plan, any Creditor shall be entitled to enforce its rights in any action at law in a court that may properly exercise personal jurisdiction over the Reorganized Debtor.  In addition, any Creditor and the U.S. Trustee may seek conversion of this case to a proceeding under chapter 7 of the Bankruptcy Code.

**12.8    *Exculpation***

To the extent permitted under 11 U.S.C. § 1125(e), neither the Debtors nor any of their employees, attorneys, advisors, members, shareholders, fiduciaries or agents (including any professionals retained by such persons), nor any of their respective predecessors or successors, will have or incur any liability to any holder of a Claim or Interest or any other entity for any act or omission in connection with the pursuit of approval of the Disclosure Statement or the solicitation of votes for or confirmation of the Plan, except for willful misconduct or gross negligence.

Dated:  November 1, 2017             CAPITOL STATION 65, LLC
                                     CAPITOL STATION MEMBER, LLC
                                     CAPITOL STATION HOLDINGS, LLC
                                     TOWNSHIP NINE OWNER, LLC


                                     By: */s/ Suneet Singal*
                                            Suneet Singal, CEO


Dated:  November 1, 2017             NUTI HART LLP


                                     By: */s/ Kevin W. Coleman*
                                            Kevin W. Coleman
                                     Attorneys for Capitol Station 65, LLC; Capitol
                                     Station Member, LLC; Capitol Station Holdings,
                                     LLC and Township Nine Owners, LLC,
                                     Debtors-in-Possession

NUTI HART LLP
411 30th Street, Suite 408
Oakland, CA 94609-3311
510.506.7152

# **Appendix 1** – ANTHEM SALE AGREEMENT

***Appendix 1.a*** – *PURCHASE AND SALE AGREEMENT*
*AND JOINT ESCROW INSTRUCTIONS*
*(Township 9 Project – All Townhouses)*

***Appendix 1.b*** – *FIRST AMENDMENT TO PURCHASE*
*AND SALE AGREEMENT*
*(Township 9 – Townhouses)*

***Appendix 1.a** –*
*PURCHASE AND SALE AGREEMENT*
*AND JOINT ESCROW INSTRUCTIONS*
*(Township 9 Project – All Townhouses)*

## PURCHASE AND SALE AGREEMENT
## AND JOINT ESCROW INSTRUCTIONS
### (Township 9 Project - All Townhouses)

THIS PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS, dated for reference purposes as of July 25, 2017 (this "**Agreement**"), is entered into by and between CAPITOL STATION 65 LLC, a California limited liability company ("**Seller**"), and ANTHEM UNITED HOMES, INC., a Washington corporation ("**Buyer**"). In consideration of the mutual promises contained in this Agreement, Buyer and Seller (sometimes referred to individually as a "**Party**" and collectively referred to as "**Parties**") agree as follows:

## RECITALS

A.          Seller owns that certain real property located in the City of Sacramento ("**City**"), County of Sacramento ("**County**"), State of California, together with the Current Entitlements (as defined in <u>Section 1</u> below), comprised of the parcels of land identified on the attached <u>Exhibit A</u>, together with the common area driveways, streets and park paseos appurtenant thereto (collectively, "**Land**"), as such parcels are further identified on the approved Tentative Map Subdivision Modification for Township 9 dated March 3, 2015 ("**Tentative Map**"), and the Final Map of Township 9-Phase 1, Subdivision No P10_036, recorded on November 13, 2012, all as attached on <u>Exhibit B</u> hereto. The Land is located within the Seller's overall project commonly known as Township 9 ("**Overall Project**").

B.          The Land including (i) all improvements, equipment, fixtures and any and all other articles of personal property attached or affixed to said Land, (ii) all assignable intangible personal property to the extent owned by Seller and arising directly out of or in connection with Seller's ownership of the Land and pertaining only to the Land (with the understanding that most such plans and drawings were prepared for the Overall Project and are not capable of being assigned solely as to the Land), (iii) all development building permit fee credits in the approximate amount of Eight Thousand Eight Hundred and Sixty-Five Dollars ($8,865) per residential unit to the extent that the City approves the same in accordance with its procedures for transferring such building permit fee credits upon payment of the Fee Credits Price (as defined below) (collectively, the "**Intangible Property**"), (iv) any and all remaining grant money pertaining to the Land, which shall be assigned to Buyer, and (v) the Current Entitlements (as defined in <u>Section 1</u> below), which shall be assigned to Buyer, are referred to collectively in this Agreement as the "**Property**."

C.          Buyer intends to develop the Land into a residential project comprised of townhouses, condominiums and apartments (collectively, "**Project**"). Buyer is an experienced developer and builder of residential projects such as the Project and is familiar with the kinds of land use and development issues that impact the construction and development of property into residential use.

D.          The Property subject of this Agreement is not currently comprised of legal parcels and will require three or more final maps to be processed and recorded. In addition, each parcel is in a different stage of mapping. For example, as to Parcels 8A, 8B, 15A and 15B, Seller

commenced processing a final map, which has yet to be finalized and recorded ("**Parcel 8/15 Final Map**"), while the final maps for the remaining parcels, which may also require a lot line adjustment, have yet to be prepared and processed, and are subject to full design review and approval of the City, which maps must be recorded in order to create the parcels comprising the Property (collectively, "**Final Maps**"). It is expected that it will take approximately six (6) months for the City to process and approve each of the Final Maps.

E.     The Property subject of this Agreement also does not constitute final buildable parcels due to the offsite improvements and park work that have yet to be completed.

F.     The development of the intended Project on the Land will require construction of parks and park paseos, specifically Peach Paseo, Victory Park, and Victory Promenade, as set forth on Schedule 1 attached hereto ("**Park Work**"). All construction and improvement work to complete the Park Work will be the responsibility and at the direction of the Buyer; provided that Seller shall assign to Buyer the grant funds allocated for the Park Work in the amount of Seven Hundred Thousand Dollars ($700,000) ("**Park Grant Amount**").

G.     The development of the Project and the City's approval of the Final Maps may be conditioned on the construction of North 5th Street, Can Ave and Cannery Ave, which constitute roads servicing the Buyer's Project (collectively, "**Street Work**"). The cost of the Street Work is estimated to be Two Million Two Hundred Fifty Thousand Dollars ($2,250,000) ("**Street Cost**"). Buyer's Project will require that the Street Work be completed. Seller has indicated to Buyer that it has received a grant for funds to complete the Street Work in the estimated amount of the Street Cost ("**Street Grant**"). Seller agrees to assign and transfer over to Buyer the Street Grant. The Street Grant shall be assigned to Buyer concurrently with the Closing on Phase 1; provided that Seller shall use all commercially reasonable efforts to deliver the City's consent or similar documentation evidencing its agreement to transfer all grants contemplated under this Agreement no later than three (3) business days prior to the expiration of the Due Diligence Period. Seller agrees to execute a cost sharing agreement to be recorded with the First Closing (as defined in Section 5.2) upon the other parcels fronting North 5th Street, Can Ave and Cannery Ave, providing for a proportionate (based on acreage) cost sharing of all actual costs of completing the Street Work to the extent such amounts exceed the actual Street Grant amount funded by the City.

H.     In addition to the Street Work, the Property will also require the construction of Chill Ave at such time as the parcels fronting said street will be developed. The cost of completing Chill Ave is estimated to be Five Hundred Thousand Dollars ($500,000), which will be the responsibility of the Buyer at such time as the City requires the same in conjunction with the preparation and approval of the Final Maps. Finally, the Phase 3 parcels serve as frontage to Township 9 Ave, along with other parcels owned by Seller on the south side of Township 9 Ave that are not the subject of this Agreement, which road has yet to be constructed. Buyer agrees to enter into a cost sharing agreement with Seller, to be recorded upon the applicable parcels with the First Closing, providing for a 50/50 allocation of all costs of constructing Township 9 Ave at such time as the first constructing party commences development of its parcels.

I.     Buyer is pricing the Property with the assumption that the parcels comprising the Property are final ready-to-build lots subject only to the recordation of the Final Maps,

completion of Chill Ave, and completion of on-site improvements by Buyer. In the event the City requires construction of additional offsite improvements or the payment of additional impact or mitigation fees (offsite), as a condition to approving Buyer's Final Maps, building permits or site improvement plans, such requirements may render Buyer's Project infeasible. As such, Buyer, with cooperation from Seller, shall use commercially reasonable efforts to determine all such requirements during the Due Diligence Period.

J.       The Property is encumbered by a Deed of Trust ("**Lender's Lien**") made in favor of Seller's existing lender COPIA LENDING, LLC (formerly known as ISIS Lending LLC) ("**Lender**"), which serves as security for the loan made by Lender in the original principal amount of Twenty Million Dollars ($20,000,000) pursuant to a promissory note dated on or about December 23, 2008 ("**Loan**"). The Loan is now in default.

K.       Seller sought relief under Title 11 of the United States Code ("**Bankruptcy Code**") by filing a voluntary petition for reorganization in the U.S. Bankruptcy Court for the Eastern District of California ("**Bankruptcy Court**") on May 30, 2017, case number 17-23627-B-11 ("**Bankruptcy Case**"). As such, the terms of this Agreement and the obligations of the Parties are subject to certain terms of the Bankruptcy Code and approval by the Bankruptcy Court.

L.       The Parties desire to effect the purchase and sale transactions contemplated by this Agreement pursuant to Seller's Chapter 11 plan of reorganization, and that the sale of the Property shall be free and clear of all monetary liens and encumbrances (collectively, "**Monetary Liens**"), other claims (as defined in Section 101 of the Bankruptcy Code), and interests of Seller's creditors, equity holders and partners.

M.       For purposes of this Agreement, the "**Effective Date**" shall mean the date the last Party hereto executes this Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, the promises and covenants of the Parties in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, the Parties agree as follows:

1.       Definitions; Recitals: Capitalized terms that are not defined when first used in this Agreement have the meanings set forth below. The Recitals set forth above are hereby incorporated by reference and shall serve as obligations of the Parties hereto.

1.1.       Approval: "**Approval**" means the approval of any applications, permits, environmental reviews, certifications and/or new entitlements, and the expiration of all applicable appeal periods, reconsideration periods or statutes of limitation for reconsidering, challenging, questioning, appealing or attacking such approval, without an appeal, request for reconsideration or legal challenge having been filed.

1.2.       Authorities: "**Authorities**" means all federal, state and local governmental and quasi-governmental agencies, bodies, entities, boards and authorities that have jurisdiction over the Property, the furnishing of utilities or other services to the Project, or the subdivision, improvement, development, occupancy, sale or use of the Property, other than the Bankruptcy Court.

1.3.     Buyer's Self-Help Right:  "**Buyer's Self-Help Right**" shall be as defined in Section 3.3.

1.4.     Chapter 11 Plan:  "**Chapter 11 Plan**" means the plan proposed by Seller in the Bankruptcy Case pursuant to Sections 1121 through 1129 of the Bankruptcy Code and providing for the sale of the Property to Buyer pursuant to, and the transactions contemplated by, the terms of this Agreement.

1.5.     Closing or Close of Escrow:  "**Closing**" "**Closing Date**" or "**Close of Escrow**" means the act of settlement of the purchase and sale of the Property, or a portion thereof, at which Seller conveys exclusive possession and title to Buyer by delivery of a Grant Deed transferring good and marketable title to the Property, free and clear of all liens and encumbrances, except Permitted Exceptions, and records the Grant Deed with the County Recorder, and Buyer delivers the Purchase Price for the applicable Phase to Seller along with other obligations as provided herein.

1.6.     Confirmation Order:  "**Confirmation Order**" means an order entered in the Bankruptcy Case confirming the Seller's Chapter 11 Plan.

1.7.     Current Entitlements:  "**Current Entitlements**" means and includes all discretionary Approvals and permits in effect for the Land as of the Effective Date, including, but not limited to, the Tentative Map, the approved plans processed by Seller, and any other entitlements that were previously processed by Seller applicable to the Property or the Project.

1.8.     Deposit:  "**Deposit**" means the First Deposit and the Second Deposit, together with all interest earned thereon, together with the other deposits delivered pursuant to this Agreement and constituting "Deposit" pursuant hereto.

1.9.     Development Approvals:  "**Development Approvals**" shall be as defined in Section 4.4.

1.10.    Documents:  "**Documents**" means all engineering, geotechnical, soils, and other studies, tests, investigations, surveys, grading plans, maps, drawings, plans and reports that reasonably relate to the Property, described on Exhibit C.  Documents do not include appraisals or any agreement(s) by which Seller acquired the Property, or any confidential, privileged or proprietary documents of Seller.

1.11.    Due Diligence Period:  "**Due Diligence Period**" means the period commencing on the Effective Date and expiring on the date that is forty-five (45) calendar days from the Effective Date (the "**Due Diligence Expiration Date**").

1.12.    Environmental Laws:  "**Environmental Laws**" means all federal, state and local environmental laws, rules, statutes, ordinances and regulations issued by any Authority and in effect as of the date of this Agreement with respect to or which otherwise pertain to or affect the Property, or any portion thereof, the use, ownership, occupancy or operation of the Property, or any portion thereof, or any owner of the Property, and as the same have been amended, modified or supplemented from time to time prior to the date of this Agreement, including, but not limited to, the Comprehensive Environmental Response, Compensation and

Liability Act of 1980 (42 U.S.C. § 9601 et seq.), the Hazardous Substances Transportation Act (49 U.S.C. § 1802 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Water Pollution Control Act (33 U.S.C. § 1251 et seq.), the Safe Drinking Water Act (42 U.S.C. § 300f et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Solid Waste Disposal Act (42 U.S.C. § 6901 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Emergency Planning and Community Right-to-Know Act of 1986 (42 U.S.C. § 11001 et seq.), the Radon and Indoor Air Quality Research Act (42 U.S.C. § 7401 note, et seq.), the Superfund Amendment Reauthorization Act of 1986 (42 U.S.C. § 9601 et seq.), comparable state and local laws, and any and all rules and regulations which have become effective prior to the date of this Agreement under any and all of the aforementioned laws.

      1.13.   Environmental Permits: "**Environmental Permits**" means all permits, consents, certifications, permission, agreements or other authorizations required by or from any state, federal, or local regulatory entity or agency, including all Authorities, to enable, permit and/or authorize development of the Property with single-family residences along with subdivision improvements. Environmental Permits includes, without limitation, those issued by the U.S. Army Corps of Engineers, U.S. Fish & Wildlife Service, California Regional Water Quality Control Board, California Department of Fish & Game, and any Conservation and Development Commission or Flood Protection Board, as applicable.

      1.14.   Escrow Agent: "**Escrow Agent**" means First American Title Insurance Company, Attention: Diane Burton, 4750 Willow Road, Suite 100, Pleasanton, CA 94588, Telephone: (925) 201-6603 and Fax: (866) 648-7806 (also referred to as "**Title Company**").

      1.15.   Final Order: "**Final Order**" means an order of the Bankruptcy Court (i) for which the time to appeal has expired and no appeal was filed, or (ii) if an appeal was filed, (A) the order has not been stayed and the appeal is subject to statutory or equitable mootness, or (B) the appeal has been dismissed or denied and the time for further appeal has expired or no right of further appeal exists.

      1.16.   First Deposit: "**First Deposit**" means the amount of Fifty Thousand Dollars ($50,000), payable in accordance with the terms of this Agreement.

      1.17.   Hazardous Materials: "**Hazardous Materials**" means any pollutants, contaminants, hazardous or toxic substances, materials or wastes (including petroleum, petroleum by-products, radon, asbestos and asbestos containing materials, polychlorinated biphenyls ("**PCBs**"), PCB-containing equipment, radioactive elements, infectious agents, and urea formaldehyde), as such terms are used in or regulated by any Environmental Laws (excluding solvents, cleaning fluids and other lawful substances used in the ordinary operation and maintenance of the Property, to the extent in closed containers and in accordance with Environmental Laws).

      1.18.   Legal Requirements: "**Legal Requirements**" means the rules, regulations, laws, ordinances, standards, approved plans and other requirements of the Authorities.

1.19.  <u>Notice of Approval</u>:  "**Notice of Approval**" means a written notice that Buyer, in its sole and absolute discretion, may elect to give to Seller indicating Buyer's willingness to proceed with the transaction, as set forth in <u>Section 4.1</u> of this Agreement.

1.20.  <u>Opening of Escrow</u>:  "**Opening of Escrow**" is defined in Section 3.1 below.

1.21.  <u>Outside Conditions Date</u>:  "**Outside Conditions Date**" shall mean January 15, 2018, and is further described in <u>Section 5.4</u> hereof.

1.22.  <u>Outside Map Date</u>:  "**Outside Map Date**" shall mean ninety (90) calendar days following entry of the Sale Order and is further described in <u>Section 10.4</u> hereof.

1.23.  <u>Permitted Exceptions</u>:  "**Permitted Exceptions**" means those matters of record or otherwise affecting the Property subject to which Buyer expressly approves prior to the Due Diligence Expiration Date pursuant to <u>Section 4.3</u>.

1.24.  <u>Phases</u>:  As used herein "**Phase 1**," "**Phase 2**," and "**Phase 3**" shall mean the parcels comprising the Property identified as such on the attached <u>Exhibit A</u> hereto.  Phase 1, Phase 2 and Phase 3 are hereinafter individually referred to as a "**Phase**" and collectively as the "**Phases**."

1.25.  <u>Purchase Price</u>:  The "**Purchase Price**" for each of the parcels constituting the Property is that certain amount (not based upon a presumed yield calculation or any formula) set forth on <u>Exhibit A</u> attached hereto.

1.26.  <u>Sale Order</u>:  "**Sale Order**" means the Bankruptcy Court order approving the purchase and sale of the Property and the other transactions contemplated herein.  The Sale Order may be either the Confirmation Order or an order entered by the Bankruptcy Court pursuant to Sections 363(b) and 363(f) of the Bankruptcy Code entered outside the context of a plan confirmation approving the purchase and sale of the Property ("**363 Sale**").

1.27.  <u>Second Deposit</u>:  The amount of One Hundred Fifty Thousand Dollars ($150,000) payable in accordance with the terms of this Agreement.

2.  <u>Purchase and Sale</u>.

2.1.  <u>Property</u>.  Subject to the terms and conditions of this Agreement, Seller agrees to sell to Buyer, and Buyer agrees to purchase from Seller, all of Seller's right, title and interest in and to the Property.

2.2.  <u>Fee Credits</u>.  As part of the overall master planned development activities that have been carried out by Seller with respect to the Overall Project, certain building permit fee credits were created for Seller's account (collectively, "**Fee Credits**") by the governing agency that will issue building permits for the Property.  Buyer has agreed to purchase the Fee Credits in an amount ultimately approved by the City for transfer and assignment to Buyer, which is estimated to be Eight Thousand Eight Hundred and Sixty-Five Dollars ($8,865) per residential unit, which amount shall not in any event exceed the City's (or applicable agency's)

calculation of the amount that may be assigned to Buyer ("**Fee Credits Price**").  Following the Closing, at such time as Buyer pulls building permits for the units, Buyer will provide written notice thereof to Seller, in which event Seller shall execute all necessary documents and assignments to assign the Fee Credits for the number of units for which Buyer has requested building permits no later than five (5) calendar days after Buyer's notice, and Buyer will pay the Fee Credits Price based on the number of building permits and the Fee Credits being assigned to Buyer in accordance with the City's calculation thereof, upon receipt of such assignment.

        2.3.    <u>Bankruptcy Sale Process</u>.

        2.3.1    <u>Plan Sale</u>.  Unless the Parties agree otherwise, the purchase and sale of the Property and the other transactions contemplated by this Agreement will be effectuated pursuant to the Chapter 11 Plan.  Seller agrees to prepare and file the Chapter 11 Plan as soon as practicable, and in any event no later than September 29, 2017.  The Chapter 11 Plan must be in a form and contain such terms as are consistent with the terms of this Agreement and as are reasonably satisfactory to Buyer.  If for any reason the Parties agree that the purchase and sale of the Property and the other transactions contemplated hereby should be effected pursuant a 363 Sale and not pursuant to the Chapter 11 Plan, then Seller shall prepare an appropriate motion for approval of the purchase and sale and other transactions pursuant to Sections 363(b) and 363(f) of the Bankruptcy Code, which motion must be in a form and containing such terms as are consistent with the terms of this Agreement and otherwise reasonably satisfactory to Buyer.

        2.3.2    <u>Sale as Part of Chapter 11 Plan</u>.  The Parties agree that this transaction provides a foundation to the overall structure and viability of the Chapter 11 Plan. Unless otherwise required by the Court, Seller agrees not to accept or enter into any competing overbids or back-up bids while seeking approval of this Agreement through its Chapter 11 Plan, given the circumstances of the Bankruptcy Case, including, without limitation, the following: the complexity of the sale transaction and scope of the due diligence required to be performed by Buyer; the need for Buyer to advance substantial expenses prior to the Bankruptcy Court's approval of the terms set forth  in this Agreement; and Buyer's unwillingness to enter into this Agreement, undertake the due diligence and incur the expenses if its Agreement is subject to Seller accepting or entering into competing bids.

        2.3.3    <u>Motion to Approve Sale Process</u>.  Notwithstanding the foregoing reasons as to why the Parties agree that an auction sale process is not in the best interest of Seller's creditors and bankruptcy estate, if the Parties mutually agree, or the Bankruptcy Court requires that an auction sale process of any kind must be used for the sale of the Property either through a Chapter 11 Plan or through a 363 Sale, then the Parties shall use all commercially reasonable efforts and cooperate to prepare amendments to this Agreement to provide for mutually satisfactory bidding procedures and compensation to Buyer if there is competitive bidding for the Property.  Such compensation is subject to Bankruptcy Court approval and may include among other things (i) reimbursement of all of Buyer's expenses relating to the preparation and negotiation of this Agreement and other transaction documents and Buyer's due diligence investigation, and (ii) a "break-up" fee equal to one percent (1%) of the consideration to be paid to Seller in the winning bid for the Property.  Seller agrees that the failure to obtain Bankruptcy Court approval of the terms of the preceding sentence shall allow Buyer to terminate this Agreement and receive immediate return of any Deposit.

3. <u>Escrow and Deposit</u>.

3.1. <u>Opening of Escrow</u>. Upon its receipt of a duly executed original counterpart of this Agreement from Seller, Buyer shall open an escrow at the offices of Escrow Agent, by delivering an executed copy of this Agreement to Escrow Agent. Escrow Agent shall promptly execute the "Acceptance by Escrow Agent" attached hereto (the date of execution of the "Acceptance by Escrow Agent" by the Escrow Agent may be referred to as the "**Opening of Escrow**") and shall notify Buyer and Seller in writing of the date of the Effective Date of this Agreement, which is defined in <u>Section 1.11</u> of this Agreement and shall constitute joint escrow instructions to Escrow Agent. The Parties shall execute such additional instructions, not inconsistent herewith, reasonably requested by Escrow Agent; provided, however, that as between the Parties, if any conflict between the provisions of this Agreement and the provisions of such additional instructions exists or arises, then the provisions of this Agreement shall control. Escrow Agent is designated the "real estate reporting person" for purposes of Section 6045 of the Internal Revenue Code of 1996, as amended, and Treasury Regulation 1.6045-4, and any instructions or settlement statement prepared by Escrow Agent shall so provide. Escrow Agent shall be responsible for filing Form 1099-S with the Internal Revenue Service. The period between the Opening of Escrow and the Closing Date shall be the "**Escrow Period**."

3.2. <u>Deposits</u>. The Deposit and any other cash held by Escrow Agent shall be held for Buyer's benefit in accordance with the terms and conditions of this <u>Section 3.2</u>.

3.2.1 <u>First Deposit</u>. Within three (3) business days following the Effective Date, Buyer shall place into escrow the First Deposit. This First Deposit shall be fully refundable through the date when the Sale Order is entered.

3.2.2 <u>Second Deposit</u>. Within five (5) business days following entry of the Sale Order, Buyer shall place into escrow the Second Deposit. The Second Deposit shall be non-refundable once made except in the event of a material breach by Seller or the failure of a condition to Closing for Buyer's benefit.

3.2.3 <u>Independent Consideration</u>. Concurrently with delivery of the First Deposit, Buyer shall deposit into escrow as independent consideration for this Agreement the sum of One Hundred Dollars ($100) (the "**Independent Consideration**"), which Independent Consideration shall be fully earned by Seller, is non-refundable under any circumstances and not applicable to the Purchase Price. Escrow Agent shall release the Independent Consideration to Seller upon receipt of the Deposit. The Independent Consideration constitutes independent consideration for the rights extended to Buyer hereunder, including, without limitation, the right and option to terminate this Agreement as provided herein. In all instances under this Agreement in which Buyer elects to terminate or is deemed to have terminated this Agreement, Seller shall retain the Independent Consideration whether or not the Deposit is returned to Buyer.

3.2.4 <u>Applicability of Deposit</u>. The Deposit shall be maintained in Escrow and shall be fully applicable to the Purchase Price at the First Closing.

3.2.5    <u>Maintenance of Deposits</u>.  Escrow Agent shall hold the Deposit and all other funds deposited by Buyer with it pursuant to this Agreement, including, without limitation, the balance of the Purchase Price if and when deposited in accordance herewith. Escrow Agent shall place the Deposit into an interest bearing account at a depository acceptable to Buyer, with the interest accruing for the benefit of Buyer.

3.2.6    <u>Subsequent Phase Deposits</u>.

(a)    Concurrently with the First Closing, Buyer shall deposit with Escrow Holder the sum of Two Hundred Thousand Dollars ($200,000), which shall serve as the deposit for the amounts due upon the Closing of Phase 2, which shall be non-refundable once made except in the event of a default by Seller or the failure of a condition to Closing for Buyer's benefit, and shall be applied to the Purchase Price at the Closing of Phase 2, and for purposes of this Agreement shall constitute the "Deposit" under this Agreement following the consummation of the First Closing.

(b)    Concurrently with the Second Closing (as defined in Section 5.2), Buyer shall deposit with Escrow Holder the sum of Two Hundred Thousand Dollars ($200,000), which shall serve as the deposit for the amounts due upon the Closing of Phase 3, which shall be non-refundable once made except in the event of a default by Seller or the failure of a condition to Closing for Buyer's benefit, and shall be applied to the Purchase Price at the Closing of Phase 3, and for purposes of this Agreement shall constitute the "Deposit" under this Agreement following the consummation of the First and Second Closings.

3.3.    <u>Buyer's Right to Terminate or Pursue Self-Help.</u>  Assuming the Sale Order is entered, in the event that the Parcel 8/15 Final Map is not recorded by the Outside Map Date, or any other conditions to each Closing for Buyer's benefit are not timely satisfied by Seller after notice and opportunity to cure in accordance with this Agreement, then Buyer may either (i) terminate the escrow, or (ii) proceed to complete all such Seller requirements utilizing its own consultants and Buyer shall receive a credit against the Purchase Price for all actual and reasonable costs, expenses, fees, taxes, map processing fees, bonding costs, and costs of any work that was to be completed by Seller under this Agreement in order to deliver the Property to Buyer at Closing in accordance herewith free of any monetary encumbrances and any delinquent taxes subject to the Permitted Exceptions only ("**Buyer's Self-Help Right**").  If Buyer exercises Buyer's Self-Help Right, then the time periods for Closing under this Agreement shall be extended automatically for each day that Buyer exercises such right in order to allow for time to satisfy any remaining conditions to Closing.  Notwithstanding any provision contained herein to the contrary, Buyer's Self-Help Right shall not include the right to initiate litigation, arbitration or any other adversary proceeding unless Seller consents to the same in writing, such consent not to be unreasonably withheld, conditioned or delayed; provided that if Seller fails to respond within ten (10) calendar days of Buyer's request therefor then Seller shall be deemed to have consented to the same.

4.    <u>Inspections, Title Review, and Development Review</u>.

4.1.    <u>Due Diligence Period; Notice of Approval</u>.  Seller shall cooperate with Buyer and shall provide to Buyer within five (5) calendar days after the Effective Date, all

Documents in Seller's possession as set forth on <u>Exhibit C</u> attached hereto.  Buyer expressly acknowledges that, except as expressly set forth in <u>Section 14.2</u> below, Seller makes no representation or warranty of any kind with respect to the Documents or any additional Documents referenced below, including their accuracy, completeness or suitability for reliance thereon by Buyer.  Seller shall, within two (2) business days after receipt, deliver to Buyer copies of any additional Documents received by Seller before the Close of Escrow.  Subject to the provisions of this Agreement, Buyer shall have the right during the Due Diligence Period to investigate title and to conduct any feasibility, economic, environmental, political, title or engineering studies, or make such other investigations, studies and tests with respect to the Property as Buyer deems necessary or appropriate to determine the feasibility of purchasing and developing the Property.  If Buyer elects to proceed with the purchase of the Property, then at any time prior to the expiration of the Due Diligence Period, Buyer may, in its sole discretion, deliver a "**Notice of Approval**."  If Buyer gives the Notice of Approval, then, subject to the terms, covenants and conditions set forth in this Agreement and Seller's express representations and warranties set forth in <u>Section 14.2</u> below, such notice shall be Buyer's acceptance and approval of the Property and conditions related thereto, including, without limitation, (i) soils and geology reports; (ii) title issues, subject to Disapproved Exceptions (as defined in <u>Section 4.3</u> below); (iii) the Documents; (iv) Buyer's inspection of the Property; (v) any survey of the Property; and (vi) zoning and other land use controls.  Buyer's failure to give the Notice of Approval prior to the expiration of the Due Diligence Period shall be deemed Buyer's election <u>not</u> to proceed with the purchase of the Property and to terminate this Agreement, whereupon the Deposit (except for the Independent Consideration) shall be immediately returned to Buyer without the need for further instructions from either Party, and no Party hereto shall have any further obligation or liability to the other with respect to the transactions contemplated by this Agreement, except for obligations which expressly survive termination.

4.2.    <u>Inspection of Property</u>.  During the Due Diligence Period and thereafter until this Agreement is terminated or until the Close of Escrow, and subject to the provisions set forth below, Buyer shall be permitted to (i) fully inspect and test the Property, including, but not limited to, soils, geotechnical and Hazardous Materials testing by qualified, and where applicable, licensed professionals, and (ii) meet with such Authorities as Buyer shall deem necessary in connection with its inspection of the Property or its subsequent contemplated development.  Buyer and its contractors, agents and employees shall have the right to enter upon the Property for such inspection and testing, including, without limitation, the conducting of invasive and non-invasive soil, geotechnical and environmental testing, subject to the following conditions.

4.2.1    Upon at least twenty-four (24) hours' prior written notice to Seller, Buyer and its agents, employees and representatives shall have a right of reasonable access to the Property for the purpose of conducting surveys, engineering, geotechnical and environmental inspections and tests (including invasive inspection, testing and sampling), which activities are hereafter referred to as the "**Work**," and any other inspections, studies or tests required by Buyer.  As a condition precedent to access to the Property by Buyer, its agents, employees or representatives, Buyer shall (i) provide Seller with proof of liability insurance relating to such inspections and testing by third parties (which insurance shall be reasonably satisfactory to Seller, shall name Seller as an additional insured, shall be for minimum coverage of One Million Dollars ($1,000,000) per occurrence, and shall be the primary insurance with respect to Seller,

and any insurance or self-insurance maintained by Seller shall be excess of the insurance required hereunder and shall not contribute with it), (ii) keep the Property free and clear of any liens resulting from or related to the Work, and (iii) indemnify, defend and hold Seller harmless from and against any and all liability, damages, costs, fees or expenses for injuries to or death of persons or damage to property to the extent caused by or resulting from Buyer's exercise of its rights hereunder, any such entry by Buyer, its agents, contractors or consultants, employees or representatives, or any Work by Buyer, its agents, employees or representatives; provided, however, that in no event shall Buyer have any obligations under this indemnification with respect to liability, damages, costs, fees or expenses resulting from Buyer's discovery of any pre-existing conditions (except to the extent exacerbated by the negligence or willful misconduct of Buyer). As a condition precedent to the commencement of any invasive Work, however, Buyer shall describe in its notice, with reasonable detail, the contemplated invasive Work and shall identify the parties who will perform the Work and their qualifications.  Such contemplated invasive Work shall be subject to approval by Seller, which approval shall not be unreasonably withheld, conditioned or delayed.  If any inspection or test disturbs the Property, Buyer shall promptly restore the Property to substantially the same condition as existed prior to any such inspection or test and Buyer shall at all times obey all applicable laws, rules and regulations. The obligations of the Buyer under this paragraph shall survive the termination of the Agreement.

4.2.2   Buyer shall use reasonable care to prevent any unreasonable interference with Seller's activities on the Property during Buyer's investigation thereof.  Buyer shall not permit the Property or any portion thereof to become subject to any lien for claims for work or materials arising out of Buyer's activities on the Property, and Buyer shall immediately remove or cause to be removed any such lien.

4.2.3   In order to minimize disagreements over the physical status of the Property, Buyer and Seller shall conduct a joint walk-through of the Property, within five (5) business days after the Effective Date.  Each Party shall have the right to have its engineer present for such walk-through.  The Parties shall prepare a list of any conditions or discrepancies found at the Property.

4.3.   Documents/Title Review.  Within five (5) calendar days after the Effective Date, Buyer shall request that Title Company deliver to Buyer a commitment for issuance of a standard coverage owner's title insurance policy ("**Title Commitment**") covering the Property, together with complete and legible copies of all documents referenced therein as exceptions to the Title Commitment.  No later than fifteen (15) calendar days following the Effective Date, Buyer shall notify Seller of Buyer's objections to title, if any ("**Disapproved Exceptions**"). Seller shall notify Buyer in writing within ten (10) calendar days after receipt of Buyer's notice of Disapproved Exceptions as to which, if any, of the Disapproved Exceptions Seller or Title Company will eliminate.  If Seller does not agree to eliminate each of the Disapproved Exceptions, then unless Buyer delivers the Notice of Approval to Seller and Escrow Agent on or before the expiration of the Due Diligence Period (in which case Buyer shall be deemed to have approved the same and elected to proceed with the Closing subject to such exceptions), Buyer shall be deemed to have disapproved title, Escrow shall terminate, Escrow Agent shall immediately return the Deposit (except for the Independent Consideration) to Buyer without any additional instructions from Seller and without any imposed conditions and Escrow Agent shall

immediately return all other documents, instruments and monies to the Party which deposited same.

            4.3.1   Except as to current real property taxes and assessments not yet due and payable, all Monetary Liens shall automatically be deemed to be Disapproved Exceptions. Permitted Exceptions shall include, without limitation, (i) a lien for non-delinquent taxes, assessments, special taxes and similar impositions, and the lien of supplemental taxes assessed pursuant to Chapter 3.5 commencing with Section 75 of the California Revenue and Taxation Code to the extent relating to events occurring from and after the Close of Escrow; (ii) the covenants, conditions and restrictions encumbering the Property as of the Effective Date; (iii) any community facilities or assessment districts encumbering the Property as of the Effective Date; and (iv) any matter created or caused by Buyer or its agents or approved in writing by Buyer. Seller shall be obligated to remove all Monetary Liens on or before Closing. Any exception to title appearing in the Title Commitment, which is not expressly identified as a Disapproved Exception by Buyer and which Seller does not also expressly agree to eliminate in writing shall be a "**Permitted Exception**."

            4.3.2   No later than fifteen (15) calendar days prior to each Closing, Escrow Agent shall obtain from Title Company and deliver to Seller and Buyer an updated Title Commitment for the Property for the issuance of an ALTA standard coverage owners' policy of title insurance and legible copies of all instruments listed in the report as exceptions to title (collectively, the "**Updated Title Documents**"). Buyer shall be deemed to object to any new matters set forth on the Updated Title Documents. Seller shall have ten (10) calendar days from issuance of the Updated Title Documents to cure the objections or to obtain the commitment of the Title Company to insure against such title exceptions in a manner acceptable to Buyer; Seller shall be required to cure any new Monetary Liens on or prior to Closing. If Buyer requires an extended form of owner's policy, then Buyer shall obtain and deliver to the Title Company within thirty (30) calendar days of the date of entry of the Sale Order an ALTA/ACSM Land Title Survey of the Property acceptable to the Title Company ("**Survey**"). Any request for an extended form of title policy shall not delay the Close of Escrow.

            4.4.   <u>Development Approval</u>. During the term of this Agreement, at Buyer's cost and expense, Buyer shall have the right to pursue any new entitlements and all Authority approvals and Permits necessary for Buyer's development of the Project, including, without limitation, all subdivision mapping approvals, land use and zoning approvals, architectural approvals, including, but not limited to, building plans, renderings, specifications, drawings, elevations, and prototypes, and any other approvals and permits required to permit Buyer to immediately commence construction of its intended development of Buyer's proposed Project and for the issuance of certificates of occupancy for such residences or buildings upon their completion in the ordinary course (collectively, the "**Development Approvals**"), all as Buyer may deem necessary for its Project. Furthermore, Buyer shall prepare and process the remaining Final Maps using commercially reasonable efforts in order to meet the proposed Closing Dates set forth in this Agreement. Seller agrees to fully cooperate with Buyer in connection with its Development Approvals and the Final Maps, and shall execute, upon request of Buyer any and all maps, documents and agreements which are reasonably necessary to accomplish such purposes, including appointment of Buyer as agent of Seller for purposes of Buyer's development of the Property, provided that Seller incurs no material cost or liability as a result of

such cooperation and provided that the document appointing Buyer as Seller's agent expressly prohibits Buyer from binding the Property or recording any documents relating to the Property without the prior written consent of Seller, which consent shall not be unreasonably withheld. In the event that the City requires that Seller, as the owner of the Property, execute any development applications or subdivision improvement agreements with the City, Seller shall execute and return such development applications and agreements to Buyer within five (5) calendar days after the date on which such items are delivered to Seller.

4.4.1    Except as otherwise set forth in the Agreement, Buyer shall have the right to prepare any site plans for the Property, including all engineering and landscaping plans and drawings, the architectural materials, utility plans for the Project, and all applications and submittals necessary to obtain its Development Approvals as it may deem necessary during the Due Diligence Period. At no out-of-pocket cost to Seller, Seller shall, for no additional consideration or payment, upon request by Buyer (i) execute and promptly deliver to such appropriate Authorities such applications, submittals, documents, instruments and other items reasonably requested by Buyer in connection with the Development Approval process for the Property; (ii) as reasonably requested by Buyer, appear at any public hearings or other, meetings for or with Authorities or neighborhood meetings in connection with, and support of the Development Approvals for the Property; and (iii) otherwise cooperate as reasonably requested by Buyer in connection with Buyer's obtaining the Development Approvals of the Property. Except as set forth in Section 4.6 below, nothing herein contained shall be deemed to grant Seller and Seller hereby confirms that Seller has no right, and it hereby waives any right, to object to the Development Approval matters relating to the Property.

4.5.    Inquiry. Subject to the provisions of Section 10 below, Buyer and its representatives, employees, agents and independent contractors shall have the right, at its sole cost and expense, to (i) meet with all City, County, district and other Authorities; and (ii) discuss with any such entities and agencies the condition of the Property and Buyer's proposed development of the Property.  Seller shall have the right to participate in any such meetings arranged by Buyer with Authorities.

4.6.    Design Review.  Buyer's design and improvement plans for Phase 2 and Phase 3 of the Property shall be subject to Seller's reasonable approval thereof, which approval shall not be unreasonably withheld, delayed or conditioned.  Buyer agrees to submit its plans to Seller prior to submission to the City, and Seller shall have fifteen (15) calendar days to submit any objections to the same.  Failure to approve or disapprove Buyer's plans within such time period shall be deemed an approval.  This right shall be personal to the Seller named in this Agreement, and shall not run to the benefit of any other parties, whether successors or assigns or otherwise.

5.    Closing.

5.1.    Timing.  The Closing on the Property shall take place in three Phases as set forth herein to provide the time needed to create the legal parcels comprising the Property. Closing shall occur at the offices of Escrow Agent during normal business hours or at such other location as Buyer and Seller may mutually agree.

     5.2.   <u>Phased Closings</u>.  Subject to Buyer's contingencies to Closing under this Agreement, including the Sale Order being a Final Order, and assuming that the Parcel 8/15 Final Map is recorded on or prior to the First Closing, the Closing on (i) Phase 1 shall occur no later than four (4) months following entry of the Sale Order ("**First Closing**"); (ii) Phase 2 shall occur no later than twelve (12) months following entry of the Sale Order ("**Second Closing**"); and (iii) Phase 3 shall occur no later than twenty (20) months following entry of the Sale Order ("**Third Closing**").  The consummation of a prior Closing shall be a condition precedent to the consummation of any subsequent Closing under this Agreement.

     5.3.   <u>Closing Extensions</u>.

     5.3.1   <u>Seller's</u>.  Notwithstanding the foregoing, if the Parcel 8/15 Final Map is not recorded by the Outside Map Date notwithstanding Seller's use of all commercially reasonable and diligent efforts, then unless Buyer exercises Buyer's Self-Help Right, Seller shall have the right to extend the Outside Map Date by a period of up to thirty (30) days to allow Seller time to record the Parcel 8/15 Final Map.

     5.3.2   <u>Buyer's</u>.  Notwithstanding the foregoing, if the Final Maps are not recorded by the dates set forth above for the Second Closing or the Third Closing, respectively, notwithstanding Buyer's use of all commercially reasonable and diligent efforts, then Buyer shall have the right to extend each such date for the Second Closing and/or the Third Closing by a period of thirty (30) days for each affected Closing to allow Buyer time to record the Final Maps.

     5.4.   <u>Outside Conditions Date</u>.  Notwithstanding anything to the contrary contained in this Agreement, in the event Seller is not able, on or before January 15, 2018, to obtain entry of the Sale Order or satisfy the other conditions to Closing for Buyer's benefit hereunder, or if the Sale Order has not become a Final Order by such date, in each case through no fault of Seller and Seller shall have used all commercially reasonable efforts to satisfy the foregoing conditions by such date ("**Outside Conditions Date**"), then Seller shall have the right to extend the Outside Conditions Date for a period of up to sixty (60) calendar days; and following such extension if the foregoing conditions have not been satisfied during such sixty (60) day period, then Buyer shall have the right to terminate this Agreement and receive a refund of the Deposit, and the Parties shall have no further obligations to each other hereunder.

     5.5.   <u>Payment of Purchase Price Balance</u>.  Provided that (i) Seller has deposited all of the items required by this <u>Section 5.5</u> no later than two (2) business days prior to the Closing Date, (ii) all conditions precedent set forth in this Agreement have been satisfied or waived, and (iii) the Title Company has confirmed to Buyer in writing that it is in receipt of all items required to be deposited by Seller and is unconditionally prepared to issue the Title Policy (defined below) to Buyer upon consummation of the Closing subject only to the Permitted Exceptions, and payment of the applicable policy premium, Buyer shall deposit with Escrow Agent the Purchase Price for the applicable Phase less the Deposit already in Escrow and adjusted by Buyer's share of prorations and Closing costs pursuant to <u>Sections 5.8</u> and <u>5.9</u> below, together with the other adjustments provided for under this Agreement.

5.6.    <u>Delivery of Closing Documentation</u>.

(a)    <u>Seller's Delivery</u>. No later than two (2) business days prior to Closing, Seller shall execute, acknowledge, and deliver to Escrow Agent, (i) Seller's grant deed transferring good and marketable title to the Property, free and clear of all liens and encumbrances, except Permitted Exceptions in the form attached hereto as <u>Exhibit D</u> (the "**Grant Deed**"), (ii) a non-foreign person affidavit in the form attached hereto as <u>Exhibit E</u> ("**FIRPTA**"), (iii) a bill of sale and assignment in the form of attached hereto as <u>Exhibit F</u> ("**Bill of Sale**"), (iv) evidence that Seller is exempt from the withholding obligations imposed by California Revenue and Taxation Code Sections 18805, 18815, and 26131, and (v) such other bills of sale, assignments, and other documents or instruments of transfer or conveyance as Buyer or Escrow Agent may reasonably request or as may be otherwise necessary to evidence and effect the sale, assignment, transfer, conveyance and delivery of the Property to Buyer at no material additional cost, obligation or liability to Seller. Seller shall, at no cost or liability to Seller, cooperate with Buyer by providing to the Title Company, at or prior to Closing, any customary affidavits, agreements and documents reasonably required by the Title Company to issue the Title Policy together with any extended coverage desired by Buyer.

(b)    <u>Buyer's Delivery</u>. No later than two (2) business days prior to Closing, Buyer shall execute, acknowledge, and deliver to Escrow Agent (i) the Bill of Sale and (ii) such other documents or instruments as Escrow Agent may reasonably request or as may be otherwise necessary to evidence and effect the sale, assignment, transfer, conveyance and delivery of the Property.

5.7.    <u>Agreement to Cooperate</u>. Each Party shall execute, acknowledge and deliver, after the Effective Date, including at or after Closing, such further assurances, instruments and documents as the other may reasonably request in order to fulfill the intent of this Agreement and the transactions contemplated hereby. Following a reasonable request for further assurances, instruments and/or documents from one Party to the other, the requested Party shall reasonably respond to the request within two (2) business days, and shall not unreasonably withhold compliance with the request. The provisions of this <u>Section 5.7</u> shall survive each Closing and delivery of the Grant Deed and shall not be merged with such deed. Buyer shall cooperate with Seller so that any density transfers for units allowed for the Property in excess of those used by Buyer in its sole and absolute discretion for its Project may be allocated to Seller.

5.8.    <u>Prorations</u>. All non-delinquent real estate taxes, and all other public or governmental charges and public or private assessments against the Property, if any, shall be adjusted and prorated, on the basis of a three hundred sixty-five (365) day year, between the Parties as of the day of Closing and shall thereafter be assumed and paid by Buyer, whether or not assessments have been levied as of the date of Closing. Seller shall be responsible for paying all delinquent taxes, and if Seller is not able to do so by the Closing, then Buyer agrees to pay such amounts, in which event such amount shall be credited against the Purchase Price for Buyer's benefit. Any tax proration based on an estimate shall be subsequently readjusted upon receipt of a tax bill. The obligation to adjust shall survive Closing. After Closing, Seller shall remain solely responsible for and shall promptly pay before delinquency any real estate taxes and assessments for the Property relating to periods prior to the Closing Date. The provisions of this

Section 5.8 shall survive each Closing and delivery of the Grant Deed for a period of twelve (12) months.

      5.9.   <u>Closing Costs</u>.  Seller shall pay the cost of the Title Policy (standard coverage) and any endorsements requested by Buyer as agreed to by Seller in order to remove a Disapproved Exception.  Seller shall pay the County transfer taxes and any City transfer taxes.  Buyer shall pay any premium increment for the extended form of Title Policy (if so elected by Buyer) and the cost of any survey obtained by Buyer, if any.  Seller and Buyer shall equally pay any recording fees.  Seller and Buyer shall equally pay the Escrow Agent's escrow fees.  All other Closing costs, escrow fees, and other fees shall be allocated between the Parties as is customary in the County.

    6.   <u>Condemnation and Damage</u>.

      6.1.   <u>Condemnation</u>.  If after the Buyer has given its Notice of Approval and prior to Closing all or any part of the Property is taken or threatened to be taken by eminent domain or condemnation, Buyer may elect either (a) to terminate this Agreement, in which event Escrow Holder shall immediately return all documents, instruments and monies (including, without limitation, the Deposit) to the Party which deposited same in respect of the Closing and this Agreement shall terminate and be of no further force or effect except for those matters that expressly survive the termination hereof; or (b) to consummate Closing as herein provided, in which event Seller shall pay or assign to Buyer all condemnation awards or payments in respect of the Property.  If Buyer elects to proceed under clause (b) above, Seller shall not compromise, settle or adjust any claims to such award without Buyer's prior written consent.  If this Agreement is terminated pursuant to this <u>Section 6.1</u>, neither Party shall have any further rights, duties, obligations or liabilities, at law or in equity, arising out of or relating to this Agreement except for those that specifically survive termination of this Agreement pursuant to other sections hereof.

      6.2.   <u>Damage</u>.  If any damage or destruction to any of the Property occurs prior to Closing, Seller shall immediately give Buyer written notice of such damage or destruction, and Buyer shall have the option, exercisable within ten (10) days after notice of such damage, either to (i) terminate the Escrow, in which case Escrow Holder shall immediately return all documents, instruments and monies (including, without limitation, the Deposit) to the Party which deposited same in respect of the Closing and this Agreement shall terminate and be of no further force or effect except for those matters that expressly survive the termination hereof, or (ii) accept the Property in its condition at that time, and receive an assignment of all of Seller's rights to any insurance proceeds payable by reason of such damage or destruction together with a credit against the Purchase Price equal to Seller's insurance deductible.  If Buyer elects to proceed under clause (ii) above, Seller shall not compromise, settle or adjust any such insurance claims without Buyer's prior written consent.

    7.   <u>Conditions Precedent to Closing</u>.

      7.1.   <u>Buyer's Conditions</u>.  Buyer's obligation to complete each Closing (unless a different date is set forth below) shall be conditioned upon the satisfaction (or Buyer's written waiver thereof) of each of the conditions precedent set forth in this <u>Section 7.1</u> below.  If these

conditions are not satisfied or affirmatively waived by Buyer in Buyer's sole and absolute discretion (except that the recording of any maps to create legal parcels may not be waived by either Party), then, without limiting any other remedies Buyer may have hereunder, and subject to Section 11, Buyer shall have the right to terminate this Agreement, in which case the Deposit shall be promptly returned from Escrow Agent to Buyer without further instruction from Seller, and neither Party shall have any duty, obligation or liability to the other except as expressly provided for herein.

(a)     Title Policy.  Seller, at its sole expense, shall cause Title Company to deliver to Buyer an ALTA owner's coverage policy of title insurance issued by the Title Insurer, with such endorsements as Buyer may reasonably request, insuring Buyer in the amount of the Purchase Price of the applicable Phase and showing the Property to be subject to no exceptions to title other than the Permitted Exceptions and such other exceptions as may expressly be approved by Buyer in writing (the "**Title Policy**").

(b)     Notice of Approval.  Buyer shall have given the Notice of Approval.

(c)     Seller's Performance.  Seller shall have performed all material obligations to be performed by Seller pursuant to this Agreement prior to Closing.

(d)     Seller's Representations and Warranties.  Seller's representations and warranties set forth herein shall be true and correct as of the Closing.

(e)     Sale Order.  The Sale Order shall have been entered and shall be a Final Order.

(f)     Monetary Liens.  Pursuant to the Sale Order, the portion of the Property subject to a Closing shall be free and clear of Monetary Liens, including, without limitation, the Lender's Lien and all liens for delinquent taxes.

(g)     Assignment of Grants.  As of the First Closing, Seller (and the City as such written consent may be required under the applicable grant agreements) shall have transferred and assigned to Buyer the Park Grant Amount and the Street Grant.

(h)     Parcel 8/15 Final Map.  As to Phase 1, Seller shall have recorded the Parcel 8/15 Final Map by the Outside Map Date.

(i)     Final Maps.  As to each of Phase 2 and Phase 3, the Final Maps shall have been approved and recorded.

(j)     Cost Sharing Agreements.  As of the First Closing, Seller shall have duly executed the cost sharing agreements required under this Agreement to be recorded concurrently therewith.

(k)     Development Agreements.  Seller shall have caused all of the development agreements affecting the Property (applicable to the master development of the Overall Project) to be released from the Property on or prior to the Closing for each Phase.

(l)     <u>Other Conditions</u>. Seller shall have satisfied its covenants under this Agreement by the Outside Conditions Date.

7.2.     <u>Seller's Conditions</u>. Seller's obligation to complete each Closing (unless a different date is set forth below) shall be conditioned upon the satisfaction (or its written waiver thereof) of each of the conditions precedent set forth in this <u>Section 7.2</u>. If these conditions are not satisfied or affirmatively waived by Seller in its sole and absolute discretion (except that the recording of any maps to create legal parcels may not be waived by either Party), then, without limiting any other remedies Seller may have hereunder, and subject to <u>Section 11</u>, Seller shall have the right to terminate this Agreement, upon which the Deposit shall be promptly returned from Escrow Agent to Buyer, and neither Party shall have any duty, obligation or liability to the other except as expressly provided for herein.

7.2.1    <u>Purchase Price</u>. Buyer shall have delivered the balance of Purchase Price in immediately available funds in accordance with the terms of this Agreement.

7.2.2    <u>Seller's Performance</u>. Buyer shall have performed all material obligations to be performed by Buyer pursuant to this Agreement prior to Closing.

7.2.3    <u>Seller's Representations and Warranties</u>. Buyer's representations and warranties set forth herein shall be true and correct as of the Closing.

7.2.4    <u>Sale Order</u>. The Sale Order shall have been entered and shall be a Final Order.

7.2.5    <u>Lender's Lien</u>. If not otherwise addressed in the Sale Order, Seller shall have received a release of the Lender's Lien as to the portion of the Property being acquired by Buyer.

7.2.6    <u>Assignment of Grants</u>. On or prior to the First Closing, Seller shall have obtained the City's written agreements for the transfer and assignment of the Park Grant Amount and the Street Grant to Buyer.

7.2.7    <u>Development Agreements</u>. On or prior to the Closing for each Phase, Seller shall have obtained the City's written release of all development agreements affecting the Property (applicable to the master development of the Overall Project).

8.     <u>Closing</u>.

8.1.     <u>Escrow Agent's Actions</u>. Upon the Closing Date, when Escrow Agent holds the items required to be deposited by Seller and Buyer as described above and Title Company is prepared to issue and deliver to Buyer the Title Policy for the applicable Phase, Escrow Agent is instructed and authorized to perform the following actions:

(a)     record the Grant Deed in the office of the County Recorder of the County;

(b)     pay any transfer taxes (to the extent the sale is not exempt from transfer taxes pursuant to Section 1146(a) of the Bankruptcy Code pursuant to the terms of the Sale Order);

(c)     pay any pro-rated real estate taxes and assessments and any other charges to be paid by Buyer, out of proceeds deposited into Escrow by Buyer;

(d)     unless otherwise provided in the Sale Order, pay any pro-rated real estate taxes and assessments and any other charges to be paid by Seller, out of the proceeds deposited into Escrow by Buyer and held for the account of Seller;

(e)     instruct the County Recorder to return the recorded Grant Deed;

(f)     unless otherwise provided in the Sale Order, disburse to Seller from the funds deposited into Escrow by Buyer, the Purchase Price including the Deposit not previously released to Seller, if any, less Seller's escrow and cash charges as prorated in accordance with Section 5.8 and Section 5.9;

(g)     disburse from funds deposited by Buyer amounts toward payment of all other items chargeable to the account of Buyer hereunder, and disburse the balance of such funds if any, to Buyer, and promptly deliver (1) to Buyer the Bill of Sale and the Title Policy; (2) to Seller a copy of the recorded Grant Deed and the Bill of Sale; and (3) to Buyer and Seller conformed copies of all recorded documents.

8.2.    Escrow Cancellation Charges.  Responsibility for the payment of escrow cancellation charges shall be borne as follows:  (i) If the Closing does not occur because of the default of a Party, then, notwithstanding anything to the contrary contained herein, the defaulting Party shall bear all escrow cancellation charges.  (ii) If the Closing does not occur because of the failure to obtain timely entry of the Sale Order, or because the Sale Order does not timely become a Final Order, then Seller shall bear all escrow cancellation charges.  (iii) If the Closing does not occur for any reason other than the reasons in clause (i) or (ii) of this Section 8.2, then Buyer and Seller shall each pay one-half of any escrow cancellation charges, if so charged by Escrow Agent.  As used herein, "**escrow cancellation charges**" means all fees, charges and expenses actually incurred by Escrow Agent, as well as all expenses related to the services of the Title Company in connection with the issuance of the Title Commitment and other title matters.

8.3.    Possession.  Upon Closing, Seller shall deliver to Buyer exclusive possession of the Property, subject to any and all Permitted Exceptions.

9.     Condition and Inspection of Property.  Except as provided in this Agreement, Seller makes no representation or warranty regarding the condition of the Property, its past use, or its suitability for Buyer's intended use.

(A)     Unless otherwise expressly provided in this Agreement, neither Seller nor any employee or agent of Seller has made or will make, either expressly or impliedly, any representations, guaranties, promises, statements, assurances or warranties of any kind concerning any of the following matters (collectively referred to herein as the "**Property Conditions**"):  (i) the suitability or condition of the Property for any purpose or its fitness for

any particular use, (ii) the profitability and/or feasibility of owning, developing, operating and/or improving the Property, (iii) the physical condition of the Property, including, without limitation, the current or former presence or absence of environmental hazards or Hazardous Materials, asbestos, radon gas, underground storage tanks, electromagnetic fields, or other substances or conditions which may affect the Property or its current or future uses, habitability, value or desirability, (iv) the rentals, income, costs or expenses thereof, (v) the net or gross acreage, usable or unusable, contained therein, (vi) the zoning of the Property, (vii) the condition of title, (viii) the compliance by the Property with applicable zoning or building laws, codes or ordinances, or other laws, rules and regulations, including, without limitation, environmental and similar laws governing or relating to environmental hazards or Hazardous Materials, asbestos, radon gas, underground storage tanks, electromagnetic fields, or other substances or conditions which may affect the Property or its current or future uses, habitability, value or desirability, (ix) water or utility availability or use restrictions, (x) geologic/seismic conditions, soil and terrain stability, or drainage, (xi) sewer, septic, and well systems and components, (xii) other neighborhood or Property conditions, including, schools, proximity and adequacy of law enforcement and fire protection, crime statistics, noise or odor from any sources, landfills, proposed future developments, or other conditions or influences which may be significant to certain cultures or religions, or (xiii) any other past, present or future matter relating to the Property which may affect the Property or its current or future use, habitability, value or desirability.

(B)     Buyer is strongly encouraged to conduct its own inspection and investigation of the Property Conditions referred to above and is further encouraged to obtain, at its expense, expert advice as to such matters from professional inspectors and others. Buyer acknowledges that as of the Closing, it has been given the full opportunity to inspect and investigate such Property Conditions to its own satisfaction or cause such an inspection and investigation by experts engaged by Buyer. Buyer represents to Seller that it is relying solely upon such inspection and investigation in connection with its purchase of the Property and not upon any express or implied representations, guaranties, promises, statements, assurances or warranties of Seller or any of Seller's employees or agents as to such Property Conditions, unless otherwise expressly provided under this Agreement and that subject to Seller's expressed representations and warranties and post-Closing obligations of Seller set forth in this Agreement, and Buyer's inspection of the Property made during the Due Diligence Period, Buyer is acquiring the Property "AS IS.".

(C)     Effective upon the Closing of the Property or any portion thereof, by initialing below, Buyer, for itself and its agents, affiliates, successors and assigns, hereby waives, releases and forever discharges Seller and its agents, affiliates, successors and assigns from any and all rights, claims and demands at law or in equity, whether known or unknown at the time of this Agreement or at Closing, which Buyer has or may have in the future, arising out of the physical, environmental or economic condition or suitability of the Property, but specifically excluding (i) the representations, warranties and covenants of Seller under this Agreement, (ii) any intentional misrepresentation, or (iii) fraud. Buyer specifically waives the provision of California Civil Code Section 1542, which specifically provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW

OR EXPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN TO HIM OR HER MUST HAVE MATERIALLY AFFECTED THE SETTLEMENT WITH THE DEBTOR.

Buyer 

10.    Additional Covenants and Agreements.  Notwithstanding anything to the contrary contained in this Agreement, the following additional covenants and agreements shall apply to the Parties:

10.1.    Right to Contact Government Officials.  In conjunction with Buyer's due diligence review and obtaining any entitlements, Buyer shall have the right to contact local, state and federal officials ("**Government Officials**").

10.2.    Master Association.  Buyer is advised, and acknowledges and agrees that the Project, including the Property, is subject to covenants, conditions, and restrictions recorded in the Official Records of the County Recorder's Office, which, inter alia, authorize the formation of an owners' association, certain use requirements and restrictions and the imposition of assessments.  If within the reasonable control of Seller at the applicable time, Buyer shall be entitled to a proportionate number of seats on the board of the owner's association at such time as it is formed.  The provisions of this Section shall survive and shall continue in full force and effect after Closing.

10.3.    Costs of Approvals.  Except as expressly set forth in this Agreement, including, without limitation, the costs related to the Parcel 8/15 Final Map and satisfaction of the related conditions imposed by the City and payment of all fees in order to finalize and record such map and such other amounts as described in this Agreement (which shall be Seller's sole responsibility), Buyer assumes all other costs, duties, risks, liabilities and obligations for improving the Property and obtaining all required Permits and Approvals (including the Final Maps for Phase 2 and Phase 3, and the related conditions thereto, but specifically excluding the Parcel 8/15 Final Map and its related costs or conditions) for Buyer's intended use thereof for the Project, and paying all costs and fees in connection therewith, including, but not limited to, building permit fees.

10.4.    Parcel 8/15 Final Map.  Seller shall process and obtain final approval of the Parcel 8/15 Final Map and record it as a condition to the First Closing for Buyer's benefit. Seller shall process and record the Parcel 8/15 Final Map no later than ninety (90) calendar days following entry of the Sale Order ("**Outside Map Date**").  Seller shall be responsible for all costs and expenses for preparing, approving and recording the Parcel 8/15 Final Map, including, without limitation, all bonding and warranty costs, and conditions thereto.

10.5.    Park Work.  The provisions of the Recitals pertaining to the Park Work are hereby incorporated by reference.

10.6.    Street Work.  The provisions of the Recitals pertaining to the Street Work are hereby incorporated by reference.

10.7.    Buyer's Self-Help Right.    In the event that Seller fails to complete processing and recording the Parcel 8/15 Final Map by the Outside Map Date, or completing any obligations required in connection therewith such as the payment of any delinquent taxes, or any other material obligations required of Seller under this Agreement, and Buyer shall have given written notice of such failure and the opportunity to cure the same within ten (10) calendar days of such notice (collectively, "**Incomplete Work**"), then Buyer shall have the right to elect to complete the Incomplete Work in accordance with the following provisions affecting Buyer's Self-Help Right.  Buyer may exercise Buyer's Self-Help Right with respect to any portion of the Incomplete Work, and any partial exercise shall not relieve Seller of Seller's obligation to complete the remainder of the Incomplete Work with respect to which Buyer has not exercised Buyer's Self-Help Right.

10.7.1  Direct Payment.    In exercising Buyer's Self-Help Right, Buyer shall have the right to use Buyer's contractors and consultants to complete any Incomplete Work.  To the extent Buyer exercises Buyer's Self-Help Right, Buyer shall have the right to pay all contractors and consultants directly.  The amounts paid by Buyer for the actual and reasonable costs to complete any Incomplete Work shall be the self-help costs (collectively, the "**Self-Help Costs**").

10.7.2  Credit to Purchase Price.    All Self-Help Costs shall be credited against and reduce the amount of the Purchase Price on a dollar-for-dollar basis for Buyer's benefit.

10.7.3  Ongoing Assignment of Seller's Rights.

(a)    Assignment of Plans and Contracts.    Concurrently with the Closing, Seller shall sign and deliver to Buyer that certain Assignment of Plans and Contracts in the form attached hereto as Exhibit G ("**Assignment of Plans and Contracts**").  Pursuant to the Assignment of Plans and Contracts and this Agreement, Seller shall and does hereby assign to Buyer, to the extent assignable, on a non-exclusive basis, without representation or warranty, all of its rights and interests in, to and under all of the following whether now or hereafter existing: (a) all plans, drawings, specifications, surveys, reports, data and similar documents relating to Seller's development of the Property and construction of the offsite and onsite improvements together with all express or implied warranties related thereto (collectively, "**Plans**"); (b) all Intangible Property owned by Seller in connection with Seller's development of any portion of the Property, and all other governmental permits, entitlements, approvals and licenses, including, without limitation, all applications for any of the foregoing (collectively, "**Permits**"); and (c) all agreements and contracts relating to the preparation, issuance, ownership or use of the Plans and Permits and the construction of all improvements contemplated thereby with respect to the Property (collectively, "**Contracts**").

(b)    Consents.    It is the intention of the Parties that, subject to the requirements of this Section 10.7.3, by virtue of the Assignment of Plans and Contracts, Buyer will have full rights, power and authority to use, re-use or rely upon all of the Plans, Permits and Contracts in connection with its development of the Property in connection with Buyer's Self-Help Right, but without any obligation to cure any default or breach on Seller's part thereunder. Seller shall use commercially reasonable efforts to obtain (a) all necessary written consents to

said assignment of Plans, Permits and Contracts ("**Necessary Consents**") from the firms preparing or entering into the Plans, Permits and Contracts, and (b) written acknowledgments ("**Right to Use Acknowledgment**") from the firms preparing or entering into the Plans, Permits and Contracts that each of them have read the terms and conditions of this Section and agrees to comply with its terms and recognize Buyer's rights, power and authority to use, re-use or rely upon all of the Plans, Permits and Contracts, which shall be obtained during the Due Diligence Period. The form by which Seller will obtain Necessary Consents and Right to Use Acknowledgments in substantial conformance therewith is attached hereto as Exhibit H. Further, Seller shall immediately advise Buyer of such inability to obtain any of the Necessary Consents and/or Right to Use Acknowledgments so that Buyer may directly discuss said request with such non-consenting parties. Seller shall also use commercially reasonable efforts to obtain all Necessary Consents and Right to Use Acknowledgments for the Plans, Permits and Contracts from all appropriate Authorities. If Seller is unable to obtain any or all Necessary Consents and Right to Use Acknowledgments, then upon request by Buyer, Seller will promptly (and in any event within fourteen (14) days thereafter) prepare and file a motion pursuant to Sections 363, 365 and/or 525 of the Bankruptcy Code to approve the assignment to Buyer (subject to the Closing of the sale of the portion of the Property to which the Plans, Permits and Contracts relate) of all of Seller's right, title and interest in and to the Plans, Permits and Contracts, which motion may be included within the Chapter 11 Plan or other motion for entry of the Sale Order.

           (c)    <u>Run with the Land</u>. Notwithstanding anything to the contrary contained herein, to the fullest extent permitted by law, all Plans, Permits and Contracts shall run with the Property and, to the extent agreed upon by the applicable party, firm, consultant, agency or regulatory authority, no party, firm, consultant, agency or regulatory authority (other than Seller and Buyer) shall have any ownership interest therein or legal or other claim or rights thereto.

           10.8.   <u>No Opposition</u>. By purchasing the Property, Buyer acknowledges Seller's right to obtain the consent of all governing agencies to develop the remaining portions of the real property within the Overall Project (not including the subject Property) in whatever reasonable manner Seller shall choose (but specifically excluding the development of the remaining Overall Project into townhouses which may be opposed by Buyer provided that the Closing for each Phase of the Property has timely occurred). Buyer, on behalf of itself and its officers, partners, directors, employees, agents, partners, members, successors and assigns, agrees that it will not in any way challenge, contest, oppose, litigate, or seek to hinder or delay, directly or indirectly, administratively, judicially, publicly or privately, including by referenda or initiative, and will not in any way assist, support, encourage or provide cooperation, direct or indirect, to others who challenge, contest, oppose, litigate, or seek to hinder or delay; (i) the processing and issuance of entitlements for the development, use, occupancy, and/or sale of the Overall Project or any matter in any way related thereto (but specifically excluding the development of the remaining Overall Project into townhouses which may be opposed by Buyer provided that the Closing for each Phase has timely occurred); (ii) any governing agency ordinances, permits, approvals or determinations in any way related to the development, construction, use, occupancy, and/or sale of any portion of the Overall Project, including, but not limited to, any development agreement, tentative or final map, or the conditions applicable thereof, (iii) ordinances, permits, approvals or determinations in any way related to the construction of public works, and/or offsite improvements related to the Overall Project; (iv) matters related to the implementation of the

Overall Project ordinances, permits, approvals, determinations or other entitlements, (v) financial agreements with governing agencies and community facilities districts or bonds issued pursuant thereto, (vi) any other documentation related to development, construction, use, occupancy, and/or sale of any portion of the Overall Project, or (vii) any modification, renewal, extension, or amendment of any of the foregoing. Buyer shall execute and acknowledge such documents, agreements, consents, waivers, or other instruments and shall take such other actions as Seller, in the exercise of its sole discretion, may deem necessary, expedient or appropriate to confirm Buyer's consent to the development of the Overall Project in accordance with the provisions of this paragraph. Seller alone shall have the right to enforce, all restrictions, covenants and agreements imposed by this paragraph, including the right to prevent the violation of any such restrictions, covenants, or agreements; order the abatement of any activity undertaken by Buyer in violation of any such restrictions, covenants, or agreements; and the right to recover damages or other amounts due for such violation. All rights, options and remedies of Seller are cumulative, and no one of them shall be exclusive of any other. Seller (and/or its assignee) shall have the right to pursue any one or all of such rights and remedies or any other remedy or relief which may be available at law or in equity, whether or not stated in this paragraph. The provisions of this paragraph shall survive and shall continue in full force and effect after the First Closing for a period of sixty (60) months.

10.9.  <u>SWPPP Indemnity</u>. TO THE MAXIMUM EXTENT PERMITTED BY LAW, SELLER SHALL INDEMNIFY AND HOLD HARMLESS BUYER AND ANY OF ITS AFFILIATES FROM AND AGAINST ANY CLAIMS, DEMANDS, DAMAGES, FINES, PENALTIES, VIOLATIONS, NOTICES OF VIOLATIONS, REASONABLE ATTORNEYS' FEES, COSTS, OR EXPENSES OF ANY TYPE OR NATURE TO THE EXTENT ARISING FROM OR RELATED TO, DIRECTLY OR INDIRECTLY, THE FAILURE OF SELLER TO (i) SATISFY SELLER'S STORM WATER OBLIGATIONS DURING THE PERIOD OF SELLER'S OWNERSHIP, OR (ii) OTHERWISE FAIL TO PROPERLY PERFORM ANY STORM WATER RELATED ACTIONS REQUIRED ON THE PART OF SELLER PRIOR TO THE CLOSING ON THE PROPERTY (OR ANY PORTION THEREOF) BY BUYER.

10.10.  <u>Assignment of Declarant Status and Development Agreement</u>. At each Closing, Seller shall partially assign to Buyer (and/or its assignee) declarant status under the existing CC&Rs relative to matters concerning the entitlement, development, improvement and use of the parcels constituting the Property being acquired at such Closing, by executing and delivering the Assignment of Declarant Status in the form and content required under the CC&Rs and pursuant to a written assignment agreement to be prepared and entered into between the Parties prior to the expiration of the Due Diligence Period. Seller shall use commercially reasonable efforts to cause any and all development agreements (applicable to the master development of the Overall Project) to be released from the Property, with respect to the first Phase concurrently with the recordation of the Parcel 8/15 Final Map, and prior to the Closing for each subsequent Phase; provided, that, Seller agrees to partially assign any incentives or fee reduction programs under such development agreements, if any, to Buyer.

10.11.  <u>Dirt</u>.  During the walk-through, the Parties shall assess whether development of the intended Project will require importation of fill dirt to cause the parcels to consist of a level pad. In the event that the pads are determined not to be sufficiently level for construction of Buyer's Project, Buyer shall complete all work to compact the sites at Buyer's

cost and expense, but Seller agrees to make available to Buyer any excess onsite dirt currently located on the Property at no additional cost to Buyer. The dirt needs for the Property and availability of onsite excess dirt shall be evaluated by Buyer during the Due Diligence Period.

10.12. <u>No Other Offers</u>. Unless required by the Bankruptcy Court, following the expiration of the Due Diligence Period and Buyer's election to proceed with the transactions contemplated hereby, during the term of this Agreement Seller shall not accept or enter into any backup offers or other agreements for the sale of the same Property to any other person or entity.

11.     <u>Default</u>.

11.1. <u>Buyer Default</u>. LIQUIDATED DAMAGES: BUYER AND SELLER AGREE THAT FOLLOWING BUYER'S DELIVERY OF THE NOTICE OF APPROVAL AND ENTRY OF THE SALE ORDER, IN THE EVENT THE CONDITIONS PRECEDENT TO CLOSING OF THIS AGREEMENT HAVE BEEN SATISFIED OR WAIVED BY BUYER, AND BUYER DEFAULTS ON ITS OBLIGATION TO COMPLETE THE CLOSING PURSUANT TO THIS AGREEMENT, SUBJECT TO THE TERMS AND CONDITIONS OF <u>SECTION 11.3</u> BELOW, AND PROVIDED THAT SELLER IS NOT IN DEFAULT OF THIS AGREEMENT BEYOND ANY APPLICABLE NOTICE AND CURE PERIODS, THE DAMAGES TO SELLER WOULD BE DIFFICULT AND IMPRACTICAL TO DETERMINE. BUYER AND SELLER FURTHER AGREE THAT THE DEPOSIT REPRESENTS A REASONABLE ESTIMATE OF THE RESULTING DAMAGES TO SELLER, SUCH DAMAGES INCLUDING COSTS OF NEGOTIATING AND DRAFTING OF THIS AGREEMENT, COSTS OF COOPERATING IN SATISFYING CONDITIONS TO CLOSING, COSTS OF SEEKING ANOTHER BUYER UPON BUYER'S DEFAULT, OPPORTUNITY COSTS IN KEEPING THE PROPERTY OUT OF THE MARKETPLACE, AND OTHER COSTS INCURRED IN CONNECTION HEREWITH. ACCORDINGLY, BUYER AND SELLER HAVE AGREED TO FIX AS LIQUIDATED DAMAGES THE AMOUNT OF THE DEPOSIT THEN IN ESCROW, AND SELLER MAY RECOVER AND/OR RETAIN SUCH AMOUNT WITHOUT RESTRICTION AS LIQUIDATED DAMAGES, AND WHICH SHALL CONSTITUTE SELLER'S SOLE AND EXCLUSIVE REMEDY FOR SUCH DEFAULT. SELLER'S RETENTION OF SAID SUMS AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY UNDER CALIFORNIA CIVIL CODE SECTION 3275 OR 3369, BUT INSTEAD, IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO SECTIONS 1671, 1676 AND 1677 OF THE CALIFORNIA CIVIL CODE. SELLER AGREES THAT THESE LIQUIDATED DAMAGES SHALL BE IN LIEU OF ANY OTHER MONETARY RELIEF OR OTHER REMEDY, INCLUDING, WITHOUT LIMITATION, SPECIFIC PERFORMANCE, TO WHICH SELLER OTHERWISE MIGHT BE ENTITLED UNDER THIS AGREEMENT, AT LAW OR IN EQUITY. THE LIMITATIONS CONTAINED IN THIS SECTION SHALL NOT APPLY TO ANY INDEMNITY OBLIGATIONS CONTAINED IN THIS AGREEMENT OR TO ANY REMEDY AVAILABLE TO SELLER UNDER <u>SECTION 11</u> OF THIS AGREEMENT. BUYER AND SELLER SPECIFICALLY ACKNOWLEDGE THEIR AGREEMENT TO THE FOREGOING LIQUIDATED DAMAGES PROVISION BY INITIALING THIS PARAGRAPH IN THE APPROPRIATE SPACES PROVIDED BELOW:

Buyer's Initials: _____     Seller's Initials: _____

11.2.  Seller's Default.  In the event of any default hereunder by Seller to convey the Property as required under this Agreement upon entry of the Sale Order (and subject to Seller's conditions to Closing), or the breach of any material provisions hereunder, Buyer shall have the right, IN LIEU OF ANY AND ALL OTHER REMEDIES AVAILABLE AT LAW OR IN EQUITY, to either (i) if reasonably practical, pursue Buyer's Self-Help Right and receive a credit against the Purchase Price for all of Buyer's costs, expenses, fees and other amounts expended in satisfaction of Seller's obligations under this Agreement in order to complete the purchase of the Property in accordance with this Agreement, (ii) cancel this Agreement either in its entirety or only as to a given portion of the Agreement that is not yet performed, or (iii) to pursue an action for specific performance of this Agreement, and if Buyer shall be the prevailing Party in such action for specific performance, Seller shall pay the actual and reasonable cost of Buyer's attorneys' fees and other costs of prosecuting such action.  If Buyer cancels this Agreement, then (a) the Deposits shall be immediately returned to Buyer without further instruction from Seller, (b) Seller will reimburse Buyer for all of its reasonable and actual out-of-pocket expenses incurred in connection with the transactions contemplated by this Agreement up to a maximum amount of $50,000.

11.3.  Return of Deposit.  For clarity purposes, in addition to any and all other remedies provided for under this Agreement, the Deposit shall be returned to Buyer in the event that (i) Buyer elects to terminate this Agreement during the Due Diligence Period, (ii) Buyer's conditions to Closing are not satisfied and Buyer does not otherwise waive the same, (iii) Seller does not obtain entry of the Sale Order by the Outside Conditions Date, or if the Sale Order has been entered but is not a Final Order by such date, (iv) a new Monetary Lien is identified in any Updated Title Documents that Seller is not able or not willing to remove, or (v) Seller is in breach of this Agreement and Buyer elects to terminate this Agreement as a result thereof.

11.4.  Cure Period.  Notwithstanding the provisions of Section 11 above and any other provisions in this Agreement applicable to a breach or default by either Party, no default by Buyer or Seller shall result in a termination or limitation of any rights of Buyer or Seller unless and until the non-defaulting Party shall have notified the other in writing of said default, in reasonably sufficient detail, and the defaulting Party shall have failed to cure said default within five (5) business days after the receipt of said written notice.  This cure period does not apply to the payment of any fees or deposits, which shall be made timely.

12.  Notices.  All notices required hereunder shall be in writing, and shall be delivered by personal delivery, facsimile, commercial courier, or by mailing such notice by first-class mail, certified, return receipt requested, postage and fees prepaid, addressed as follows:

To Buyer:                Anthem United Homes, Inc.
                         3001 Douglas Blvd., Suite 200
                         Roseville, CA 95661
                         Attention:  Brendan Leonard
                         Telephone:   916-960-0240
                         Facsimile:   916-960-0242
                         Email:          BLeonard@AnthemUnited.com

| With copies to: | Stoel Rives LLP |
| | 500 Capitol Mall, Suite 1600 |
| | Sacramento, CA 95814 |
| | Attention:  Sylvia S. Arostegui |
| | Telephone:    916-447-0700 |
| | Facsimile:    916-447-4781 |
| | Email:        Sylvia.Arostegui@stoel.com |
| | |
| To Seller: | Capitol Station 65 LLC |
| | 410 Park Avenue, 14th Floor |
| | New York, NY 10022 |
| | Attention:  Suneet Singal |
| | Telephone:    916-213-5272 |
| | Facsimile:    916-914-2487 |
| | Email:        s@firstcapitalre.com |
| | |
| With copies to: | Nuti Hart LLP |
| | 411 30th Street, Suite 408 |
| | Oakland, CA 95609 |
| | Attention:  Gregory C. Nuti |
| | Telephone:    510-507-7152 |
| | Email:        gnuti@nutihart.com |
| | |
| Escrow Agent: | First American Title Company |
| | 4750 Willow Road, Suite 100 |
| | Pleasanton, CA 94588 |
| | Attention:  Diane Burton, Escrow Holder |
| | Telephone:    925-201-6603 |
| | Facsimile:    866-648-7806 |
| | Email:        dburton@firstam.com |

or to such other address as either Party may designate by written notice to the other.  All notices shall be deemed delivered upon actual receipt or refusal of delivery.  Email addresses are provided herein for convenience only, and are not deemed to be an acceptable method for delivery of notices, unless otherwise specifically set forth in this Agreement.

13.    <u>Brokers</u>.  Seller hereby agrees to indemnify, defend and hold Buyer free and harmless from and against any and all claims for any real estate brokerage commission or finder's commission or fee owed by Seller to any broker, agent, finder or third party retained by Seller. Buyer hereby agrees to indemnify, defend and hold Seller free and harmless from and against any and all claims for any real estate brokerage commission or finder's commission or fee owed to any broker, agent, finder or third party retained by Buyer.  Each Party shall be responsible for any finder's fee agreed to by such party pursuant to separate agreements that such Party executed in connection with the same.

14.    Representations, Warranties and Covenants.

14.1.    Buyer's Warranties and Representations.  To induce Seller to enter into this Agreement, Buyer represents and warrants to Seller as follows:

(a)    Buyer's Authority.  Buyer has the legal power, right and authority to enter into this Agreement and the instruments referenced herein, and to consummate the transactions contemplated hereby.

(b)    Actions.  All requisite action (corporate, trust, partnership or otherwise) has been taken by Buyer in connection with the entering into this Agreement, the instruments referenced herein, and the consummation of the transaction contemplated hereby.

(c)    Signatory.  The individuals executing this Agreement and the instruments referenced herein on behalf of Buyer and the officers of Buyer, if any, have the legal power, right, and actual authority to execute this Agreement and consummate the transaction contemplated herein.

(d)    Enforceability.  Subject to entry of the Sale Order, this Agreement and all documents required hereby to be executed by Buyer are and shall be valid, legally binding obligations of and enforceable against Buyer in accordance with their terms except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, moratorium and other principles relating to or limiting the rights of contracting Parties generally in a case or proceeding concerning Buyer.

(e)    Conflicting Documents.  Neither the execution and delivery of this Agreement and the documents and instruments referenced herein, nor the occurrence of the obligations set forth herein, nor the consummation of the transaction contemplated herein, nor compliance with the terms of this Agreement and the documents and instruments referenced herein conflict with or result in the material breach of any terms, conditions or provisions of, or constitute a default under, any bond, note, or other evidence of indebtedness or any contract, indenture, mortgage, deed of trust, loan, partnership agreement, lease or other agreement or instrument to which Buyer is a party.

(f)    Patriot Act.  Buyer is not, and will not be, a person or entity with whom Seller is restricted from doing business under the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, H.R. 162 Public Law 107-56 (commonly known as the "**USA Patriot Act**") and Executive Order Number 13224 on Terrorism Financing, effective September 24, 2001 and regulations promulgated pursuant thereto, including, without limitation, persons and entities named on the office of Foreign Asset Control Specially designated Nationals and Blocked Persons List.

14.2.    Seller's Representations.    Seller hereby makes the following representations and warranties as of the Effective Date, which representations and warranties shall be deemed to be remade by Seller to Buyer as of the Closing Date.  All representations and warranties that are expressly qualified "to Seller's knowledge" shall be deemed to refer to actual (but not constructive) knowledge, without any duty of inquiry or personal liability for the same, of Al Esquivel ("**Seller's Representative**") without Seller's Representative having any

obligation to make an independent inquiry or investigation. In the event of any breach of any representation or warranty by Seller above, Seller's Representative shall not be personally liable for such breach and recourse may not be had against Seller's Representative personally. Seller represents and warrants that Seller's Representative is the person charged with the day-to-day operation of the Property and the person most likely to have knowledge of the truth and accuracy of the below representations and warranties by Seller. Seller has not made and shall have no duty to make any special inquiry or investigation of any of the matters referred to in this Section for purposes of making the representations and warranties stated below. Seller shall not be deemed to have breached any warranty or made any misrepresentation if it has disclosed the truth of the matter in question in a Seller Update Certificate (as defined below). Except as explicitly set forth in this Agreement, Seller makes no representation concerning the Property and Buyer agrees that any representation made by Seller or any of its agents prior to date of this Agreement is not binding upon Seller, nor may Buyer rely thereto, except to the extent such representation is explicitly set forth in this Agreement. If, prior to the Closing Date, Seller acquires actual knowledge of any facts or circumstance which would cause the representations contained in this Section 14.2 to become untrue if such representations were made as of the date Seller becomes aware of such fact or circumstance, Seller shall immediately disclose the same to Buyer by delivery to Buyer of a written notice duly executed by Seller (herein the "**Seller Update Certificate**") identifying any such representation or warranty which is not, or no longer is, true and correct and explaining the state of facts giving rise to the change. If, despite the changes or other matters described in such Seller Update Certificate, the Closing occurs, Seller's representations and warranties set forth in this Agreement shall be deemed to have been modified by all statements made in such Seller Update Certificate and Seller shall have no liability to Buyer for any such changes, matters or statements made in such Seller Update Certificate except to the extent the same are materially inaccurate when made in such Seller Update Certificate.

(a)     Seller's Authority. Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of California and, subject to Bankruptcy Court approval and entry of the Sale Order, has the legal power, right and authority to enter into this Agreement and the instruments referenced herein, and to consummate the transaction contemplated hereby.

(b)     Actions. All requisite limited liability company action has been taken by Seller in connection with the entering into this Agreement, the instruments referenced herein, and the consummation of the transaction contemplated hereby and, to Seller's knowledge, except for entry of the Sale Order, does not require the consent of any other partner, shareholder, trustee, trustor, beneficiary, creditor, investor, Authority or other party. Further, to Seller's knowledge, other than may be required by a development agreement affecting the Property, any entitlement or conditions thereto or any other document disclosed by Buyer to Seller, no action by any Authority is necessary to make this Agreement a valid instrument binding upon Seller in accordance with its terms.

(c)     Signatory. The individuals executing this Agreement and the instruments referenced herein on behalf of Seller and the officers of Seller, if any, have the legal power, right, and actual authority to bind Seller to the terms and conditions hereof and thereof.

(d)     Enforceability.  Subject to entry of the Sale Order, this Agreement and all documents required hereby to be executed by Seller are and shall be valid, legally binding obligations of and enforceable against Seller in accordance with their terms except to the extent that such enforcement may be limited by applicable principles relating to or limiting the rights of contracting Parties generally.

(e)     Patriot Act.  Seller is not, and will not be, a person or entity with whom Buyer is restricted from doing business under the USA Patriot Act and Executive Order Number 13224 on Terrorism Financing, effective September 24, 2001 and regulations promulgated pursuant thereto,  including, without limitation, persons and entities named on the office of Foreign Asset Control Specially Designated Nationals and Blocked Persons List.

(f)     Foreign Person.  Seller is not a "foreign person" as that term is defined in Section 1445 of the Internal Revenue Code of 1986, as amended, and applicable regulations.

(g)     Condemnation.  To Seller's knowledge, there are no pending or threatened condemnation proceedings affecting the Property, or any part thereof.

(h)     Hazardous Materials.  To Seller's knowledge:  (i) there is not, and to the best of Seller's knowledge has not been, any violation of "Environmental Laws" related to the Property or the presence or release of "Hazardous Materials" on or from the Property, (ii) except as may be disclosed in the Documents delivered to Buyer, to Seller's knowledge, neither Seller nor any prior or other occupant has manufactured, introduced, released or discharged from or onto the Property any "Hazardous Materials" or any toxic wastes, substances or materials (including, without limitation, asbestos) during the period of Seller's ownership.  To Seller's knowledge, Seller has not used the Property or any part thereof for the generation, treatment, storage, handling or disposal of any Hazardous Materials, in violation of any Environmental Laws.  To Seller's knowledge (i) there are no underground storage tanks located on the Property, (ii) there have been no claims made or threatened in writing by any third party against Seller or the Property relating to damage, cost recovery compensation, contribution loss or injury resulting from any Hazardous Materials, and (iii)  there are no enforcement, cleanup, removal or other Authority actions instituted, completed or threatened in writing pursuant to any applicable federal, state or local laws relating to any Hazardous Materials and affecting the Property.    The term "**Environmental Laws**" includes, without limitation, the Resource Conservation and Recovery Act and the Comprehensive Environmental Response Compensation and Liability Act and other federal laws governing the environment as in effect on the date of this Agreement, together with their implementing regulations, guidelines, rules or orders as of the date of this Agreement, and all state, regional, county, municipal and other local laws, regulations, ordinances, rules or orders that are equivalent or similar to the federal laws recited above or that purport to regulate Hazardous Materials.  The term "**Hazardous Materials**" includes petroleum, including crude oil or any fraction thereof, natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas or such synthetic gas), and any substance, material, waste, pollutant or contaminant listed or defined as hazardous or toxic under any Environmental Law.

(i) <u>Leases</u>. Seller has not entered into any lease, license or other agreement permitting any person or entity to occupy or use any portion of the Property or otherwise affect the Property or any part thereof except as disclosed in the Documents delivered to Buyer.

(j) <u>No Other Contracts</u>. Seller has not granted to any person or entity, and to Seller's knowledge, no person or entity has, any conditional or unconditional right and/or option to purchase the Property, and/or right of first refusal or right of first offer to purchase the Property.

(k) <u>Title</u>. Seller holds sole fee title to the Property and upon entry of the Sale Order shall have full rights to convey the same to Buyer, and no person (including, without limitation, any tenant) has any option to purchase or first refusal rights with respect to the Property or any part thereof.

(l) <u>No Violations</u>. Except as may be disclosed in the Documents delivered to Buyer, to Seller's knowledge, Seller has not received (i) any written notice of any existing violation of any statute, ordinance, regulation or administrative or judicial order concerning the Property, nor (ii) any notice from any Authority that any work of repair, maintenance, or improvement needs to be performed upon the Property.

(m) <u>Instruments Delivered to Buyer</u>. To Seller's knowledge, all instruments, documents, lists, schedules and items, including the Documents, prepared by Seller and required to be delivered to Buyer fairly present the information set forth in a manner that is not misleading and will be true, complete and correct in all respects on the date of delivery and upon each Closing Date, as they may be updated, modified or supplemented in accordance with this Agreement; provided, however, that Seller does not warrant the content or accuracy of any third-party information or report. To Seller's knowledge, Seller has provided all Documents in Seller's possession pertaining to the Property.

(n) <u>Notification of Change in Condition</u>. Seller shall promptly notify Buyer of any event or circumstance which makes any representation or warranty of Seller under this Agreement untrue or misleading, it being understood that the Seller's obligation to provide notice to Buyer shall in no way relieve Seller of any liability for a breach by Seller of any of Seller's representations, warranties or covenants under this Agreement.

14.3. <u>Survival</u>. Unless otherwise expressly stated to the contrary in this Agreement, the representations and warranties of the Parties set forth herein shall be true as of the Effective Date and the date of each Closing, and shall survive each Closing and delivery of each Grant Deed for a period of six (6) months. Seller shall notify Buyer in writing immediately if any representation made by Seller becomes untrue or misleading in light of information obtained by Seller after the Effective Date and prior to Closing.

14.4. <u>Seller's Covenants</u>. From and after the date hereof and through and including the last Closing, Seller shall, at the Seller's sole cost and expense: (a) keep in full force and effect, and/or renew to the extent necessary, all existing licenses, permits, and entitlements for the Property; and (b) continue to maintain the Property in accordance with Seller's existing

business practices and in such condition so that the Property shall be in substantially the same condition on the Closing as of the Effective Date hereof. Further, so long as this Agreement remains in force, Seller shall not (i) cause, permit or, through Seller's acts or omissions, suffer to exist any encumbrance, charge or lien to be placed or claimed upon the Property which would survive past Close of Escrow; (ii) lease, convey or otherwise transfer all or any portion of the Property; (iii) do any act or execute any document which would affect the Property and Buyer's rights under this Agreement without the prior written consent of Buyer, not to be unreasonably withheld; (iv) seek, initiate or facilitate the creation either before or after Closing of any new or additional public assessment district, Mello-Roos tax or other assessment constituting a lien against the Property for any purpose, including, without limitation, the financing of any off-site improvements under any subdivision improvement agreement or otherwise**;** and (v) cause any action to be taken which would cause any of the representations or warranties made by Seller in this Agreement to be false on or as of the Closing Date.

15. <u>General</u>.

15.1. <u>Entire Agreement</u>. This Agreement constitutes the final and entire Agreement between the Parties, and they shall not be bound by any terms, covenants, conditions, representations or warranties not expressly contained herein. This Agreement may not be amended except by a written instrument executed by both Parties.

15.2. <u>Partial Invalidity</u>. If any one or more of the provisions contained in this Agreement shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

15.3. <u>Time of the Essence</u>. Time is of the essence of this Agreement and the performance of each and every one of the terms and conditions hereof.

15.4. <u>Successors and Assigns</u>. Subject to the limitations set forth below, this Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective legal representatives, successors and assigns. Buyer and Seller shall not assign, hypothecate, or otherwise transfer such rights hereunder, or delegate such duties hereunder, without the prior written consent of the other party, which approval shall not be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, Buyer may assign, convey, or otherwise transfer its rights and obligations hereunder, without Seller's consent but upon prior written notice to Seller, to (i) any affiliate, subsidiary or related entity of Buyer, or (ii) any entity affiliated with Buyer established to hold title to the Property. No assignment shall relieve Buyer from its obligations, responsibilities or liabilities under this Agreement.

15.5. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

15.6. <u>Headings</u>. The headings of the Sections, subsections, paragraphs and subparagraphs hereof are provided for convenience of reference only, and shall not be considered in construing their contents.

15.7. <u>Exhibits and Schedules</u>. Each writing or map or plan referred to herein as being attached hereto as an exhibit or otherwise designated herein as an exhibit is incorporated herein by reference and made a part hereof. The following exhibits and schedules are attached to this Agreement:

| | |
|---|---|
| Exhibit A | Parcels, COE and Pricing |
| Exhibit B: | Tentative and Final Maps |
| Exhibit C: | List of Documents |
| Exhibit D: | Form of Grant Deed |
| Exhibit E: | Form of FIRPTA Affidavit |
| Exhibit F: | Form of Bill of Sale |
| Exhibit G: | Assignment of Plans and Contracts |
| Exhibit H: | Right to Use Acknowledgement |
| Schedule 1: | Park Work |

15.8. <u>Time Periods</u>. Any and all references in this Agreement to time periods which are specified by reference to a certain number of days refer to calendar days, unless "business days" is otherwise expressly provided. Therefore, if (a) the last date by which a Closing is permitted to occur hereunder, or (b) any date by which a Party is required to provide the other Party with notice hereunder, occurs on a Saturday or a Sunday or a banking holiday in the jurisdiction where the Property is located, then and in any of such events, such applicable date shall be deemed to occur, for all purposes of this Agreement, on that calendar day which is the next succeeding day, which is not a Saturday, Sunday or banking holiday. The term "business days" shall have the meaning ascribed to it in California Civil Code Section 9.

15.9. <u>No Partnership</u>. Nothing in this Agreement shall be deemed in any way to create between the Parties any relationship of partnership, joint venture or association, and the Parties disclaim the existence thereof.

15.10. <u>Waivers</u>. No Party shall be deemed to have waived the exercise of any right which it holds hereunder unless such waiver is made expressly and in writing (and no delay or omission by any Party hereto in exercising any such right shall be deemed a waiver of its future exercise). No such waiver made as to any instance involving the exercise of any such right shall be deemed a waiver as to any other such instance, or any other such right.

15.11. <u>Choice of Law</u>. This Agreement shall be given effect and construed by application of California law.

15.12. <u>Attorneys' Fees</u>. In the event of any legal action or arbitration proceeding between the Parties regarding this Agreement or the Property, the prevailing Party shall be entitled to payment by the non-prevailing Party of its reasonable attorneys' fees, costs, and litigation or arbitration expenses as determined in the course of the proceeding.

15.13.  Cooperation in Exchange.  In the event that Seller intends to enter into a contract with a qualified intermediary for the purpose of effecting a tax-deferred exchange in accordance with Section 1031 of the U.S. Internal Revenue Code of 1986, as most recently amended, Buyer shall reasonably cooperate with Seller; shall execute, acknowledge, and deliver any and all documents which Seller may reasonably request, provided that such documents are given to Buyer at least ten (10) business days before such documents are to be so delivered; and shall deal with any intermediary as Seller may direct; provided, however, that Buyer shall not be required to (i) incur any escrow or title cost or any liability in connection with any proposed exchange, (ii) delay the Closing, (iii) be responsible for locating exchange property, or (iv) take title to any property other than the Property.  Seller shall indemnify and hold Buyer harmless from and against any liability, including reasonable attorneys' fees and costs, in any way related to the exchange, including, but not limited to, any liability as a result of the exchange being a taxable or non-taxable event.  Buyer makes no representation as to whether or not the transfer of the Property is a tax-deferred exchange.  Seller shall reimburse Buyer for reasonable attorneys' fees incurred in the review of documents which Seller requests Buyer to execute pursuant to this Section, whether or not the tax-deferred exchange is in fact consummated.  Seller shall apply the amount to be reimbursed toward payment of the Purchase Price at the Closing.  Seller's obligation to cause the conveyance of the Property to Buyer in the time and manner provided in this Agreement is not contingent upon Seller's ability to effectuate a tax-deferred exchange.  Each Party agrees to sign a Notice of Assignment prior to Close of Escrow confirming that such Party has received the Notice of Assignment and consents to the assignment.

15.14.  Publicity.  Each of the Parties agrees that it shall not issue or permit the issuance of a press release regarding this Agreement prior to the filing of the Chapter 11 Plan (or motion for entry of the Sale Order) without the prior written consent of the other Party, which consent may be withheld in the other Party's sole and absolute discretion; provided, however, that the foregoing provisions shall not apply to any disclosure requirements under applicable corporate and securities laws.

15.15.  Representation by Counsel.  Notwithstanding any rule or maxim of construction to the contrary, any ambiguity or uncertainty shall not be construed against either Seller or Buyer based upon authorship of any of the provisions hereof.  Seller and Buyer each hereby warrant, represent and certify to the other as follows: (a) that the contents of this Agreement have been completely and carefully read by the representing Party and counsel for the representing Party; (b) that the representing Party has been separately represented by counsel and the representing Party is satisfied with such representation; (c) that the representing Party's counsel has advised the representing Party of, and the representing Party fully understands, the legal consequences of this Agreement; and (d) that no other person (whether a party to this Agreement or not) has made any threats, promises or representations of any kind whatsoever to induce the execution hereof, other than the performance of the terms and provisions hereof.

[SIGNATURES APPEAR ON THE FOLLOWING PAGE]

IN WITNESS WHEREOF, the Parties hereto have executed under seal this Agreement as of the Effective Date.

SELLER:

CAPITOL STATION 65 LLC,
a California limited liability company,
as Debtor and Debtor in Possession

By: _____

Name: _Suneet Singal_____

Title: _CEO / CHAIRMAN_____

Date: _7/27/17_____


BUYER:

ANTHEM UNITED HOMES, INC.,
a Washington corporation

By: _____

Name: _DAVID RAGLAND_____

Title: _V.P._____

Date: _7/27/17_____

## ACCEPTANCE BY ESCROW AGENT

The undersigned joins in the execution of the Agreement for the purpose of agreeing to act as Escrow Agent under the Agreement and to be bound by and perform the terms thereof as such terms apply to Escrow Agent.

ESCROW AGENT:

FIRST AMERICAN TITLE COMPANY

By: _Barbara Clarke_

Name: _BARBARA CLARKE_

Title:    Escrow Officer

Date: _7-27-2017_

## EXHIBIT A TO PURCHASE AGREEMENT

## PARCELS, COE AND PRICING

| PHASE | PARCEL | PRESUMED YIELD | PURCHASE PRICE | COE - MONTHS AFTER ENTRY OF SALE ORDER |
|---|---|---|---|---|
| | TOWNHOUSES | | | |
| 1 | 8A - townhouses | 22 | $1,364,000 | 4 |
| 1 | 8B - townhouses | 22 | $1,364,000 | 4 |
| 1 | 15A/B - affordable | 16 | $160,000 | 4 |
| 1 | 15A/B - townhouses | 12 | $744,000 | 4 |
| 2 | 7A - townhouses | 25 | $1,650,000 | 12 |
| 2 | 7B - townhouses | 25 | $1,650,000 | 12 |
| 2 | 16A/B - affordable | 9 | $90,000 | 12 |
| 2 | 16A/B - townhouses | 19 | $1,254,000 | 12 |
| 2 | 12A - townhouses | 16 | $1,056,000 | 12 |
| 2 | 6A - townhouses | 26 | $1,716,000 | 12 |
| 2 | 6B - townhouses | 30 | $1,980,000 | 12 |
| | **Subtotal Land** | **222** | **$13,028,000** | |
| | **Fee Credits** | | **$1,968,030** | |
| | ***Total Valuation - Townhouses*** | | ***$14,996,030*** | |
| | | | | |
| | MULTIFAMILY | | | |
| 3 | 12C - MF | 95 | $2,185,000 | 20 |
| 3 | 15C - MF | 56 | $1,232,000 | 20 |
| 3 | 16C - MF | 56 | $1,232,000 | 20 |
| | **Subtotal Land** | **207** | **$4,649,000** | |
| | **Fee Credits** | | **$1,835,055** | |
| | ***Total Valuation - MF*** | | ***$6,484,055*** | |
| | | | | |
| | **TOTAL Land Purchase** | **429** | **$17,677,000** | |
| | **TOTAL Fee Credits** | | **$3,803,085** | |
| | ***TOTAL Valuation*** | | ***$21,480,085*** | |

<u>EXHIBIT B TO PURCHASE AGREEMENT</u>

<u>TENTATIVE AND FINAL MAPS</u>

[SEE ATTACHED]



TYPICAL STREET SECTIONS

SECTION A-A
RICHARDS BOULEVARD

SECTION B-B
7TH STREET (SOUTH)

SECTION C-C
7TH STREET (NORTH)

SECTION D-D
RIVERINE WAY

SECTION E-E
5TH STREET (SOUTH)

SECTION F-F
5TH STREET (NORTH)

SECTION G-G
TOWNSHIP NINE AVENUE

SECTION H-H
N. 6TH STREET

SECTION I-I
VINE STREET
NEW STREET 'B'
CANNERY AVENUE
SCALEHOUSE STREET
CHILL AVENUE
N. 6TH STREET

LEGEND:
— — — PROJECT BOUNDARY
— — — PROPOSED RIGHT OF WAY
— — — PROPOSED PROPERTY LINE
— — — EXISTING EASEMENT
— — — PROPOSED EASEMENT
— — — ROADWAY CENTERLINE
— — — EXISTING PROPERTY LINE

VICINITY MAP

GENERAL NOTES:

**OWNER/SUBDIVIDER**
Capitol Station 65 LLC
640 Bercut Drive, Suite C
Sacramento, CA 95811
Attn: Steve Goodwin
(916) 442-7700

**ENGINEER/PLANNER**
NV5, Inc.
2525 Natomas Park Drive, Suite #300
Sacramento, CA 95833
Attn: Jay F. Rudke
(916) 641-9100

**ASSESSOR PARCEL NUMBERS:**
All or portions of parcels:
001-0200-056, 066, and 067, County of Sacramento, CA

**LEGAL DESCRIPTION**
Designated Remainder 1, Designated Remainder 2, and Lot 1,
as shown on the map entitled "Township 9, Phase 1, Subdivision
No. PM12-106," filed for record November 13, 2012 in Book 378
of final maps, page 1, Sacramento County Records.

**SUBDIVISION NAME**
Township 9

**AREA**
64.46 ac. Gross

**TOTAL NUMBER OF LOTS**
24 LOTS
23 Residential Mixed Use Lots
1 Open Space Lot

**EXISTING ZONING**
GB-PUD SPD & HMR-PUD SPD

**PROPOSED ZONING**
GB-PUD SPD & HMR-PUD SPD

**EXISTING LAND USE**
Vacant

**PROPOSED LAND USE**
Park/Open Space, Multi-Family Residential, Office, Commercial

**FIRE DISTRICT**
City of Sacramento

**SCHOOL DISTRICT**
Grant Joint Union High
North Sacramento Elementary

**UTILITIES**
| Storm Drainage | City of Sacramento |
| Sewer | City of Sacramento |
| Water | City of Sacramento |
| Electrical | SMUD |
| Gas | Pacific Gas and Electric |
| Telephone | AT&T |
| Cable | Comcast |

**PHASING**
This project will be phased with multiple final parcel maps.

**NOTES:**
1. Lots 1A, 1B, 1C, 2A, 2B, 3–B, and 14–17 are proposed for condominium uses.
2. All existing structures within the project boundaries have been removed.
3. All existing trees and shrubs within the project boundaries have been removed.

**PARCELS**

| LOT # | LAND USE | ACRES |
|---|---|---|
| LOT 1A | Retail/Multi-Family Residential | 1.70 |
| LOT 1B | Retail/Multi-Family Residential | 1.64 |
| LOT 1C | Retail/Multi-Family Residential | 1.44 |
| LOT 2A | Retail/Multi-Family Residential | 0.94 |
| LOT 2B | Retail/Multi-Family Residential | 1.38 |
| LOT 3A | Retail/Multi-Family Residential | 1.02 |
| LOT 3B | Retail/Multi-Family Residential | 2.13 |
| LOT 5A | Retail/Multi-Family Residential | 1.09 |
| LOT 6B | Retail/Multi-Family Residential | 1.40 |
| LOT 7A | Retail/SF Residential/MF Residential | 1.06 |
| LOT 7B | Retail/SF Residential/MF Residential | 0.95 |
| LOT 8A | Retail/SF Residential/MF Residential | 0.84 |
| LOT 8B | Retail/SF Residential/MF Residential | 0.82 |
| LOT 9 | Open Space | 0.85 |
| LOT 10A | Retail/Multi-Family Residential | 0.88 |
| LOT 13 | Office/Retail/Multi-Family Residential | 2.44 |
| LOT 14 | Office/Retail/Multi-Family Residential | 1.94 |
| LOT 15A | Retail/SF Residential/MF Residential | 0.52 |
| LOT 15B | Retail/SF Residential/MF Residential | 0.51 |
| LOT 15C | Retail/SF Residential/MF Residential | 0.67 |
| LOT 16A | Retail/SF Residential/MF Residential | 0.56 |
| LOT 16B | Retail/SF Residential/MF Residential | 0.53 |
| LOT 16C | Retail/SF Residential/MF Residential | 0.69 |
| LOT 17 | Office/Retail/Multi-Family Residential | 2.24 |
| | TOTAL: | 28.47 ac |

**PARK PARCELS AND EASEMENTS:**

| LOCATION | NET ACREAGE |
|---|---|
| LOT 3A | 0.24 |
| LOT 4 | 0.25 |
| LOT 8A | 0.12 |
| LOT 8 | 0.12 |
| LOT 14 | 0.27 |
| LOT 15A | 0.07 |
| LOT 15B | 0.07 |
| LOT 15C | 0.10 |
| LOT 17 | 0.03 |
| PARK BLVD MEDIAN | 0.36 |
| N. 7TH STREET MEDIAN | 0.64 |
| | TOTAL: 2.13 Ac |

REVISED

NORTH

SCALE: 1" = 100'

SHEET NUMBER
1
OF [ ] SHEETS

N|V|5
NETWORK ENGINEERING

2525 NATOMAS PARK DRIVE, SUITE 300
SACRAMENTO, CA 95833

JOB NUMBER
SA151001

**TOWNSHIP 9**
TENTATIVE MAP
SUBDIVISION MODIFICATION

PREPARED FOR: CAPITOL STATION 65 LLC     DATE SUBMITTED: 3/4/2016

FINAL MAP OF

# TOWNSHIP 9 - PHASE 1

SUBDIVISION NO P10_036

PARCEL 9, 10, 11, 12, 13 AND A PORTION OF 15 OF 26 RS 28,
AND A PORTION OF S.L.S. 949 CITY OF SACRAMENTO, CALIFORNIA.
CITY OF SACRAMENTO, COUNTY OF SACRAMENTO, STATE OF CALIFORNIA

OCTOBER 2012

## NOLTE
BEYOND ENGINEERING

2495 NATOMAS PARK DRIVE, FOURTH FLOOR          SACRAMENTO, CA. 95833
916.641.9100 TEL  916.641.9222 FAX          WWW.NV5.COM
SHEET 1 OF 8

### OWNERS STATEMENT:

THE UNDERSIGNED HEREBY CONSENTS TO THE PREPARATION AND RECORDATION OF THIS FINAL MAP OF TOWNSHIP 9 – PHASE 1 AND OFFER FOR DEDICATION AND DOES HEREBY DEDICATE TO ANY AND ALL PUBLIC USE THE PUBLIC STREETS, AVENUES, WAY AND BOULEVARD SHOWN HEREON AND ALSO OFFER FOR DEDICATION AND DO HEREBY DEDICATE FOR SPECIFIC PURPOSES THE FOLLOWING:

1. EASEMENT FOR THE INSTALLATION AND MAINTENANCE OF SEWER PIPES, UNDERGROUND DRAINAGE PIPELINES, ELECTROLIERS, WATER PIPES, GAS PIPES, UNDERGROUND WIRES FOR CABLE TELEVISION, ELECTRIC AND TELEPHONE SERVICES TOGETHER WITH ANY AND ALL APPURTENANCES PERTAINING THERETO ON, OVER, UNDER AND ACROSS THOSE STRIPS OF LAND SHOWN HEREON AND DESIGNATED "PUBLIC UTILITY EASEMENT" (P.U.E.).

2. PURSUANT TO THE PROVISIONS OF SECTION 66475 OF THE SUBDIVISION MAP ACT, IRREVOCABLE OFFER OF DEDICATION FOR A RECREATIONAL EASEMENT, TOGETHER WITH ANY AND ALL APPURTENANCES PERTAINING THERETO ON, OVER AND ACROSS AS SHOWN HEREON AND DESIGNATED AS "IOD FOR EXCLUSIVE PARK EASEMENT" (E.P.E.).

3. PURSUANT TO THE PROVISIONS OF SECTION 66475 OF THE GOVERNMENT CODE, WE HEREBY IRREVOCABLY OFFER FOR DEDICATION TO THE CITY OF SACRAMENTO, AN EASEMENT FOR ANY PUBLIC ROAD PURPOSES, ON, OVER, UNDER AND ACROSS THE STRIPS OF LAND SHOWN HEREON AND DESIGNATED "ROAD IRREVOCABLE OFFER OF DEDICATION" (R.I.O.D.).

4. EASEMENT FOR PUBLIC SIDEWALK AND PEDESTRIAN ACCESS TOGETHER WITH ANY AND ALL APPURTENANCES PERTAINING THERETO ON, OVER AND ACROSS STRIPS OF LAND SHOWN HEREON AND DESIGNATED AS "PUBLIC SIDEWALK AND PEDESTRIAN EASEMENT."

**CAPITOL STATION 65, LLC**
A CALIFORNIA LIMITED LIABILITY COMPANY

BY: _Scott C. Syphax_          BY: _____

NAME: _____          NAME: _____

DATE: _10/23/12_          DATE: _____

### NOTARY ACKNOWLEDGMENT :

STATE OF CALIFORNIA }
COUNTY OF _Sacramento_ } SS

ON _Oct. 23, 2012_ BEFORE ME, _Mary L. Ackman, Notary Public_, PERSONALLY APPEARED _Scott C. Syphax_ WHO PROVED TO ME ON THE BASIS OF SATISFACTORY EVIDENCE TO BE THE PERSON(S) WHOSE NAME(S) IS/ARE SUBSCRIBED TO THE WITHIN INSTRUMENT AND ACKNOWLEDGED TO ME THAT HE/SHE/THEY EXECUTED THE SAME IN HIS/HER/THEIR AUTHORIZED CAPACITY(IES), AND THAT BY HIS/HER/THEIR SIGNATURE(S) ON THE INSTRUMENT THE PERSON(S) OR ENTITY UPON BEHALF OF WHICH THE PERSON(S) ACTED, EXECUTED THE INSTRUMENT.

I CERTIFY UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT.

WITNESS MY HAND AND OFFICIAL SEAL.

_Mary L. Ackman_          _Mary L. Ackman_
NOTARY'S SIGNATURE          PRINT NOTARY'S NAME

MY PRINCIPLE PLACE OF BUSINESS IS _Sacramento_ COUNTY.

COMMISSION NO. _1921467_

MY COMMISSION EXPIRES: _Feb. 8, 2015_

### BENEFICIARY'S STATEMENT:

ISIS LENDING, LLC, AS BENEFICIARY UNDER THAT CERTAIN DEED OF TRUST RECORDED DECEMBER 24, 2008 IN BOOK 20081224 AT PAGE 865 OFFICIAL RECORDS OF SACRAMENTO COUNTY, CONSENTS TO THE PREPARATION AND FILING OF THIS FINAL MAP.

ISIS LENDING, LLC, A DELAWARE LIMITED LIABILITY COMPANY

BY: _____

NAME: _GARRY J. SPANNER_

TITLE: _PRESIDENT_

DATE: _10·18·12_

### NOTARY ACKNOWLEDGMENT :

STATE OF CALIFORNIA }
COUNTY OF _San Mateo_ } SS

ON _18 October 2012_ BEFORE ME, _L.G. Riley, Notary Public_, PERSONALLY APPEARED _Garry J Spanner_ WHO PROVED TO ME ON THE BASIS OF SATISFACTORY EVIDENCE TO BE THE PERSON(S) WHOSE NAME(S) IS/ARE SUBSCRIBED TO THE WITHIN INSTRUMENT AND ACKNOWLEDGED TO ME THAT HE/SHE/THEY EXECUTED THE SAME IN HIS/HER/THEIR AUTHORIZED CAPACITY(IES), AND THAT BY HIS/HER/THEIR SIGNATURE(S) ON THE INSTRUMENT THE PERSON(S) OR ENTITY UPON BEHALF OF WHICH THE PERSON(S) ACTED, EXECUTED THE INSTRUMENT.

I CERTIFY UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT.

WITNESS MY HAND AND OFFICIAL SEAL.

_L.G. Riley_          _L.G. Riley_
NOTARY'S SIGNATURE          PRINT NOTARY'S NAME

MY PRINCIPLE PLACE OF BUSINESS IS _San Mateo_ COUNTY.

COMMISSION NO: _1920M / 1926023_

MY COMMISSION EXPIRES: _18 March 2015_

### SURVEYOR'S STATEMENT:

THIS MAP WAS PREPARED BY ME OR UNDER MY DIRECTION AND IS BASED UPON A FIELD SURVEY IN CONFORMANCE WITH THE REQUIREMENTS OF THE SUBDIVISION MAP ACT AND LOCAL ORDINANCE AT THE REQUEST OF CAPITOL STATION 65, LLC, A CALIFORNIA LIMITED LIABILITY CORPORATION IN JANUARY, 2010. I HEREBY STATE THAT THIS FINAL MAP SUBSTANTIALLY CONFORMS TO THE APPROVED OR CONDITIONALLY APPROVED TENTATIVE MAP; THAT ALL MONUMENTS ARE OF CHARACTER AND OCCUPY THE POSITIONS INDICATED AND SHALL BE SET BY JANUARY 31, 2013 AND THAT SAID MONUMENTS ARE SUFFICIENT TO ENABLE THIS SURVEY TO BE RETRACED.

_Sherrie Z. Zimmerman_          
SHERRIE Z. ZIMMERMAN, PLS 8964
LICENSE EXPIRES: 09/30/2014

_October 25, 2012_
DATE:

### CITY SURVEYOR'S STATEMENT:

I HEREBY STATE THAT I HAVE EXAMINED THIS FINAL MAP ENTITLED "TOWNSHIP 9–PHASE 1", AND FIND IT SUBSTANTIALLY THE SAME AS THE TENTATIVE MAP APPROVED BY THE CITY PLANNING COMMISSION OF THE CITY OF SACRAMENTO AND ANY APPROVED ALTERATIONS THEREOF, THAT ALL PROVISIONS OF THE SUBDIVISION MAP ACT AND ALL APPLICABLE CITY ORDINANCES HAVE BEEN COMPLIED WITH, AND THAT I AM SATISFIED THAT SAID MAP IS TECHNICALLY CORRECT.

I HEREBY APPROVE THIS FINAL MAP OF "TOWNSHIP 9–PHASE 1" AND ACCEPT, ON BEHALF OF THE PUBLIC, SUBJECT TO IMPROVEMENTS, THE PUBLIC STREETS AND THE EASEMENTS HEREON OFFERED FOR DEDICATION, BUT REJECT AT THIS TIME THE IRREVOCABLE OFFER OF DEDICATION (R.I.O.D.), SAID OFFER MAY BE ACCEPTED BY THE CITY AT ANY TIME. THE ABANDONMENTS OF THE EASEMENTS LISTED HEREON PURSUANT TO SECTION 66434(G) OF THE GOVERNMENT CODE ARE HEREBY APPROVED.

_Faith B. Recio_          _Nov 1, 2012_          
CITY SURVEYOR          DATE:
FAITH B. RECIO, PLS 8424
EXP. DATE 12/31/2012
CITY OF SACRAMENTO

### CITY CLERK'S STATEMENT:

I HEREBY ATTEST TO THE APPROVAL OF THIS FINAL MAP ENTITLED "TOWNSHIP 9–PHASE 1".

_Shirley Concolino_          _11-1-12_
CITY CLERK          DATE
CITY OF SACRAMENTO

### RECORDER'S STATEMENT:

FILED THIS _1ST_ DAY OF _NOVEMBER_ 2012 AT _10:47_ A.M. IN BOOK _378_ OF FINAL MAPS, AT PAGE _001_, AT THE REQUEST OF CAPITOL STATION 65, LLC, TITLE TO THE LAND INCLUDED IN THE SUBDIVISION BEING VESTED AS PER CERTIFICATE NO. _7080_ ON FILE IN THIS OFFICE

SIGNED: _CRAIG A. KRAMER_
COUNTY RECORDER

BY: _____
DEPUTY

DOCUMENT NO: _BK 20121113 PG 0929_
FEE: _$159.00_

_378-1-1_

FINAL MAP OF
# TOWNSHIP 9 - PHASE 1
SUBDIVISION NO P10_036
PARCEL 9, 10, 11, 12, 13 AND A PORTION OF 15 OF 26 RS 28,
AND A PORTION OF S.L.S. 949 CITY OF SACRAMENTO, CALIFORNIA.
CITY OF SACRAMENTO, COUNTY OF SACRAMENTO, STATE OF CALIFORNIA
OCTOBER 2012

## NOLTE
BEYOND ENGINEERING
2495 NATOMAS PARK DRIVE, FOURTH FLOOR,  SACRAMENTO, CA. 95833
916.641.9100 TEL  916.641.9222 FAX  WWW.NV5.COM
SHEET 2 OF 8

### INDEX SHEET

**LEGEND**
- ○ DIMENSION POINT (NOTHING FOUND OR SET)
- ▓ FOUND MONUMENT AS NOTED
- ⬠ SET 3/4" REBAR WITH CAP STAMPED LS 8964
- ⊙ SET 1/2" DIA. X 2" MAG & WASHER LS 8964 PER CITY MANAGER DESIGNEE (16.44.050)
- ⊗ SET BRASS DISK IN MONUMENT WELL STAMPED LS 8964 PER CITY STANDARD

I.O.D. IRREVOCABLE OFFER OF DEDICATION
E.P.E. EXCLUSIVE PARK EASEMENT
CL CENTERLINE
FND FOUND
(R) RADIAL
RT REGIONAL TRANSIT

**CONDOMINIUM NOTE**
LOTS 1, 2, 3, 4, 5 & 6 ARE APPROVED FOR CONDOMINIUM PURPOSES

**REFERENCES**
(1) RECORD OF SURVEY 26 R.S. 28
(2) RECORD OF SURVEY 58 R.S. 4
(3) PARCEL MAP, 152 P.M. 8
(4) CITY OF SACRAMENTO SURVEY CONTROL
(5) QUITCLAIM DEED 20060125 O.R. 1897



**NOTES:**
1. SHEET 2 IS AN INDEX SHEET AND SHOWS BEARINGS AND DISTANCES FOR THE SUBDIVISION EXTERIOR BOUNDARY.
2. FOR BASIS OF BEARINGS SEE SHEET 3 OF 8.
3. SHEET 3 OF 8 IS A DETAIL OF HOW THE PROPERTY WAS ESTABLISHED.
4. SHEET 4 OF 8 IS A DETAIL SHOWING THE LOCATIONS OF THE EXISTING EASEMENTS.
5. THE TOTAL AREA OF RIGHT-OF-WAY TO BE DEDICATED PER THIS MAP IS ±9.808 ACRES.
6. THE OWNER/DEVELOPER MUST DISCLOSE TO FUTURE/ POTENTIAL OWNERS THE EXISTING 21KV ELECTRICAL FACILITIES.
7. LOTS A, B & C SHALL BE GRANTED I.O.D. IN FEE TITLE TO THE CITY OF SACRAMENTO FOR PARK PURPOSES.
8. THE LOCATION OF THE GREAT WESTERN POWER COMPANY EASEMENT RECORDED IN BOOK 412 OF DEEDS AT PAGE 491 IS NOT DISCLOSED BY RECORD INFORMATION AND IS NOT SHOWN ON THIS MAP.
9. THE TOTAL AREA OF THIS SUBDIVISION IS ±66.114 ACRES.
10. ALL DISTANCES AND DIMENSIONS ARE IN FEET AND DECIMALS THEREOF.
11. THE FOLLOWING EASEMENTS FOR I.O.D. NOT SHOWN HEREON ARE HEREBY ABANDONED PURSUANT TO SECTION 66434(g) OF THE GOVERNMENT CODE:

75.5' PUBLIC UTILITY EASEMENT PER 800910 O.R. 795,
20' WIDE FIRE PROTECTION EASEMENT PER 800710 O.R. 983
25' X 75.5' UTILITY EASEMENT PER 800710 O.R. 983
PUBLIC ROAD AND UTILITY EASEMENT PER 20010330 O.R. 171
SLOPE EASEMENT PER 951229 O.R. 576

378-1-2



**FINAL MAP OF**

# TOWNSHIP 9 - PHASE 1

SUBDIVISION NO P10_036

PARCEL 9, 10, 11, 12, 13 AND A PORTION OF 15 OF 26 RS 28,
AND A PORTION OF S.L.S. 949 CITY OF SACRAMENTO, CALIFORNIA.
CITY OF SACRAMENTO, COUNTY OF SACRAMENTO, STATE OF CALIFORNIA.

OCTOBER 2012

**NOLTE**

2495 NATOMAS PARK DRIVE, FOURTH FLOOR,    SACRAMENTO, CA. 95833
916.641.8100 TEL.  916.641.0222 FAX    WWW.NOLTE.COM

SHEET 3 OF 8

**LEGEND**

- ○ DIMENSION POINT (NOTHING FOUND OR SET)
- ✕ FOUND MONUMENT AS NOTED
- ⬠ SET 3/4" REBAR WITH CAP STAMPED LS 8964
- ⊛ SET 1/2" DIA. X 2" MAG & WASHER LS 8964 PER CITY MANAGER DESIGNEE (16.44.050)
- ⊕ SET BRASS DISK IN MONUMENT WELL STAMPED LS 8964 PER CITY STANDARD
- I.O.D.   IRREVOCABLE OFFER OF DEDICATION
- E.P.E.   EXCLUSIVE PARK EASEMENT
- CL   CENTERLINE
- FND   FOUND
- (R)   RADIAL
- RT   REGIONAL TRANSIT

**REFERENCES**

(1) RECORD OF SURVEY 26 R.S. 28
(2) RECORD OF SURVEY 58 R.S. 4
(3) PARCEL MAP, 152 P.M. 8
(4) CITY OF SACRAMENTO SURVEY CONTROL
(5) QUITCLAIM DEED 20060125 O.R. 1897

**BASIS OF BEARINGS:**

THE BASIS OF BEARINGS OF THIS SURVEY IS IDENTICAL WITH THAT OF THE
CENTERLINE OF RICHARDS BOULEVARD, AS SHOWN ON THAT RECORD OF SURVEY
RECORDED IN BOOK 58 OFFICIAL SURVEYS, PAGE 4 SACRAMENTO COUNTY OFFICIAL
RECORDS. THE BEARING IS GIVEN AS NORTH 71°44'05" WEST.

378-1-3



FINAL MAP OF
# TOWNSHIP 9 - PHASE 1
SUBDIVISION NO P10_036
PARCEL 9, 10, 11, 12, 13 AND A PORTION OF 15 OF 26 RS 28,
AND A PORTION OF S.L.S. 949 CITY OF SACRAMENTO, CALIFORNIA.
CITY OF SACRAMENTO, COUNTY OF SACRAMENTO, STATE OF CALIFORNIA

OCTOBER 2012

## NOLTE
BEYOND ENGINEERING

2495 NATOMAS PARK DRIVE, FOURTH FLOOR,          SACRAMENTO, CA. 95833
916.641.9100 TEL  916.641.9022 FAX          WWW.NOLTE.COM

SHEET 4 OF 8

**LEGEND**

○  DIMENSION POINT (NOTHING FOUND OR SET)
▣  FOUND MONUMENT AS NOTED
∅  SET 3/4" REBAR WITH CAP STAMPED LS 8964
⊚  SET 1/2" DIA. X 2" MAG & WASHER LS 8964 PER CITY MANAGER DESIGNEE (16.44.050)
⊛  SET BRASS DISK IN MONUMENT WELL STAMPED LS 8964 PER CITY STANDARD
I.O.D.   IRREVOCABLE OFFER OF DEDICATION
E.P.E.   EXCLUSIVE PARK EASEMENT
CL      CENTERLINE
FND     FOUND
(R)     RADIAL
RT      REGIONAL TRANSIT

**EASEMENT NOTES:**

1. THE LOCATION OF THE GREAT WESTERN POWER COMPANY EASEMENT RECORDED IN BOOK 412 OF DEEDS AT PAGE 491 IS NOT DISCLOSED BY RECORD INFORMATION AND IS NOT SHOWN ON THIS MAP.

2. THE LOCATION OF THE TEMPORARY ACCESS EASEMENT RECORDED IN BOOK 20110428 OFFICIAL RECORDS AT PAGE 805 IS NOT DISCLOSED BY RECORD INFORMATION AND IS NOT SHOWN ON THIS MAP.

378-1-4



FINAL MAP OF
# TOWNSHIP 9 - PHASE 1
SUBDIVISION NO P10_036
PARCEL 9, 10, 11, 12, 13 AND A PORTION OF 15 OF 26 RS 28,
AND A PORTION OF S.L.S. 949 CITY OF SACRAMENTO, CALIFORNIA.
CITY OF SACRAMENTO, COUNTY OF SACRAMENTO, STATE OF CALIFORNIA

OCTOBER 2012

**NOLTE**
BEYOND ENGINEERING

2495 NATOMAS PARK DRIVE, FOURTH FLOOR, SACRAMENTO, CA. 95833
916.641.9100 TEL  916.641.9222 FAX
WWW.NV5.COM

SHEET 5 OF 8

LEGEND
○ DIMENSION POINT (NOTHING FOUND OR SET)
▣ FOUND MONUMENT AS NOTED
⊡ SET 3/4" REBAR WITH CAP STAMPED LS 8964
⊚ SET 1/2" DIA. X 2" MAG & WASHER LS 8964
　 PER CITY MANAGER DESIGNEE (16.44.050)
⊗ SET BRASS DISK IN MONUMENT WELL
　 STAMPED LS 8964 PER CITY STANDARD
I.O.D. IRREVOCABLE OFFER OF DEDICATION
E.P.E. EXCLUSIVE PARK EASEMENT
CL CENTERLINE
FND FOUND
(R) RADIAL
RT REGIONAL TRANSIT

SCALE: 1"=80'

378-1-5

This page is a survey/subdivision map.

FINAL MAP OF

# TOWNSHIP 9 - PHASE 1

SUBDIVISION NO P10_036

PARCEL 9, 10, 11, 12, 13 AND A PORTION OF 15 OF 26 RS 28,
AND A PORTION OF S.L.S. 949 CITY OF SACRAMENTO, CALIFORNIA.
CITY OF SACRAMENTO, COUNTY OF SACRAMENTO, STATE OF CALIFORNIA

OCTOBER 2012

## NOLTE

NOLTE ASSOCIATES ENGINEERING

2495 NATOMAS PARK DRIVE, FOURTH FLOOR,  SACRAMENTO, CA. 95833
916.641.9100 TEL   916.641.0222 FAX   WWW.NV5.COM

SHEET 6 OF 8

### LEGEND

○ DIMENSION POINT (NOTHING FOUND OR SET)
✖ FOUND MONUMENT AS NOTED
⚲ SET 3/4" REBAR WITH CAP STAMPED LS 8964
⊘ SET 1/2" DIA. X 2" MAG & WASHER LS 8964
   PER CITY MANAGER DESIGNEE (16.44.050)
⊗ SET BRASS DISK IN MONUMENT WELL
   STAMPED LS 8964 PER CITY STANDARD

I.O.D. IRREVOCABLE OFFER OF DEDICATION
E.P.E. EXCLUSIVE PARK EASEMENT
CL CENTERLINE
FND FOUND
(R) RADIAL
RT REGIONAL TRANSIT

### CURVE TABLE (THIS SHEET ONLY)

C1 R=369.67' L=318.27' Δ=49°19'47"
C2 R=555.33' L=176.38' Δ=18°11'50"
C3 R=350.00' L=332.13' Δ=54°22'18"
C4 R=575.00' L=182.62' Δ=18°11'51"
C5 R=235.00' L=176.62' Δ=43°03'45"
C6 R=200.00' L=144.75' Δ=41°27'59"
C7 R=165.00' L=123.87' Δ=43°03'43"
C8 R=200.00' L=142.29' Δ=40°45'48"
C9 R=575.00' L=182.62' Δ=18°11'51"
C10 R=575.00' L=167.26' Δ=16°40'00"
C11 R=575.00' L=15.36' Δ=01°31'50"
    CH=N84°44'52"E  15.36'
C12 R=282.82' L=8.86' Δ=01°47'44"
    CH=N00°55'54"W  8.86'
C13 R=282.82' L=58.43' Δ=11°50'15"
    CH=N04°59'14"E  49.51'

NORTH 5TH STREET

DESIGNATED REMAINDER 1
26.855 Ac GROSS
25.310 Ac NET

RIVERINE WAY

AMERICAN RIVER

LOT A
9.634 ACRES

I.O.D. FOR PARK
PURPOSES

LOT 1
2.895 AC GROSS
2.314 AC NET

LOT 2
1.923 AC GROSS
1.141 AC NET

LOT 3
SEE SHEET 5

VINE STREET

CHILL AVENUE

LOT B
6.249 AC GROSS
5.507 AC NET

I.O.D. FOR PARK
PURPOSES

NORTH 7TH STREET

378-1-6

# TOWNSHIP 9 - PHASE 1

FINAL MAP OF

SUBDIVISION NO P10_036

PARCEL 9, 10, 11, 12, 13 AND A PORTION OF 15 OF 26 RS 28,
AND A PORTION OF S.L.S. 949 CITY OF SACRAMENTO, CALIFORNIA.
CITY OF SACRAMENTO, COUNTY OF SACRAMENTO, STATE OF CALIFORNIA

OCTOBER 2012

## NOLTE

BEYOND ENGINEERING

2495 NATOMAS PARK DRIVE, FOURTH FLOOR,          SACRAMENTO, CA. 95833
916.641.9100 TEL  916.641.9222 FAX          WWW.NVS.COM

SHEET 7 OF 8

LEGEND

○  DIMENSION POINT (NOTHING FOUND OR SET)
▣  FOUND MONUMENT AS NOTED
◇  SET 3/4" REBAR WITH CAP STAMPED LS 8964
◉  SET 1/2" DIA. X 2" MAG & WASHER LS 8964
    PER CITY MANAGER DESIGNEE (16.44.050)
⊗  SET BRASS DISK IN MONUMENT WELL
    STAMPED LS 8964 PER CITY STANDARD

I.O.D.  IRREVOCABLE OFFER OF DEDICATION
R.I.O.D.  ROADWAY IRREVOCABLE OFFER OF DEDICATION
E.P.E.  EXCLUSIVE PARK EASEMENT
CL  CENTERLINE
FND  FOUND
(R)  RADIAL
RT  REGIONAL TRANSIT

SCALE: 1"=50'

LOT A
SEE SHEET 6

N77°31'16"W 148.19'

LOT B
6.249 AC GROSS
5.507 AC NET

I.O.D. FOR PARK
PURPOSES

PUBLIC UTILITY EASEMENT
(2012 1101 OR 1010)

RIVERINE WAY

N56°08'49"E
17.05'

N71°32'22"W
16.50'

DESIGNATED REMAINDER 2
6.916 AC GROSS
5.080 AC NET

LOT 2
SEE SHEET 6

N18°28'55"E 230.12'

N18°28'55"E 229.28'

R=101.00' L=41.68'
Δ=23°38'30"

N81°07'51"W
75.58'
51.96'

N8°52'09"E 59.53'

R=531.00' L=68.13'
Δ=07°30'33"

N71°37'18"W 395.69'

CENTERLINE OF 10' WIDE
WATERLINE EASEMENT
(881006 O.R. 1112)

(R.I.O.D.)

N71°38'10"W 605.46'

148.72'

N71°38'10"W 645.46'

496.74'

30' TEMPORARY
ACCESS EASEMENT
(20100730 O.R. 1343)

12' SMUD & PAC BELL EASEMENT (800710 O.R. 983)

I.O.D. FOR E.P.E.
(20120730 OR 052?)

SEE DETAIL K
SHEET 8 OF 8

SEE DETAIL H
SHEET 8 OF 8

I.O.D. FOR E.P.E.
(20120130 OR 052?)

N18°28'55"E 1389.31'
N18°28'55"E 1784.97' (MON TO MON)

NORTH 7TH STREET

LOT 3
SEE SHEET 5

PARCEL 1
(152 PM 8)
NOT A PART

PARCEL 2
(152 PM 8)
NOT A PART

PARCEL 3
(20060125 OR 1897)
NOT A PART

SEE SHEET 5

378-1-7

**FINAL MAP OF**

# TOWNSHIP 9 - PHASE 1

**SUBDIVISION NO P10_036**

PARCEL 9, 10, 11, 12, 13 AND A PORTION OF 15 OF 26 RS 28,
AND A PORTION OF S.L.S. 949 CITY OF SACRAMENTO, CALIFORNIA.
CITY OF SACRAMENTO, COUNTY OF SACRAMENTO, STATE OF CALIFORNIA

OCTOBER 2012

**NOLTE**
BEYOND ENGINEERING

2495 NATOMAS PARK DRIVE, FOURTH FLOOR,   SACRAMENTO, CA. 95833
916.641.9100 TEL   916.641.0222 FAX    WWW.NV5.COM

SHEET 8 OF 8

**LEGEND**
- ○ DIMENSION POINT (NOTHING FOUND OR SET)
- ● FOUND MONUMENT AS NOTED
- ⌀ SET 3/4" REBAR WITH CAP STAMPED LS 8964
- ⊗ SET 1/2" DIA. X 2" MAG & WASHER LS 8964 PER CITY MANAGER DESIGNEE (16.44.050)
- ⊞ SET BRASS DISK IN MONUMENT WELL STAMPED LS 8964 PER CITY STANDARD
- I.O.D. IRREVOCABLE OFFER OF DEDICATION
- E.P.E. EXCLUSIVE PARK EASEMENT
- RT REGIONAL TRANSIT
- CL CENTERLINE
- FND FOUND
- (R) RADIAL

DETAIL A (SHEET 3 OF 8) NOT TO SCALE

DETAIL B (SHEET 3 OF 8) NOT TO SCALE

DETAIL C (SHEETS 3 & 5 OF 8) NOT TO SCALE

DETAIL D (SHEETS 3 & 5 OF 8) NOT TO SCALE

DETAIL E (SHEET 3 OF 8) NOT TO SCALE

DETAIL F (SHEET 6 OF 8) (NOT TO SCALE)

DETAIL G (SHEET 6 OF 8) NOT TO SCALE

DETAIL H (SHEET 5 OF 8) NOT TO SCALE

DETAIL J (SHEET 5 OF 8) NOT TO SCALE

DETAIL K (SHEET 6 & 7 OF 8) NOT TO SCALE

SEE DETAIL H (SHEET 5 OF 8) NOT TO SCALE

SEE DETAIL J (SHEET 5 OF 8) NOT TO SCALE

LOT 1
LOT 2
LOT 3
LOT 8

RIVERINE WAY
NORTH 7TH STREET
NORTH 5TH STREET
RIVERINE WAY

BASIS OF BEARINGS

DESIGNATED REMAINDER 2

378-1-8

EXHIBIT C TO PURCHASE AGREEMENT

LIST OF DOCUMENTS

1.   All COAs and Design Review approvals;

2.   EIR – Executive Summary, Draft, Final and the related permits and mitigation; measures

3.   Any and all Development Agreements and any Amendments thereto;

4.   Any plans, maps, soils reports, including Phase I preliminary site assessments, biological survey assessments, plans, permits and other items in Seller's immediate possession;

5.   Any existing survey of the Property;

6.   A copy of Seller's title policy related to the Property;

7.   Copies of tax bills statements for the Property for tax years 2014, 2015 and 2016 relating to personal and ad valorem taxes and rental and special assessments;

8.   Copies of any and all environmental, soils, endangered species, traffic, and engineering studies and reports;

9.   Copies of any and all plats, site plans, elevations, topographical maps, surveys, tentative maps, draft final maps, improvement plans, landscape plans, utility designs, and architecture;

10.  Copies of any and all utility documents and agreements, management agreements, service and maintenance agreements and equipment leases;

11.  Copies of all permits and licenses;

12.  Any and all information regarding condemnation notice(s), proceedings and awards;

13.  Copies of all publicly recorded or filed financing, commitments, notes, bonds, mortgages, deeds of trust, financing statements and other indebtedness securing the Property;

14.  Copies of all Authority and third-party approvals related to the Property, including all approvals, permits, and authorizations necessary for development, construction, use or occupancy of the Property and the subdivision of the land, and all required public improvement agreements, easements, dedications or other similar agreements in connection with the Property; and

15.  Any additional information reasonably requested by Buyer pertaining to the proposed development of the Property in Seller's immediate possession.

EXHIBIT D TO PURCHASE AGREEMENT

FORM OF GRANT DEED

**RECORDING REQUESTED BY AND**
**WHEN RECORDED MAIL TO:**

Anthem United Homes, Inc.
3001 Douglas Blvd., Suite 200
Roseville, CA 95661

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## GRANT DEED

The Undersigned Grantor(s) Declare(s):
Documentary Transfer Tax is $_____; City Transfer tax is:$_____

[__] computed on full value of interest or property conveyed, or
[__] computed on full value less value of liens or encumbrances remaining at time of sale
[__] unincorporated area, or [__] City of _____
Tax Parcel No. – See Exhibit A hereto

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, _____, a _____ ("**Grantor**"), hereby grants to _____, a _____ ("**Grantee**"), the following real property located in the City of _____, County of _____, State of California ("**Property**"), as further described on Exhibit A attached hereto, together with all rights, privileges, easements and appurtenances held by Grantor, if any, appertaining to the Property. This conveyance is made subject to the lien of non-delinquent real property taxes and assessments and covenants, conditions, restrictions, easements, rights-of-way, servitudes, encumbrances and all other matters of record as of the date hereof, if any.

IN WITNESS WHEREOF, Grantor has executed this Grant Deed as of the date set forth below.

**GRANTOR:**        **[INSERT]**

By: _____

Its: _____

Date: _____

[Notary Acknowledgment on Next Page]

## CALIFORNIA ALL PURPOSE ACKNOWLEDGMENT

> *A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.*

STATE OF CALIFORNIA                    )

COUNTY OF _____            )

On _____, before me, _____,
Notary Public, personally appeared _____
_____
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


Signature:_____          (Seal)

Exhibit A to Grant Deed

Legal Description

[TO BE ATTACHED BY ESCROW HOLDER]

EXHIBIT E TO PURCHASE AGREEMENT

FORM OF FIRPTA AFFIDAVIT

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by CAPITOL STATION 65 LLC, a California limited liability company ("Seller"), the undersigned hereby certifies the following on behalf of Seller:

1.     Seller is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2.     Seller is not a disregarded entity as defined in § 1.1445-2(b)(2)(iii) of the Internal Revenue Code;

3.     Seller's U.S. employer identification number is _____; and

4.     Seller's office address is _____.

Seller understands that this certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Seller.

[ENTITY TO BE CONFIRMED],
a _____

By:      _____
Name: _____
Its:      _____

DATED: _____

EXHIBIT F TO PURCHASE AGREEMENT

FORM OF BILL OF SALE[1]

This ASSIGNMENT AND BILL OF SALE (this "**Bill of Sale**") is made as of _____, 2017, by CAPITOL STATION 65 LLC, a California limited liability company ("**Assignor**"), in favor of ANTHEM UNITED HOMES, INC., a Washington corporation ("**Assignee**"), pursuant to that certain Agreement of Purchase and Sale of Land and Joint Escrow Instructions, by and between Assignor and Assignee, dated _____, 2017 (the "**Purchase Agreement**").  This Bill of Sale is subject to the terms and provisions of the Purchase Agreement, and in the event of any inconsistency between the Purchase Agreement and this Bill of Sale, the terms and provisions of the Purchase Agreement shall control.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby sells, conveys, delivers, transfers and assigns to Assignee, without warranty of any kind, all of Assignor's right, title and interest in, to and under, and Assignee assumes all rights, duties and obligations under, any and all of the following items, only to the extent that they are related to that certain real property located in the City of Sacramento, County of Sacramento, State of California, which is more particularly described in the Purchase Agreement (the "**Land**"):

(a)     all zoning, use, occupancy, and operating permits, and all other Authority permits, licenses, approvals, applications, subdivision maps, entitlements, conditions of approval, Environmental Permits, certificates, rights and obligations under any development agreement, cost sharing agreements, environmental impact reports and mitigation monitoring programs, school fee mitigation agreements, building permits, development allocations, and development rights relating to the Land;

(b)     all utility and other permits relating to the Land;

(c)     all fee credits and license tax credits; all prepaid expenses, fees, and deposits applicable to the Land, and the right to any refunds thereunder or rebates thereof, including, without limitation, all refunds of utility deposits;

(d)     all plans and specifications for buildings, structures and fixtures located on the Land, whether existing or anticipated;

(e)     all tax and assessment protest actions and claims to seek reductions in the valuation of the Land for property tax purposes, and rights to prosecute same, for any period after the Closing Date, including, without limitation, all of Assignor's right, title and interest in and to all tax and assessment refunds or rebates now or hereafter payable for any period after the Closing Date.  Assignor shall not be responsible therefore or entitled to any refunds resulting therefrom.  Assignor agrees to cooperate with Assignee by executing such documents and providing to Assignee or the appropriate governing body or agency such items as Assignee or

---

[1] ***NOTE:  Bill of Sale to be revised to reflect and conform to terms of Sale Order.***

such governing body or agency may reasonably request, so as to facilitate Assignee's prosecution of tax and assessment protest actions and claims, provided such cooperation entails no material cost or expense to Assignor;

(f)     Assignor's rights to any warranties and indemnities received by Assignor from third parties affecting the Property conveyed at the Closing, and Assignor's rights and/or remedies under any contract it or its predecessors in interest may have with any design professionals, construction contractors, construction subcontractors, other contractors involved in the improvement of the lots, or other aspects of the physical improvement of the Property for claims, damage or losses directly related to the Property; and

(g)     All of Assignor's right, title and interest in and to the Intangible Property and entitlements (as such terms are defined in the Purchase Agreement);

(all of the above being referred to herein collectively as the "**Personal Property**").

Assignor covenants that, without cost or liability to Assignor, Assignor shall, at any time and from time to time upon written request therefor, execute and deliver to Assignee such documents and instruments as Assignee may reasonably request in order to fully assign, transfer and vest the Personal Property in Assignee.

The covenants, warranties and agreements of Assignor contained herein shall survive the consummation of the purchase and sale of the Land and the execution and delivery of the deed and this Assignment and Bill of Sale and shall not be merged thereby.

[SIGNATURES APPEAR ON THE FOLLOWING PAGE.]

The provisions of this Assignment shall be binding upon and shall inure to the benefit of the successors and assigns of Assignor and Assignee, respectively.

ASSIGNOR:

CAPITOL STATION 65 LLC,
a California limited liability company


By: _____

Name: _____

Title: _____

Date: _____


ASSIGNEE:

ANTHEM UNITED HOMES, INC.,
a Washington corporation


By: _____

Name: _____

Title: _____

Date: _____

EXHIBIT G TO PURCHASE AGREEMENT

ASSIGNMENT OF PLANS AND CONTRACTS

[TO BE PREPARED DURING DUE DILIGENCE PERIOD]

EXHIBIT H TO PURCHASE AGREEMENT

RIGHT TO USE ACKNOWLEDGEMENT


[TO BE PREPARED DURING DUE DILIGENCE PERIOD]

SCHEDULE 1 TO PURCHASE AGREEMENT

PARK WORK

[TO BE ATTACHED DURING DUE DILIGENCE PERIOD]

***Appendix 1.b*** *–*
*FIRST AMENDMENT TO PURCHASE*
*AND SALE AGREEMENT*
*(Township 9 – Townhouses)*

**FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT**
**(Township 9 - Townhouses)**

This First Amendment to Purchase and Sale Agreement and Joint Escrow Instructions, dated as of September 11, 2017 ("**Amendment**"), is entered into by and between CAPITOL STATION 65 LLC, a California limited liability company ("**Seller**"), and ANTHEM UNITED HOMES, INC., a Washington corporation ("**Buyer**").

## Recitals

A.  Buyer and Seller entered into that certain Purchase and Sale Agreement and Joint Escrow Instructions dated for reference purposes as of July 25, 2017 (**"Purchase Agreement"**), concerning the purchase and sale of that certain real and other property located in the City of Sacramento ("**City**"), County of Sacramento ("**County**"), State of California, located within the Seller's overall project commonly known as Township 9 ("**Overall Project**"), all as further described in the Purchase Agreement and described as the "Property" therein ("**Property**").

B.  Buyer and Seller desire to amend the Purchase Agreement pursuant to the terms and conditions of this Amendment.

NOW, THEREFORE, in consideration of the foregoing recitals, and the mutual covenants contained herein, the parties agree as follows:

## Agreement

1.  Definitions.  Except as otherwise provided herein, all capitalized terms set forth in this Amendment shall have the meaning given them in the Purchase Agreement.

2.  Effective Date.  The effective date of this Amendment shall be September 11, 2017 notwithstanding the date that either party hereto executes the same.

3.  Clarification of Obligations.  Article 10 of the Purchase Agreement is hereby amended by adding a new Section 10.13 thereto as follows:

> 10.13   Clarification of Obligations.  Buyer and Seller agree that:

> (a)   Buyer's Fee Credits; Quimby Credits.

>> Fee Credits.  Any and all fee credits generated as a result of work, activities or efforts performed or paid for by Buyer shall be the property of Buyer and shall not be part of the Fee Credits (which shall include Quimby Credits for purposes of this amendment); provided, however, to the extent Seller has credits applicable to the building permit fees, Buyer shall, to the maximum extent, first purchase or compensate Seller for the Fee Credits in accordance with the terms of the Purchase Agreement before utilizing credits earned by Buyer pursuant to this section, it being the intent of the Seller and Buyer to clarify that the

foregoing provisions not diminish the obligation of Buyer to purchase the Fee Credits as set forth in the Purchase Agreement.

Quimby Credits.   To the extent Seller has Quimby Credits available to be applicable against the mapping fees for Phase 2A, 2B and 3, then Buyer agrees to purchase such Quimby Credits in an amount ultimately approved by the City for transfer and assignment to Buyer and applicable to the mapping fees for the foregoing phases, which shall not in any event exceed the City's (or applicable agency's) calculation of the amount that may be assigned to Buyer for its mapping fees.  For clarity purposes, Seller is processing the map for Phase 1 and Seller is responsible for all fees related thereto.

(b)     Lot 12 Paseo.  Seller shall cause the abandonment of the paseo on Lot 12 no later than the Third Closing.

(c)     Sump Pump; Intersection.  As between Buyer and Seller, Seller shall be responsible for all obligations, liabilities and costs related to (1) any future sump pump obligations (specifically, those related to improvements to sump 111 as described in the River District finance plan) and for the completion of any and all drainage studies related to any such present or future sump pump obligations to the extent the same may be required or imposed by the City or any applicable governing agency with respect to the Overall Project, and (2) the reconstruction of the intersection at Richards Boulevard and N. 5th Street as may be required by the City which is currently described to be triggered and due upon the construction of 1,000 dwelling units or 1/3 of project trip generation.

(d)     Project Documents.  In the event that Buyer fails to complete the acquisition of the entirety of the Property not due to the default of Seller, Buyer shall promptly re-assign and re-transfer to Seller, at no expense to Seller, all documents, studies, reports, improvement plans, maps and any other documents related to the Property as well as any unspent Grant Funds and/or other rights and benefits related to the Property assigned or transferred to Buyer pursuant to this Agreement.

4.  <u>Timing of Phase 2</u>.  The Purchase Agreement is hereby amended to revise the timing of Phase 2 such that  Phase 2 shall now become Phase 2A and Phase 2B, and each shall be subject to the following terms:  (a) Phase 2A shall be comprised of parcels 7A, 7B, 16A and 16B, and the Close of Escrow on Phase 2A shall be on or before 12 months after the entry of the Sale Order, and (b) Phase 2B shall be comprised of parcels 6A, 6B and 12A, and the Close of Escrow on Phase 2B shall be on or before 24 months after the entry of the Sale Order.  All references to Phase 2 in the Purchase Agreement shall be deemed to refer to Phase 2A and Phase 2B, and the Closing for Phase 2 shall mean the Closing on each of Phase 2A and Phase 2B.  The subsequent phase deposit for Phase 2 as described in Section 3.2.6(a) of the Purchase Agreement shall be $200,000 for Phase 2A and $200,000 for Phase 2B, and the timing for the delivery of the same shall be adjusted based on the updated timing for Close of Escrow set forth herein.  Furthermore, <u>Exhibit A</u> to the Purchase Agreement shall be deemed to be revised as set forth in this paragraph, with all other terms to remain the same.

5.  <u>Notice of Approval</u>.  Upon full execution hereof, this Amendment shall also constitute Buyer's Notice of Approval under the Purchase Agreement.

6.  <u>Ratification</u>.  Buyer and Seller hereby agree that, except as provided in this Amendment, the Purchase Agreement is ratified, affirmed and remains in full force and effect and is incorporated herein by this reference.  Notwithstanding anything to the contrary contained in the Purchase Agreement, the express provisions of this Amendment shall control and govern as to any inconsistency or contradiction between the provisions of this Amendment and the provisions of the Purchase Agreement.

7.  <u>Recitals</u>.  The Recitals set forth in this Amendment are incorporated herein by this reference.

8.  <u>Counterparts</u>.  This Amendment may be executed in multiple counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument.

9.  <u>Electronic Signatures</u>.  In order to expedite the transaction contemplated herein, electronic or facsimile signatures may be used in place of original signatures on this Amendment.  Buyer and Seller intend to be bound by the signatures on the facsimile document or a document sent by electronic mail, are aware that the other party will rely on the facsimile signatures or electronic signatures, and hereby waive any defenses to the enforcement of the terms of this Amendment based on the use of a facsimile or electronic signature.

[Signatures on Next Page]

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the dates set forth below.

SELLER:

CAPITOL STATION 65 LLC,
a California limited liability company,
as Debtor and Debtor in Possession

By: _____

Name: SUNEET SINGAL

Title: CEO / CHAIRMAN

Date: 9/19/17

BUYER:

ANTHEM UNITED HOMES, INC.,
a Washington corporation

By: David Ragland

Name: DAVID RAGLAND

Title: V.P.

Date: 9/19/17

**Appendix 2** – TENTATIVE MAP FOR THE
TOWNSHIP NINE DEVELOPMENT



# Schedule 1.1.33 – MINIMUM PARCEL SALE PRICE

Plan Schedule 1.1.33
**MINIMUM PARCEL SALE PRICE**

| TMParcel No | Lot Size (Net Developable Acres) | Appraised Value (land only) | Release Price Ratio | Minimum Sale Price (land and fee credits) |
|---|---|---|---|---|
| 1 | 5.08 | $12,590,000 | 19.38% | $15,150,645 |
| 3A | 0.94 | $2,589,052 | 3.99% | $3,115,632 |
| 3B | 1.38 | $3,800,948 | 5.85% | $4,574,012 |
| 4 | 1.14 | $4,200,000 | 6.47% | $5,054,226 |
| 5A | 1.02 | $3,230,000 | 4.97% | $3,886,941 |
| 5B | 2.13 | $2,425,000 | 3.73% | $2,918,214 |
| 6A | 1.09 | $1,861,536 | 2.87% | $2,240,149 |
| 6B | 1.4 | $2,390,964 | 3.68% | $2,877,256 |
| 7A | 1.06 | $1,135,149 | 1.75% | $1,366,024 |
| 7B | 0.95 | $1,017,351 | 1.57% | $1,224,267 |
| 8A | 0.84 | $1,008,000 | 1.55% | $1,213,014 |
| 8B | 0.82 | $984,000 | 1.52% | $1,184,133 |
| 10A | 0.86 | $2,243,093 | 3.45% | $2,699,309 |
| 10B | 1.18 | $3,069,907 | 4.73% | $3,694,287 |
| 12A | 0.85 | $1,301,235 | 2.00% | $1,565,890 |
| 12B | 0.79 | $1,206,765 | 1.86% | $1,452,206 |
| 13 | 2.44 | $6,965,000 | 10.72% | $8,381,592 |
| 14 | 1.94 | $4,750,000 | 7.31% | $5,716,089 |
| 15A | 0.51 | $481,800 | 0.74% | $579,792 |
| 15B | 0.49 | $462,906 | 0.71% | $557,055 |
| 15C | 0.7 | $661,294 | 1.02% | $795,793 |
| 16A | 0.55 | $608,418 | 0.94% | $732,162 |
| 16B | 0.49 | $542,045 | 0.83% | $652,290 |
| 16C | 0.73 | $807,537 | 1.24% | $971,780 |
| 17 | 2.24 | $4,618,000 | 7.11% | $5,557,242 |
| | **31.62** | **$ 64,950,000.00** | **100%** | **$78,160,000** |