
**FILED**

JAN 08 2019

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In re | ) | Case No. 17-23627-B-11 |
| | ) | |
| CAPITOL STATION 65, LLC, a California Limited Liability Company, | ) | DC No. NH-3 |
| | ) | |
| Debtor(s). | ) | |
| ——————————————— | ) | |
| | ) | Case No. 17-23629-B-11 |
| In re | ) | |
| | ) | |
| CAPITOL STATION MEMBER, LLC, | ) | |
| | ) | |
| Debtor(s). | ) | |
| | ) | |
| ——————————————— | ) | |
| | ) | |
| In re | ) | Case No. 17-23628-B-11 |
| | ) | |
| CAPITOL STATION HOLDINGS, LLC, | ) | |
| | ) | |
| Debtor(s). | ) | |
| | ) | |
| ——————————————— | ) | |
| | ) | |
| In re | ) | Case No. 17-23630-B-11 |
| | ) | |
| TOWNSHIP NINE OWNERS, LLC, | ) | |
| | ) | |
| Debtor(s). | ) | |
| | ) | |
| ——————————————— | ) | |

**NOT FOR PUBLICATION**

**MEMORANDUM AND ORDER GRANTING MOTION TO APPROVE POSTPETITION FINANCING, GRANTING PRIMING LIEN, AND RELATED RELIEF**

Presently before the court is a motion by Capitol Station 65, LLC, Capital Station Member, LLC, Capitol Station Holdings, LLC, and Township Nine Owners, LLC, each a debtor and debtor in possession - collectively, "Debtors" - to approve postpetition

financing, grant a priming lien, and for related relief. An initial hearing on the motion was held on August 29, 2017. A final evidentiary hearing on the motion was held on December 11, 2017. Appearances at both hearings were noted on the record. This memorandum and order constitutes the court's final decision on the motion and its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a) applicable by Federal Rules of Bankruptcy Procedure 7052 and 9014(c).

**INTRODUCTION**

The Debtors request authorization to borrow up to an aggregate amount of $10,000,000.00 from Serene Investment Management, LLC, or its assigns ("Serene"), as postpetition debtor in possession financing (the "DIP Loan"). The Debtors also request authorization to grant Serene a super-priority administrative claim and a senior priming lien on substantially all real and personal property assets, including the real property comprising the development known as the Township Nine project which encompasses approximately 65 acres bound by North 5th Street on the west, North 7th Street on the east, Richards Boulevard on the south, and the American River on the north (the "Township Nine Property"). The Township Nine Property, and the Debtors' other personal property assets, are encumbered by a deed of trust held by Township Nine Avenue, LLC, which is the assignee of Copia Lending, LLC.[1] There are also additional encumbrances

---

[1] To avoid confusion, Township Nine Avenue, LLC, will be referred to by its former name, *i.e.*, Copia.

1   on the Township Nine Property.

2       Copia opposes the motion and the DIP Loan.  Copia filed an
3   initial opposition on August 15, 2017, and a supplemental
4   opposition on November 27, 2017.  The Debtors filed an initial
5   reply on August 22, 2017, and a supplemental reply on December 4,
6   2017.  The Unsecured Creditors' Committee also filed a position
7   statement on August 15, 2017, and it has expressed support for
8   both the motion and the DIP Loan.

9       At the conclusion of the August 29, 2017, hearing the court
10  granted the Debtors' motion on an interim basis and authorized
11  the Debtors to borrow up to $1,900,000.00 through December 8,
12  2017.  The borrowing date was subsequently extended to January 9,
13  2018, and the amount increased to $2,000,000.00 on a further
14  interim basis following the final evidentiary hearing held on
15  December 11, 2017.

16      As an initial matter, the court adopts and by this reference
17  incorporates herein its evidentiary rulings stated on the record
18  in open court on December 11, 2017, regarding objections to, and
19  the admissibility and admission of, the parties' direct testimony
20  declarations and exhibits.

21      The court also adopts and incorporates herein as its final
22  findings of fact and conclusions of law the tentative findings of
23  fact and conclusions of law stated on the record in open court on
24  August 29, 2017, as they pertain to the following sections of
25  Copia's initial opposition: (i) § III.A. (objection re: "end run"
26  around § 362(d)(3)); and (ii) § III.C. (objection re: use of the
27  proposed DIP Loan as a sub-rosa plan).  See Transcript, dkt. 128,
28  at 6:3-7:17 (re: § III.A.) and 10:12-11:13 (re: § III.C.).

- 3 -

1  Section III.F. of Copia's initial opposition, which pertains to
2  repayment of the DIP Loan, was addressed and sufficiently
3  resolved by the § 1125 "adequate information" disclosures made in
4  the context of the now-approved disclosure statement. <u>See</u> dkts.
5  175, 177, and 179.

6       In addition to valuation and adequate protection
7  determinations, that leaves §§ III.B., III.D., and III.E. of
8  Copia's initial opposition and the additional objections and
9  arguments in Copia's supplemental opposition.  Those matters are
10 addressed below.

11

12 **BACKGROUND**

13      As noted above, the Township Nine Property is a master
14 planned development that consists of approximately 65 gross acres
15 north of Downtown Sacramento.  The development includes
16 approximately 31.62 net developable acres.  Anthem United Homes,
17 Inc. ("Anthem") is under contract to buy 11.27 of the net
18 developable acres (land) for $17,677,000.00.  Anthem will also
19 assume $4,398,420.00 in infrastructure completion costs
20 associated with the land it is buying.  It is also buying fee
21 credits.

22      The Township Nine Property is a mixed-use, transit-oriented
23 development that does and will include high-density rental units
24 and for-sale housing, retail and office space, open space,
25 trials, and parks.  It includes 2,201 residential units
26 consisting of apartments, condominiums, hotel, hospitality, and
27 attached and detached townhouse projects.  It also includes up to
28 840,000 square feet of office space and 150,000 square feet of

retail space as well as 27 acres of parks and open space.  The
development is light rail accessible on the Green Line and
includes extensive footage along the American River and Twin
Rivers Bike Trail.  The project was entitled in August 2007, with
the tentative map amended in 2010 and again in 2017.

Copia holds a first deed of trust on the Township Nine
Property.  That deed of trust secures Copia's 2008 loan to the
Debtors in the original principal amount of $20,000,000.00.
Copia contends that as of December 11, 2017, the loan balance is
$46,787,543.00, exclusive of attorney's fees after May 24, 2017.
The Debtors dispute that amount.  Other encumbrances on the
Township Nine Property total approximately $597,154.00.

On December 11, 2017, the court heard several hours of
testimony by two appraisers:  Arthur E. Gimmy, President of AGI
Valuations ("AGI"), and Adam Bursch, Director of Appraisal with
Bender Rosenthal, Inc. ("BRI").  Both appraisers have extensive
education, training, and professional qualifications.  Both are
qualified as experts.

Mr. Gimmy testified for the Debtors.  Mr. Gimmy prepared an
appraisal which the Debtors submitted with their motion.  That
initial appraisal, dated March 29, 2016, concluded that as of
March 15, 2016, (i) the total appraised market value of the
Township Nine Property, with fee credits, was $78,160,000.00, and
(ii) the market value of the "as is" fee simple interest in the
Township Nine Property, without fee credits, was $64,950,000.00.

Mr. Gimmy also prepared an updated appraisal.  That updated
appraisal is dated October 2, 2017.  It relies on discounted
comparables from the Downtown, Midtown, and East Sacramento area

- 5 -

markets.  It concludes that, as of October 2, 2017, (i) the total appraised "as is" market value of the Township Nine Property, with fee credits (valued at $16,512,769.00) and less the cost to complete remaining infrastructure (estimated at $9,918,500.00) is $77,950,000.00 and (ii) the market value of the "as is" fee simple interest in the Township Nine Property exclusive of fee credits and reflecting the cost to complete the remaining infrastructure is $61,431,500.00 (the "AGI Appraisal").[2]

Mr. Bursch testified for Copia.  Mr. Bursch prepared an appraisal that Copia submitted with its initial opposition to the Debtors' motion.  That initial appraisal, dated May 26, 2017,

_____

[2]In addition to the March 2016 and October 2017 appraisals, Mr. Gimmy and AGI have a long history of valuing Township Nine Property for the Debtors' current and former owners, and for Copia.  Those valuations are as follows:

    (a)    an appraisal for Copia with a value date of January 2012 and market value opinion of $51,400,000.00;

    (b)    an appraisal for Nehemiah Corporation of America ("Nehemiah") with a value date of December 24, 2012, and market value opinion of $57,200,000.00;

    (c)    an appraisal for Nehemiah with value date of December 20, 2013, and market value opinion of $61,500,000.00;

    (d)    an appraisal for Nehemiah with a value date of December 31, 2014, and market value opinion of $64,950,000.00;

    (e)    an appraisal for Nehemiah with a value date of August 15, 2015, and market value opinion of $64,950,000.00 without fee credits and $78,160,000.00 with updated fee credit values; and

    (f)    an appraisal for Nehemiah with a value date of December 31, 2015, and market value opinion of $64,950,000.00 without fee credits and $78,160,000.00 with updated fee credit values.

The appraisal in ¶(a) was prepared directly for Copia.  The appraisals in ¶¶ (d) and (f) were prepared at Copia's request but paid for by Nehemiah.  BRI does not have a similar history of appraising the Township Nine Property.

concluded that as of December 31, 2016, the market value of the Township Nine Property, (i) <u>with fee credits</u>, was $27,100,000.00, and (ii) <u>without fee credits</u>, was $12,810,000.00.

Mr. Bursch also prepared an updated appraisal. That updated appraisal is dated September 26, 2017. It relies on no Downtown and Midtown comparables, and, instead, relies exclusively on comparables from West and East Sacramento and the River District neighborhood. It concludes that as of September 15, 2017, the Township Nine Property has a market value, (i) <u>with fee credits</u> (valued at $13,190,000.00) of $46,540,000.00, and (ii) <u>without fee credits</u> of $33,350,000.00 (the "BRI Appraisal").

A summary of the AGI and BRI Appraisals is as follows:

**AGI**

| Appraisal Date | Valuation Date | W/ Fee Credits | W/O Fee Credits |
|---|---|---|---|
| March 29, 2016 | March 15, 2016 | $78,160,000.00 | $64,950,000.00 |
| October 2, 2017 | October 2, 2017 | $77,950,000.00 | $61,431,500.00 |

**BRI**

| Appraisal Date | Valuation Date | W/ Fee Credits | W/O Fee Credits |
|---|---|---|---|
| May 26, 2017 | December 31, 2016 | $27,100,000.00 | $12,810,000.00 |
| September 26, 2017 | September 15, 2017 | $46,540,000.00 | $33,350,000.00 |

The updated AGI Appraisal and the updated BRI Appraisal, and their respective exhibits, were admitted into evidence and are the governing appraisals and exhibits for purposes of the December 11, 2017, final evidentiary hearing.

In addition to Messrs. Gimmy and Bursch, the court also heard expert testimony and received into evidence a report from Dean Wehrli, Senior Vice President, John Burns Real Estate Consulting, LLC, on behalf of the Debtors. Mr. Wehrli's testimony and report concerned the Downtown and Midtown

competitive market areas, the inclusion of the Township Nine
Property in those market areas, and the appropriate use of a
discount applicable to comparables from those market areas to
value the Township Nine Property.   Copia provided no similar
expert testimony independent of Mr. Bursch's opinion.   Alberto
Esquivel, Project Manager for Capitol Station 65, LLC, also
testified for the Debtors.   And the court admitted into evidence
a declaration of Robert Perkins for the limited purpose of
establishing the disputed amount of the debt owed to Copia.   The
testimony of these witnesses and the exhibits are discussed in
greater detail below.

Debtors' Exhibit Q was also admitted into evidence as
Copia's business record.   Exhibit Q consists of a number of Real
Estate Portfolio Reports in which Copia's agent, TDA Investment
Group, represented to its investor, Construction Laborers Pension
Trust for Southern California, historical values of the Township
Nine Property consistent with a number of AGI's prior appraisals
of the property.[3]   Those representations of value are as follows:

> (1)   $40,400,000.00 (land value) for the quarter ended
>         December 31, 2009:
>
> (2)   $51,400,000.00 for the quarters ended December 31,
>         2011; March 31, 2012; June 30, 2012; September 30,
>         2012; December 31, 2012:
>
> (3)   $57,200,000.00 for the quarters ended March 31,
>         2013; June 30, 2013; September 30, 2013:
>
> (4)   $61,500,000.00 for the quarters ended December 31,
>         2013; March 31, 2014; June 30, 2014; September 30,
>         2014:
>
> (5)   $64,950,000.00 for the quarters ended December 31,

---

[3]Mr. Gimmy testified that TDA is an agent of Copia.   His
testimony on that point was not disputed or rebutted.

2014; March 31, 2015; June 30, 2015; September 30, 2015: and,

(6)  $78,000,000.00+ for the quarters ended December 31, 2015; March 31, 2016; June 30, 2016; September 30, 2016; December 31, 2016; March 31, 2017; June 30, 2017.

Notably, the $51,400,000.00, $64,950,000.00, and $78,000,000.00 value representations are consistent with value conclusions in the AGI appraisals that were prepared for and requested by Copia as noted in footnote 2, supra.  Copia and/or its agent did not criticize or object to the methodology, assumptions, or ultimate value conclusions in any of AGI's prior appraisals of the Township Nine Property.

Valuation at this stage of the chapter 11 case is critical. It will determine whether the Debtors are able to borrow up to $10,000,000.00 from Serene and grant Serene a senior lien that primes Copia's existing deed of trust and all other encumbrances on the Township Nine Property.

Exercising their business judgment, the Debtors have selected Serene as their debtor in possession lender.  Without Serene, and the ability to grant Serene a super-priority administrative claim and senior priming lien, the Debtors could not obtain any credit or postpetition financing, unsecured or otherwise.  And the Debtors made diligent efforts to do so.

Early on, the Debtors engaged the assistance of Tim Eppler of COF Capital Partners.  Mr. Eppler is qualified in the area of real estate finance, including distressed lending and debtor in possession financing.  Mr. Eppler approached six potential lenders on the Debtors' behalf in an effort to procure postpetition debtor in possession financing.  The Unsecured

Creditors Committee also assisted in the search for other potential lenders.

All lenders that Mr. Eppler contacted requested a first priority and senior lien on the Debtors' assets. All lenders also offered interest rates that varied from 14% to 18%. Serene, on the other hand, offered a lower interest rate at 10% - which is actually lower than Copia's current 16% default rate. Serene also offered the Debtors terms more favorable than the other lenders contacted. For example, Serene offered the Debtors an option to convert the postpetition financing into postconfirmation financing (rather than the paying the DIP Loan in full on effective date). Serene also offered lower fees. And Serene agreed to terms for release prices for parcels of the Township Nine Property as they are sold.

**JURISDICTION**

Federal subject matter jurisdiction is founded on 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (L), (M), and (O). To the extent this is a matter that may ever be determined to be a matter that a bankruptcy judge may not hear and determine without consent, the parties have nevertheless consented to such determination by a bankruptcy judge. <u>See</u> 28 U.S.C. § 157(c)(2). Venue is proper under 28 U.S.C. § 1409.

**DISCUSSION**

I.   Valuation Analysis and Value Determination

    A.   Appraisal Standards

    Valuation of property in bankruptcy a case may be determined in various contexts and for different purposes throughout the case. Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship), 116 F.3d 790, 797 (5th Cir. 1997) (valuation issues arise in various contexts including establishing equity, adequate protection, and plan confirmation). In the context of the motion before the court, the court is asked to value the Township Nine Property for DIP Loan adequate protection purposes and for plan confirmation.

    Bankruptcy courts are given considerable flexibility in resolving valuation issues. Id. at 799; see also 4 COLLIER ON BANKRUPTCY ¶ 506.03[7], at 506-50 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010). Valuation of property is not an exact process. See Boyle v. Wells (In re Gustav Schaefer Co.), 103 F.2d 237, 242 (6th Cir.), cert. denied, 308 U.S. 579, 60 (1939) ("The valuation of property is an inexact science and whatever method is used will only be an approximation[.]"). In fact, courts are often greeted with conflicting appraisals and testimony, to which weight must be assigned depending upon credibility assessments. In re Smith, 267 B.R. 568, 572 (Bankr. S.D. Ohio 2001) ("Because the valuation process often involves the analysis of conflicting appraisal testimony, a court must necessarily assign weight to the opinion testimony received based on its view of the qualifications and credibility of the parties' expert witnesses."); In re Coates, 180 B.R. 110, 112 (Bankr.

D.S.C. 1995) ("The valuation process is not an exact science, and the court must allocate varying degrees of weight depending upon the court's opinion of the credibility of ... [the appraisal] evidence.").

A bankruptcy court is not bound by valuation opinions or reports submitted by appraisers, and may form its own opinion as to the value of property in bankruptcy proceedings. See In re Patterson, 375 B.R. 135, 144 (Bankr. E.D. Pa. 2007). Indeed, the Ninth Circuit has stated that a court may reject an appraisal or not credit it with any weight whatsoever when determining value. See Sammons v. C.I.R., 838 F.2d 330, 334 (9th Cir. 1988). And as one court in the Ninth Circuit explained:

> Complex factual inquires such as valuation require the trial judge to evaluate a number of facts: whether an expert appraiser's experience and testimony entitle his opinion to more or less weight; whether an alleged comparable sale fairly approximates the subject property's market value; and the overall cogency of each expert's analysis. Sammons v. Comm's of IRS, 838 F.2d 330, 333 (9th Cir. 1988); Ebben v. Comm's, 783 F.2d 906, 909 (9th Cir. 1986). The court does not necessarily abuse its discretion if it decides to reject an appraisal. Id.

In re Ahmed, 2011 WL 1004649, *2 (Bankr. N.D. Cal. 2011); see also In re Evans, 492 B.R. 480, 508 (Bankr. S.D. Miss. 2013) ("A court may accept an appraisal in its entirety, may choose to give weight only to portions of the appraisal, or may reject the appraisal altogether.").

An appraisal may be rejected as unreliable when it is based on assumptions that are fundamental to the appraiser's conclusion with no anchors to reality thereby rendering the assumptions fundamentally flawed. In re Diamond Beach VP, LP, 506 B.R. 701, 717-718 (Bankr. S.D. Tex. 2014). An appraisal may also be

- 12 -

1  rejected when its purpose is suspect.  See In re Hoosier Hi-
2  Reach, Inc., 64 B.R. 34, 38 (Bankr. S.D. Ind. 1986).  And
3  significantly, where only one of two competing appraisals is
4  based on relevant comparables the court may reject in its
5  entirety the other appraisal that is not.  See In re Jones, 2004
6  WL 298612, *2 (Bankr. C.D. Ill. 2004).  Indeed, "[a]ppraisals
7  that use comparable properties that are so dissimilar to the
8  subject property have been recognized as unreliable."  In re Pod,
9  560 B.R. 77, 83 (Bankr. E.D.N.Y. 2016) (citations omitted); see
10  also In re Brown, 289 B.R. 235, 238 (Bankr. M.D. Fla. 2003)
11  ("[T]he better reasoned approach is to review all of the proposed
12  comparables, including in its analysis only those that assist the
13  Court in its determination.").

14       B.   The Appraisals

15       The AGI Appraisal and the BRI Appraisal differ dramatically
16  with regard to the comparables that each uses to value the
17  Township Nine Property.  The AGI Appraisal relies on Downtown and
18  Midtown comparables whereas the BRI Appraisal excludes
19  comparables from those areas and relies on comparables from East
20  and West Sacramento and the River District neighborhood.  Mr.
21  Bursch testified that the comparables used to value the Township
22  Nine Property are the most important factor in each appraiser's
23  opinion of value.  The court agrees with that concept.  See In re
24  Wood, 2017 WL 562248, *5 (Bankr. D. N.H. 2017) ("If an appraiser
25  has chosen the 'wrong' comparable sales, i.e., properties that
26  are not actually comparable, then the adjustments an appraiser
27  makes to the comparable sales do not really matter.").

28       Substantial evidence supports the placement of the Township

1   Nine Property in the Downtown and Midtown market areas.  Colliers
2   International, an industry-leading global real estate company
3   with extensive knowledge and experience in commercial and
4   property development real estate, is cited throughout the BRI
5   Appraisal.  Colliers is a credible data source.  Colliers places
6   the Township Nine Property in the Central Sacramento submarket,
7   the Downtown/Midtown/East Sacramento retail submarket, and the
8   Downtown Sacramento office submarket.  Mr. Bursch also
9   acknowledged on cross-examination that the Township Nine Property
10  is in (and within) those Downtown and Midtown market areas.  And
11  he also acknowledged on cross-examination that the Township Nine
12  Property is within the same "CMA" - or "competitive market area"
13  which is defined as the geographic source of competitive real
14  estate supply - as the Downtown and Midtown market areas.  In
15  that regard, Mr. Bursch's latter acknowledgment is consistent
16  with Mr. Wehrli's expert testimony and report, which are credible
17  and which the court accords substantial weight.  Both place the
18  Township Nine Property in the same competitive market area as
19  Downtown and Midtown.

20       The categorical exclusion of Downtown and Midtown
21  comparables from the BRI Appraisal renders the BRI Appraisal
22  unreliable and internally inconsistent.  The BRI appraisal is
23  unreliable because Downtown comparables are relevant, if not
24  critical, to the determination of the value of the Township Nine
25  Property.  That means by excluding Downtown and Midtown
26  comparables the BRI Appraisal uses comparables that are too
27  dissimilar from the Township Nine Property and, in that regard,
28  it uses the wrong comparables.  That also means the analysis

1    applied to the comparables used in the BRI Appraisal really does
2    not matter.  The BRI Appraisal is also internally inconsistent,
3    and thereby inherently unreliable, because, on the one hand, the
4    appraisal and its author acknowledge that the that the Township
5    Nine Property is in (and within) the Downtown and Midtown market
6    areas and, at the same time, the appraisal excludes Downtown and
7    Midtown comparables.

8          Mr. Bursch gave several reasons in an attempt to justify the
9    exclusion of Downtown and Midtown comparables from the BRI
10   Appraisal.  However, the court finds and concludes that none of
11   those reasons are credible.

12         Mr. Bursch testified that he excluded Downtown and Midtown
13   comparables from the BRI Appraisal based on "surveys" - which
14   were actually free-form telephone conversations - that he
15   conducted with numerous "market participants."  Mr. Bursch
16   testified <u>on the witness</u> stand that he asked *each* market
17   participant with whom he spoke their opinion about comparisons
18   between the Downtown and Midtown market areas and the Township
19   Nine Property, and the use of the former as comparables for the
20   latter.  Mr. Bursch was then presented with his <u>deposition</u>
21   <u>testimony</u> where he was asked if he asked *each* "market
22   participant" whether Downtown and Midtown market areas should be
23   used as comparables for the Township Nine Property and his answer
24   during his deposition was a direct "No."

25         In short, Mr. Bursch's directly contradicted himself on a
26   critical point relevant to the appraisal process and the Township
27   Nine Property valuation analysis.  The court draws several
28   conclusions from Mr. Bursch's conflicting testimony.

First, and most important, Mr. Bursch's conflicting witness stand and deposition testimony weighs negatively on his overall credibility.

Second, if Mr. Bursch's witness stand testimony <u>is not true</u> and his deposition testimony is true, *i.e.*, he <u>did not</u> ask each "market participant" about the Township Nine Property in comparison to the Downtown and Midtown market areas, then it would appear that Mr. Bursch contradicted himself on the witness stand in an effort to justify the exclusion of Downtown and Midtown comparables from the BRI Appraisal by creating the false impression of a unanimous opinion among "market participants" that the Township Nine Property is not comparable to the Downtown and Midtown areas.

Third, if Mr. Bursch's witness stand testimony <u>is true</u> and his deposition testimony is not true, *i.e.*, he <u>did</u> ask *each* "market participant" with whom he spoke about the use (and exclusion) of Downtown and Midtown comparables for the Township Nine Property, then his opinion of value was unduly and prejudicially influenced. Mr. Bursch also testified that one of the "market participants" with whom he spoke is a competitor of the Debtors. As the Debtors' competitor that "market participant" would have a significant financial motive and business incentive to exclude the Township Nine Property from the Downtown and Midtown market areas and thereby influence a substantial reduction in the value of the Township Nine Property.

Mr. Bursch also testified that he excluded Downtown and Midtown comparables from his valuation analysis in the BRI Appraisal because the Township Nine Property does not have the

quality and concentration of amenities that are found in the
Downtown and Midtown areas. It is true that the Township Nine
Property offers fewer and different types of amenities than the
amenities found in the immediate Downtown and Midtown market
areas. For example, whereas Downtown and Midtown offer access to
bars, restaurants, grocery, retail, and entertainment the
Township Nine Property offers access to parks, trails, open
space, and river and light rail access. However, Mr. Bursch also
testified that no one amenity is more important than another and
the market does not distinguish between amenities because the
market does not have the granularity to differentiate in the
value of amenities. And if the market lacks the granularity to
distinguish between the value of different amenities then, as Mr.
Wehrli's expert testimony and report establish, it is more
appropriate and reliable to include, and then discount, Downtown
and Midtown comparables, as the AGI Appraisal does, rather than
to categorically exclude comparables from those areas, as the BRI
Appraisal does.

Including, and then discounting, Downtown and Midtown
comparables, rather than excluding those comparables altogether,
is also consistent with the "walkability" concept as it pertains
to the amenities that each area offers. Both appraisers
testified that "walkability" is an important consideration in the
context of amenities. "Walkability" was defined to include
access to amenities from within one-quarter to one mile. Mr.
Bursch acknowledged that the Township Nine Property is within one
mile of the central core of the central Downtown Sacramento
business district. That puts many of the amenities in the

Downtown and Midtown areas, including the Golden 1 Arena
according to Mr. Bursch, within "walkability" of the Township
Nine Property.  And that too undercuts Mr. Bursch's testimony
that the difference in the quality and number of amenities
between the Township Nine Property and the Downtown and Midtown
areas warrants a total exclusion of Downtown and Midtown
comparables rather than discounting comparables from those areas
in the valuation analysis.

Three additional factors also weigh heavily against the
reliability and credibility of the BRI Appraisal.

First, for a number of years Copia and/or its agent
represented to its investor values of the Township Nine Property
nearly identical to values established by AGI's prior appraisals
of the property.  In fact, at least three of those represented
values were established by AGI appraisals that Copia directed and
requested.  Placed in that context, the purpose of the BRI
Appraisal is suspect.  Copia only became an advocate for
appraisals that reduce the value of the Township Nine Property by
nearly two-thirds, and then by over one-half, after the Debtors
filed their chapter 11 petitions and moved to approve the DIP
Loan that requires a lien senior to its deed of trust.
Otherwise, Copia and/or its agent were more than willing to
accept substantially higher values and to continually represent
those substantially higher values to its investor without
questioning or criticizing AGI's concluded values or the
assumptions and methodologies that AGI used to establish the
concluded values.

Second, and along the same lines, in its quarter ended March

30, 2017, Copia and/or its agent represented to its investor that
the Township Nine Property was worth upwards of $78,000,000.00.
About two months later, at the end of May of 2017, Copia obtained
the first BRI appraisal that purported to value the Township Nine
Property at nearly one-third that amount with fee credits, *i.e.*,
$27,100,000.00, and substantially less without fee credits, *i.e.*,
$12,810,000.00.  Yet, for the quarter ended June 30, 2017, almost
a month after it obtained that first appraisal from BRI in May of
2017, Copia and/or its agent continued to represent to its
investor that the value of Township Nine Property remained at
upwards of $78,000,000.00 without any mention of the (first) May
2017 BRI appraisal.[4]  One conclusion easily drawn from that
course of conduct, and the apparent concealment of material
information from its investor, is that Copia and/or its agent did
not view the first BRI appraisal as a reliable valuation of the
Township Nine Property.  And if that's the case, why then should
the court view the (second) BRI Appraisal as a reliable valuation
of the Township Nine Property when the (second) BRI Appraisal is
merely an "update" of the first May 2017 appraisal.

    Third, there is a substantial variance in land values
between the first and second BRI appraisals.  The first BRI
appraisal values the Township Nine Property land, without fee
credits and as of December 31, 2016, at $12,810,000.00.  The
second BRI Appraisal values the Township Nine Property land,

_____

[4]Notably, the June 30, 2017, quarter end representation of
value is consistent with the value established by AGI's March
2016 appraisal which, in turn, is consistent with the December
31, 2015, appraisal that AGI prepared at the request of Copia
and/or its agent.

- 19 -

without fee credits and as of September 15, 2017, at

$33,350,000.00.  That is an increase in dollars of

$20,540,000.00.  And according to the court's math, that

translates to a 160.3435% increase in land value over a nine

month period.  That increase is not realistic.  Nor is it

consistent with the BRI Appraisal which reflects that between

December 2016 and September 2017 the Sacramento market

experienced a monthly appreciation of between 5% and 6%.

Assuming that Mr. Bursch's market appreciation analysis is

correct, at best, one would realistically expect a corresponding

increase in the land value of the Township Nine Property between

the first and second BRI appraisals of between 45% and 54% - not

160%.[5]  In that regard, not only is the BRI Appraisal unreliable,

but, it is unrealistic and therefore not credible.

     The AGI Appraisal, in contrast, relies on Downtown and

Midtown comparables.  And although it discounts those Downtown

and Midtown comparables, based on the court's conclusion that the

Township Nine Property is in (and within) the Downtown and

Midtown market areas, the court reiterates that it is more

reliable to value the Township Nine Property by using, and then

discounting, Downtown and Midtown comparables rather excluding

comparables from those markets altogether.  This approach is

consistent with and supported by Mr. Wehrli's expert testimony

and report and it is precisely what the AGI Appraisal does, i.e.,

it discounts Downtown and Midtown comparables used to value the

---

[5]Even the highest percentage of appreciation noted during
the time period is 95% which is still far below the 160% increase
in land value between the first and second BRI appraisals.

1  Township Nine Property.[6]

2      Finally, a word about the Anthem sale.  Copia's argument

3  regarding the Anthem sale and its effect on the AGI appraisal is

4  somewhat inconsistent.  Mr. Bursch testified that the Anthem sale

5  is a retail sale and the AGI Appraisal value is a bulk sale value

6  which means one does not compare to the other.  That differs

7  substantially from the argument Copia makes in its supplemental

8  opposition where it states as follows:

> The Anthem PSA is clearly a strong indicator of the
> value for the [Township Nine] Property.  It is a sale
> of a portion of the [Township Nine] Property.  It is
> recent, having been executed in July, 2017.  Both
> Anthem and Debtors are knowledgeable market
> participants.  The Anthem sale is a result of arm's
> length negotiation.  Debtors have represented to the
> bankruptcy court that [the] Anthem PSA is a market
> transaction.

14  Dkt. 225 at 7:27-8:3.  Copia cannot have it both ways.  And

15  although this may be a case of Copia's witness not supporting

16  Copia's argument, the argument that the Anthem sale is a relevant

17  indicator of value is nevertheless made.  Therefore, the court

18  will address it.

19      Anthem is purchasing 11.27 net developable acres for

20  $17,677,000.00 and assuming $4,398,420.00 in infrastructure

21  development costs for a total effective purchase price (not

---

[6]There is no evidence to suggest that the discount applied
in the AGI Appraisal is illogical or unreasonable.  Copia does
suggest in its supplemental opposition that some of the Township
Nine Property parcels were not discounted.  Copia notes that the
AGI Appraisal values Areas I & IV at an adjusted retail value of
$120.00 per square foot which it also notes is the same square
foot price for comparable C-3 Downtown parcels.  That is
incomplete.  Comparable C-3 Downtown parcels are valued at a
range of between $120.00 and $135.00 per square foot.  The
$120.00 adjusted retail valuation is at the lower end of that
range and is subject to further discounts overlooked by Copia.

including fee credits) of $22,075,420.00. The 11.27 net developable acres is 490,921 square feet which means, at least according to Mr. Bursch's testimony, the Anthem sale factors out to $45.00 per square foot.

The total square footage of the Township Nine Property considered is 1,377,367 square feet. That means: (i) at the $71,350,000.00 adjusted retail land value concluded in the AGI Appraisal the square foot price is approximately $51.80;[7] (ii) at the $61,431,500.00 land value (exclusive of fee credits and inclusive of estimated costs to complete infrastructure) concluded in the AGI Appraisal the square foot price is approximately $44.60; and (iii) at the court's adjusted land value of $59,114,105.00 (exclusive of fee credits and inclusive of adjusted costs to complete infrastructure) the square foot price is approximately $42.92.[8] In contrast, the concluded land value (exclusive of fee credits) in the BRI Appraisal is $33,350,000.00 which is approximately $24.21 per square foot.

The point is, if, as Copia asserts, the Anthem sale is a market sale and as a market sale it is indicative of the value of the Township Nine Property, see Tyner v. Nicholson (In re Nicholson), 435 B.R. 622, 634 (9th Cir. BAP 2010), *abrogation on*

---

[7]Copia maintains in its supplemental opposition that AGI Appraisal uses an $88.00 per square foot adjusted value which results in an overvaluation of the land. The $88.00 per square foot is an adjusted weighted average that is further discounted and adjusted down to to $51.80 per square foot. Copia fails to account for the additional adjustments.

[8]Of course, these are averages of entire property and there are some parcels that are more valuable than others. The parcels that Anthem is purchasing are not as valuable as some of the other Township Nine Parcels.

*other grounds noted*, <u>Ramirez v. Nationstar Mortgage, LLC</u>, 2016 WL
7189831 (9th Cir. BAP 2016), then it supports the land value
established by the AGI Appraisal and further undercuts the BRI
Appraisal's land value.  In other words, if anything, as to the
AGI Appraisal, the Anthem sale reinforces its reliability, and as
to the BRI Appraisal, the Anthem sale undercuts its reliability.

　　　In sum, the court finds and concludes that the Township Nine
Property is in (and within) the Downtown and Midtown market areas
and within the same area of competitive supply as those areas.
That means Downtown and Midtown comparables are relevant, if not
critical, to a reliable valuation of the Township Nine Property.
That also means the wholesale exclusion of Downtown and Midtown
comparables renders the BRI Appraisal, together with its
concluded value and valuation analysis, unreliable.

　　　The BRI Appraisal is also unreliable and not credible
because it includes assumptions that are either unfounded or
unsupported when tested against Mr. Bursch's cross-examination
testimony.  That includes its fee credit analysis discussed,
<u>infra</u>.

　　　And the purpose of the BRI Appraisal is also suspect when
considered in the context of these chapter 11 proceedings,
particularly, when Copia and/or its agent directed, requested,
accepted, and relied upon a number of prior AGI appraisals as the
source for representations to an investor without questioning or
criticizing the methodology, assumptions', and value conclusions
in those earlier AGI appraisals.

　　　Therefore, for all the foregoing reasons, the court rejects
the BRI Appraisal and gives it no weight in its valuation

- 23 -

analysis.   Instead, the court adopts and relies on the AGI
Appraisal as a reliable and credible valuation of the Township
Nine Property, subject to the adjustments noted below.

C.    Fee Credits

Now on to·fee credits.   In order to build on a parcel of
land a developer must obtain building permits.   The City of
Sacramento requires builders to pay various fees in order to
obtain building permits.   Fee credits reduce or eliminate fees
that a builder has to pay to acquire building permits.   Fee
credits are an additional asset that can be sold with and enhance
the value of the land.

The BRI Appraisal discounts the fee credits available to the
Township Nine Property and values those fee credits at a
discounted value of $13,190,000.00.   The AGI Appraisal, on the
other hand, values the Township Nine Property fee credits at face
value in the amount of $16,512.769.00.   Based on the evidence
presented, the court finds and concludes that valuation of the
fee credits associated with the Township Nine Property at face
value is more reliable.

Mr. Bursch testified that fee credits should be discounted
because in his opinion a developer would not pay 100% of the face
value of fee credits that are not used when purchased but,
instead, are used for development at some future point.   The
court gives no weight to that opinion for at least three reasons.

First, Mr. Bursch testified that his discounted fee credit
analysis is based on telephone conversations with "market
participants."   However, Mr. Bursch also testified that the
"market participants" with whom he had those telephone

conversations had no experience with fee credits and, in fact, never dealt with fee credits associated with any development.

Second, Mr. Bursch considered only fee credit decreases. He acknowledged that over time the value of fee credits may actually increase. And he also testified that he did not consider that potential for increase in his discount analysis.

Third, discounting fee credits conflicts with historical and real-world market data unique to the Township Nine Property. Fee credits associated with the Township Nine Property have now been sold twice in the recent past. They were sold for the construction associated with the Cannery Place apartment and they were sold with the Anthem sale. In both instances, the respective buyers paid, or have agreed to pay, face value for fee credits. That is significant with regard to the Anthem sale. It closes in phases, yet, Anthem is paying full face value for fee credits it will use sometime in the future.

Therefore, for the foregoing reasons and consistent with the AGI Appraisal, the court values fee credits associated with the Township Nine Property at $16,512,769.00.

D.   Cost to Complete Infrastructure

Costs of completion must be factored into valuation. The parties stipulated to a gross cost to complete infrastructure of $15,635,895.00. There are $3,400,000.00 in grants available to offset those costs. There is a dispute over whether $1,625,000.00 attributable to what is referred to as "Sump 111" should be treated as a grant or fee credit, or whether it should be included in or subtracted from the costs of completion. There is also a dispute over whether the infrastructure completion

costs of over $4,000,000.00 that Anthem has agreed to assume in its purchase of Township Nine Property parcels should likewise be included or deducted.

The "Sump 111" cost was not included as a fee credit in the AGI Appraisal so it will not be included here. The court also will not deduct from the stipulated gross costs to complete the infrastructure completion costs being assumed by Anthem. The Anthem sale has not closed and the infrastructure completion costs associated with that sale have not yet been assumed which means that, as of October 2, 2017, those costs remained the Debtors' obligation.

Therefore, the court finds and concludes that the net cost of completion is the stipulated $15,635,895.00 less the $3,400,000.00 existing grants which results in a net cost of completion of infrastructure of $12,235,895.00.

E.   <u>Determination of Value</u>

Having rejected the BRI Appraisal as unreliable and not credible, and having adopted the AGI Appraisal subject to the infrastructure completion cost adjustment, the court values the Township Nine Property as follows:

(i) the total "as is" market value, as of October 2, 2017, with fee credits and less the adjusted net costs to complete the remaining infrastructure of $12,235,895.00, is ($71,350,000.00 - $12,235,895.00 =) $59,114,105.00 plus $16,512,769.00 (value of fee credits) which is $<u>75,626,874.00</u>; and

(ii) the market vale of the "as is" fee simple interest, exclusive of fee credits and reflecting the cost to complete the remaining infrastructure, as of October 2, 2017, is $<u>59,114,105.00</u>.

II.  <u>Adequate Protection</u>

     Now to adequate protection.  The Ninth Circuit has held that a 20% equity cushion provides adequate protection.  <u>Pistole v. Mellor (In re Mellor)</u>, 734 F.2d 1396, 1401 (9th Cir. 1984) (relief from stay context).  In fact, case law almost uniformly holds that an equity cushion of at least 20% constitutes adequate protection.  <u>In re Holt</u>, 2010 WL 3294693, *6 (Bankr. D. Mont. 2010) (citing cases); <u>see also</u> <u>In re McKillips</u>, 81 B.R. 454, 458 (Bankr. N.D. Ill. 1987) (surveying the cases which show that an equity cushion of more than 20% is adequate but less than 11% is not).  The 20% threshold is applied to the use of cash collateral.  <u>In re McClure</u>, 2015 WL 1607365, *6 (Bankr. C.D. Cal. 2015).  And importantly, 20% is also the threshold that is applied to partially developed land.  <u>See</u> <u>In re C.B.G. Ltd.</u>, 150 B.R. 570, 573 (Bankr. M.D. Pa. 1992).

     The court assumes for purposes of its analysis that Copia is owed the disputed amount of $46,787,543.00.  Other encumbrances on the Township Nine Property total approximately $597,154.00.  Factoring in the proposed $10,000,000.00 DIP Loan, encumbrances against the Township Nine Property total approximately $57,384,697.00.  With a $75,626,874.00 valuation, at a minimum, there remains unencumbered equity $18,242,177.00.  That translates to an equity cushion of at least 24.12%.[9]  Therefore, the court finds and concludes that Copia's interest in, and all other encumbrances on, the Township Nine Property are adequately

_____

     [9]That amount is based on the disputed amount of Copia's claim.  Of course, to the extent the Debtors are able to reduce that claim amount the equity cushion increases.

- 27 -

1  protected.

2  III. <u>Copia's Remaining Objections</u>

3      A.   <u>DIP Loan Terms [Copia Obj. § III.B.]</u>

4      Copia objects to the terms of the DIP Loan as "outrageous."

5  The court disagrees.

6      Copia's objection centers primarily on the DIP Loan interest

7  rate.  Copia appears to complain that the effective interest rate

8  of 14% (which includes points, 10% otherwise) is too high given

9  an apparent lack of risk.  Copia cites <u>In re Tapang</u>, 540 B.R.

10  701, 707 (Bankr. N.D. Cal. 2015), apparently to suggest that the

11  applicable interest rate of the DIP Loan should be no more than a

12  5% cramdown rate.

13      Copia's reliance on <u>Tapang</u> is misplaced.  The 5% cramdown

14  rate in <u>Tapang</u> is a postconfirmation rate.  The rate here is a

15  postpetition, preconfirmation rate.  There is a difference in

16  that there is significantly more risk to a postpetition,

17  preconfirmation lender than there is to a postconfirmation lender

18  where risk is diminished by the stability of a confirmed plan.

19  <u>See In re MPM Sillicones, LLC</u>, 2014 WL 4436335, *27 (Bankr.

20  S.D.N.Y. 2014) (citing 7 COLLIER ON BANKRUPTCY, ¶ 1129.05[c][i]

21  (16th ed. 2014) ("[I]nstead of the interim and inherently more

22  uncertain risk present in debtor-in-possession financing, the

23  court, at confirmation, is presented with a less risky, more

24  stable and restructured debtor."), <u>aff'd</u>, 531 B.R. 321 (S.D.N.Y.

25  2015), <u>aff'd in part, rev'd in part, and remanded</u>, 874 F.3d 787

26  (2d Cir. 2017).  That additional preconfirmation risk justifies a

27  somewhat higher interest rate for postpetition, preconfirmation

28  financing.  <u>See Id.</u> ("[L]oans imposed at confirmation resemble

1   more traditional exit or long-term financing than interim

2   debtor-in-possession financing.").

3          Copia states the effective interest rate on the DIP Loan is

4   14%, the Debtors state it is 10%.  In either case, the DIP Loan

5   interest rate is below Copia's current 16% default rate.  And

6   although perhaps somewhat significant, the interest rate offered

7   by Serene is not outrageous.  See generally ABI Commission

8   Report: Proposed Amendments and Their Impact on Valuation, 031416

9   ABI-CLE 163 at n.56 (noting Lyondell Chemical Co.'s $8 billion

10  postpetition DIP financing facility which came with a 13%

11  interest rate and a 7% fee).  Moreover, as the bankruptcy

12  appellate panel stated in Official Committee of Unsecured

13  Creditors v. Bank of America (In re Fleetwood Enters., Inc.), 471

14  B.R. 319 (9th Cir. BAP 2012):  "In any extension of debt

15  financing under § 364, . . . [o]ften the debtor in possession

16  will be able to obtain only onerous terms, which the bankruptcy

17  court must balance against the debtor in possession's apparent

18  lack of alternatives."  Id., 2012 WL 2017952 at *11 (citing 3

19  COLLIER ON BANKRUPTCY ¶ 364.04[2][d] (Alan N. Resnick & Henry J.

20  Sommer, eds., 16th ed. 2011)).

21         Here, there are no better alternatives for the Debtors.  The

22  Debtors made diligent and good faith efforts to obtain

23  postpetition financing on the best terms possible.  The Debtors

24  presented evidence at the initial August 29, 2017, hearing that

25  they discussed postpetition debtor in possession financing with

26  numerous other potential lenders.  The Unsecured Creditors

27  Committee also assisted in a search for other potential lenders.

28  And while other potential lenders offered the Debtors interest

rates between 14% and 18%, their repayment terms and fees were less favorable than the terms and fees offered by Serene.  The point is, when balanced against favorable terms, the DIP Loan interest rate does not render the terms of the DIP Loan "outrageous" as Copia contends.  Therefore, Copia's objection to the DIP Loan on this basis is overruled.

        B.   <u>Violation of the Bankruptcy Code's Priority Scheme.</u>
            <u>[Copia Obj. § III.D.]</u>

Copia next objects to the Debtors' use of loan proceeds from the DIP Loan to pay administrative expenses, including attorney's fees, operating expenses, and claims.  Copia contends that proposed use of loan proceeds from the DIP Loan violates the Bankruptcy Code's priority scheme because the DIP Loan is effectively a disposition of its collateral which means it must be paid before any administrative expenses and, further, administrative expenses may only be paid from the proceeds of its collateral if the requirements of § 506(c) are met.  The court disagrees.

In <u>In re Olde Prairie Block Owner, LLC</u>, 448 B.R. 482 (Bankr. N.D. Ill. 2011), the court concluded that even if a priming lien granted to secure postpetition financing was tantamount to the disposition of an existing secured creditor's collateral thereby making the loan proceeds cash collateral those loan proceeds could nevertheless be used to pay administrative expenses because the secured creditor was adequately protected by a substantial equity cushion.  <u>Id.</u> at 496-97.  Stated another way, the court recognized that § 506(c) is inapplicable to proceeds of financing obtained from unencumbered equity under § 364(d) even if the loan

proceeds are or are tantamount to cash collateral under § 363 so long as there is adequate protection.  In that regard, Olde Praire is consistent Sec. Leasing Partners, LP v. ProAlert, LLC (In re ProAlert, LLC), 314 B.R. 436 (9th Cir. BAP 2004), which the court finds instructive and persuasive.

In ProAlert, the BAP considered whether a bankruptcy court may allow the use of cash collateral pursuant to § 363 without considering whether the requirements for a § 506(c) surcharge were met.  The debtor moved to use cash collateral to pay operating expenses, attorney fees, a valuation expert, and an accountant.  The secured creditor consented to the use of cash collateral to pay the operating expenses but not for professional fees, and argued that the debtor was seeking to use a cash collateral motion brought under § 363 to effectuate a surcharge under § 506(c).  In its order approving the use of cash collateral, the bankruptcy court wrote that "[a]nalytically, if the creditor's interest is adequately protected, then, by definition, there is no surcharge and section 506(c) does not come into play."  Id. at 439.  The BAP affirmed, holding that even if the requirements of § 506(c) are not met, a debtor may nevertheless use the cash collateral for administrative expenses so long as a secured creditor whose cash collateral is being used is adequately protected.  Id. at 444–45; see also In re Gen. Auto Bldg., LLC, 2012 WL 6737741, at *2 (Bankr. D. Or. 2012) ("Debtor seeks to pay its appraiser from [the lender's] cash collateral, which is governed by § 363, not § 506(c). Section 363 requires adequate protection, not benefit to the creditor.") (internal citation omitted).

1    Like Old Praire, here, the Debtors seek to use the
2    unencumbered equity in the Township Nine Property as collateral
3    for the DIP Loan.  Even if that makes the DIP Loan tantamount to
4    a disposition of Copia's collateral, and the loan proceeds cash
5    collateral as Copia has argued and as the court opined during the
6    August 29, 2017 hearing, existing encumbrances on the Township
7    Nine Property, Copia's included, are adequately protected.
8    Consistent with ProAlert, that means loan proceeds from the DIP
9    Loan may be used to pay ongoing expenses in the administration of
10    the estate without regard to § 506(c).  The use of proceeds from
11    the DIP Loan in that manner does not violate the Bankruptcy
12    Code's priority scheme.  Therefore, Copia's objection to the
13    Debtors' motion on these grounds is overruled.

14        C.   Proposed Budget is Woefully Deficient [III.E.]

15        Copia's objection to the Debtors' proposed budget focuses on
16    the absence of any explanation of the development costs and the
17    Debtors' budget allocation for the payment of attorney's fees.
18    The latter is addressed above and the former is resolved by the
19    parties' stipulation regarding the costs of completion admitted
20    into evidence for purposes of the December 11, 2017, evidentiary
21    hearing.  Therefore, this objection to is overruled.

22    IV.   § 364(c) & § 364(d) Requirements

23        As explained above, the court is persuaded that the Debtors
24    diligently attempted and were unable to obtain credit or secure a
25    loan, unsecured or otherwise, and they could not do so in the
26    absence of the Serene DIP Loan.  And as is also explained above,
27    all interests in the Township Nine Property, Copia's included,
28    are adequately protected.  Therefore, the court finds and

- 32 -

1  concludes that the statutory requirements of § 364(c) and §
2  364(d) are satisfied.

3  V.    § 364(e) Requirements

4       The terms of DIP Loan are at least as favorable to the
5  Debtors as those available from alternative sources the Debtors
6  diligently pursued.  The DIP Loan was negotiated in good faith
7  and is an arm's length transaction between a sophisticated
8  lender, on the one hand, and a significant market participant and
9  real estate developer, on the other hand.  The Debtors' selection
10  of Serene as its postpetition lender for the DIP Loan reflects
11  the Debtors' valid and legitimate exercise of prudent business
12  judgment consistent with their fiduciary duties, the loan terms
13  are fair and reasonable under the circumstances, and the loan and
14  its terms are enforceable in accordance with applicable law.  The
15  credit extended to the Debtors by Serene under the terms of the
16  DIP Loan shall therefore be deemed to have been extended in good
17  faith as that term is used in § 364(e) and Serene, and its
18  assigns, shall have protections of Bankruptcy Code § 364(e).

19

20  **CONCLUSION**

21       Therefore, based on the foregoing and for all the foregoing
22  reasons;

23       IT IS ORDERED that the Motion to Approve Postpetition
24  Financing, Grant Priming Lien, and Related Relief filed on August
25  1, 2017, at dkt. 59, is, on a final basis, **GRANTED**.

26       IT IS FURTHER ORDERED that the Debtors are authorized to
27  borrow up to an aggregate of $10,000,000.00, on the terms set
28  forth in the DIP Credit Agreement.

- 33 -

1    IT IS FURTHER ORDERED that the Debtors are authorized to

2 make the expenditures of funds consistent with this memorandum

3 and order and the motion.

4    IT IS FURTHER ORDERED that Serene and/or its assigns shall

5 have and are hereby granted a super-priority administrative claim

6 under 11 U.S.C. §§ 507(b) and 364(c)(1) and a senior and first-

7 priority priming lien under 11 U.S.C. § 364(d) on the Debtors'

8 real and personal property assets (subject the defined Carve-Out)

9 generally and, in particular, on the Township Nine Property.

10    IT IS FURTHER ORDERED that Serene, and its assigns, shall be

11 and hereby are entitled to the protections of 11 U.S.C. § 364(e).

12    IT IS FURTHER ORDERED that the continued hearing set for

13 January 9, 2018, at 2:00 p.m. is **VACATED**.  The matter is removed

14 from calendar and no appearances are necessary.

15    Dated:  January 8, 2018.

16

17    _____

18    UNITED STATES BANKRUPTCY JUDGE

19

20

21

22

23

24

25

26

27

28

- 34 -

INSTRUCTIONS TO CLERK OF COURT
SERVICE LIST

The Clerk of Court is instructed to send the attached document, via the BNC, to the following parties:

Gregory C. Nuti
411 30th Street, Suite 408
Oakland CA 94609

Donald W. Fitzgerald
400 Capitol Mall #1750
Sacramento CA 95814

David M. Meegan
11341 Gold Express Dr #110
Gold River CA 95670

Marc A. Levinson
400 Capitol Mall #3000
Sacramento CA 95814-4407

Sheryl N. Patterson
915 I St 4th Fl
Sacramento CA 95814

Jamie P. Dreher
621 Capitol Mall 18th Fl
Sacramento CA 95814

Randy Michelson
220 Montgomery Street, Suite 2100
San Francisco CA 94104

Allen C. Massey
501 I St #7-500
Sacramento CA 95814

Randy P. Orlik
2029 Century Park East, # 2100
Los Angeles CA 90067